TROUTMAN SANDERS LLP
875 Third Avenue
New York, New York 10022
Tel: (212) 704-6000
Fax: (212) 704-6288
Aurora Cassirer
Brett D. Goodman
Alissa K. Piccione
Aurora.Cassirer@troutman.com
Brett.Goodman@troutman.com
Alissa.Piccione@troutman.com

*Proposed Counsel to the Plaintiff*
*The D&M Capital Group, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In re:

THE D&M CAPITAL GROUP, LLC,

                         Debtor.

Chapter 11

Case No. 19-11711(SCC)

------------------------------------------------------------------X

THE D&M CAPITAL GROUP, LLC,

                         Plaintiff,

-against-

ESSEX GLOBAL TRADING, LLC, ALEKS PAUL, and "JOHN DOES," said names being fictitious and unknown,

                         Defendants,

-and-

RADWAN DIAMOND & JEWELLERY TRADING, ULTIMATE DIAMOND CO., S.B. DIAMOND CORP., PALAWAN HOLDINGS LIMITED, and GEMCUT S.A.,

                         Nominal Defendants.

Adv. Pro. No. 19-01300 (SCC)

**AMENDED**
**COMPLAINT**

------------------------------------------------------------------X

The D&M Capital Group, LLC (the "<u>Debtor</u>" or the "<u>Plaintiff</u>"), as debtor and debtor-in-possession in the above-captioned chapter 11 case, and as the Plaintiff in the above-captioned adversary proceeding, files this amended complaint (the "<u>Amended Complaint</u>") for declaratory judgment, turnover of estate property, and other relief against Essex Global Trading, LLC ("<u>Essex</u>"), Aleks Paul ("<u>Paul</u>" and, with Essex, the "<u>Essex Defendants</u>"), and certain unknown parties (collectively, the "<u>John Doe Defendants</u>"). In support of the Amended Complaint, the Plaintiff alleges as follows:

<u>**THE NATURE OF THE ADVERSARY PROCEEDING**</u>

1.      Through artifice and fraud, the Essex Defendants currently possess or have disposed property of the Debtor's estate under § 541 of the Bankruptcy Code. And despite several demands for its return, the Essex Defendants have yet to restore possession of this property to the Debtor.

2.       Shortly before filing for bankruptcy, the Debtor consigned to Essex certain precious stones and fine jewelry (hereinafter defined as the "<u>Precious Stones</u>"),[1] which the Debtor owns or in which the Debtor has a financial interest. The consignment memos evidencing the transfers expressly provide that title to the Precious Stones shall remain with the Debtor, and the Precious Stones must be returned on demand. The memos also prohibit Essex, as consignee, from selling or otherwise disposing of the Precious Stones, unless the Debtor agrees to the disposition, and Essex has received an invoice for the Precious Stones from the Debtor.

3.      Although Essex's possession of almost all the Precious Stones was initially lawful when consigned, that possession became unlawful once the Debtor made its first demand for return, and the Essex Defendants refused to comply.

---

[1] *See* Allegations Common to All Counts *infra* ¶¶ 23–46.

4. Upon information and belief, the Essex Defendants are refusing to return the Precious Stones, which are worth over $17,030,000.00, as "protection" against the risk of non-payment on an unsecured, $6,500,000.00 debt, which is allegedly owed by the Plaintiff in connection with a series of loans unrelated to the consigned Precious Stones.

5. Neither of the Essex Defendants were granted a security interest in any of the Precious Stones. Thus, there is no basis for the Essex Defendants to claim possession of the Precious Stones or sell them and, in doing so, the Essex Defendants have stolen property from the Debtor's estate.

6. Even if the Essex Defendants had a lien on the Precious Stones—which they do not—the value of the Precious Stones is far greater than the alleged $6,500,000.00 loan balance.

7. More than that, the underlying, high-interest loans that Essex made to the Debtor are predatory loans. If the Debtor owes an outstanding debt to Essex, that is only because Paul used scare tactics to coerce the Debtor into continuing to borrow on such one-sided terms. Under these circumstances, it would be extremely inequitable to permit the Essex Defendants to make themselves whole before the estate's other creditors.

8. For the benefit of its creditors and other parties in interest, the Debtor brings this action to obtain a judgment declaring that the Precious Stones are property of the estate. The Defendants have yet to return the Precious Stones. The Precious Stones will likely play a key role in the Debtor's plan negotiations, so their return in kind or payment equal to their value is critical to the Debtor's successful reorganization.

9. Under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and, as applicable, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Code"), the Debtor also interposes claims for turnover; avoidance of preferences and transfers;

disallowance of claims; subordination of claims; and a permanent injunction. The Debtor also seeks damages based on numerous New York state law causes of action, including fraudulent inducement and unjust enrichment.

## THE BANKRUPTCY CASE

10.     On May 28, 2019 (the "Petition Date"), the Debtor filed a voluntary pursuant to chapter 11 of Bankruptcy Code and has continued in possession of its property and management of its business affairs as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

11.     No official committee of unsecured creditors, trustee, or examiner has been appointed in the chapter 11 case.

12.     The Debtor is a representative of its estate with the capacity to sue and be sued pursuant to § 323 of the Bankruptcy Code.

13.     This action is maintained by the Debtor in its capacity as a debtor-in-possession and as statutory trustee pursuant to § 1107 of the Bankruptcy Code, which vests in the debtor-in-possession all the duties and powers of a trustee.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. §§ 157(b).

15.     The Debtor consents to the entry of a final order by the Court in this adversary proceeding if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the U.S. Constitution.

16.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE PARTIES**

*The Plaintiff*

17.     The Plaintiff was organized in 2006 and is located at 592 Fifth Avenue, New York, New York. The Plaintiff specializes in buying and selling high-end diamonds and other precious stones and jewelry throughout the world.

*The Essex Defendants*

18.     Upon information and belief, Essex is a New York limited liability company organized under the laws of the State of New York, with a principal place of business at 580 Fifth Avenue, 21st Floor, New York, New York 10036, which is engaged in lending funds at extremely high interest rates and buying and selling of diamonds.

19.     Upon information and belief, Paul is the sole owner and principal of Essex.

20.     Upon information and belief, Paul is also a convicted felon who has reportedly traded in stolen goods.

*The John Doe Defendants*

21.     Upon information and belief, either or both the Essex Defendants may have transferred one or more of the Precious Stones to one or more third parties. As of the date of this Amended Complaint, the Plaintiff does not know the identity of these third parties, if any.

*The Nominal Defendants*

22.     Radwan Diamond & Jewellery Trading ("Radwan"), S.B. Diamond Corp. ("SB"), Ultimate Diamond Co. ("Ultimate"), Palawan Holdings Limited ("Palawan"), and GemCut S.A. ("GemCut" and, with Radwan, SB, Ultimate, and Palawan, the "Nominal Defendants") are named solely as nominal defendants because of their respective, asserted interests in the Precious Stones that are the subject of this adversary proceeding.

## ALLEGATIONS COMMON TO ALL COUNTS

A.    *The Plaintiff purchased the Precious Stones with the participation of the Nominal*
      *Defendants.*

23.    In the ordinary course of its business, the Plaintiff, from time to time, (a) purchases diamonds, loose stones, or finished jewelry with the participation of third parties, like the Nominal Defendants, or (b) receives diamonds, other loose stones, or finished jewelry "on memo", i.e., consignment from various jewelry wholesalers for sale to third parties or consigns memo goods to other dealers in the trade.

24.    In the case of third-party participation, a participant expects and bargains for the right to receive the percentage of the net purchase price received by the Plaintiff for the sale of the goods in the percentage amount provided by the participant to the Plaintiff. In the case of consignment, the consignor expects to receive the consignment price stated on the memo or, if accepted by the consignor, the price agreed to with the Plaintiff upon the Plaintiff's resale of goods to a third party. These practices are ordinary and common in the diamond and precious stone industry.

### *Item JR0182*

25.    On or about August 6, 2008, the Plaintiff purchased a "Class JR0182 – One PL Ring with 23.38 CTS, KASHMIR SAPPHIRE WITH (2) BLTS 0.89 AND 0.83 CTS JR0182" ("Item JR0182" or the "Kashmir Sapphire") from Brachfeld Gems for $1,850,000.00. Attached as Exhibit "A" is a copy of the invoice from Brachfeld Gems to the Plaintiff for the Kashmir Sapphire.

26.    The Plaintiff, Ultimate, and Benma Diamonds Ltd. ("Benma") each financed one-third of the purchase price with the understanding that they would each have a one-third claim to (a) the Sapphire Ring until resold, and (b) the net proceeds received upon resale. Attached as

Exhibit "B" are copies of the invoices from the Plaintiff to Ultimate and Benma for their interests in the Kashmir Sapphire.

27.     On February 22, 2010 and May 2, 2014, the Plaintiff purchased from Benma and Ultimate, respectively, their one-third interests in the Kashmir Sapphire. Attached as Exhibit "C" are copies of the bill and invoice from Benma and Ultimate, respectively, to the Plaintiff.

28.     On May 5, 2014 and July 9, 2014, the Plaintiff sold a one-third interest in the Kashmir Sapphire to Radwan and a one-third interest to SB, with the understanding that they would each have a one-third claim to (a) the Kashmir Sapphire until resold, and (b) the net proceeds received upon resale. Attached as Exhibit "D" are copies of the invoices from the Plaintiff to Radwan and SB for the Kashmir Sapphire.

29.     By memo dated February 26, 2019, a copy of which is attached as Exhibit "E", SB consigned the Kashmir Sapphire to the Plaintiff.

30.     Because of that consignment, the Plaintiff is authorized by SB and Radwan to deal with the Kashmir Sapphire, consign it to others, and attempt to obtain customers to purchase it.

### *Item DM2950*

31.     On or about November 19, 2015, the Plaintiff successfully bid on a "CLASS DM2950 10.51 PS FDORPK VS1" ("Item DM2950") at a Sotheby's auction for $2,170,000.00. Attached as Exhibit "F" is a copy of the invoice from Sotheby's to Ultimate for Item DM2950.

32.     Ultimate invoiced the Plaintiff for two-thirds of the purchase price, and the Plaintiff then invoiced Radwan for one-third of the purchase price for Item DM2950. Thus, simultaneously with the original purchase or shortly thereafter, the three participants holding equal one-third interests in Item DM2950 were the Plaintiff, Ultimate, and Radwan. The invoices from Ultimate to the Plaintiff and the Plaintiff to Radwan for Item DM2950 are attached as Exhibit "G".

33.     Radwan consigned Item DM2950 to the Plaintiff. Because of that consignment, the Plaintiff is authorized to deal with Item DM2950, consign it to others, and attempt to obtain customers to purchase it.

*Item JR0280*

34.     On or about February 15, 2018, the Plaintiff purchased "Item No. JR0280 - YG Diamond Ring with SE 10 02CT FVY VS2 Set with FYI Melee 2 15 CT TW" ("Item JR0280") from H.M.S. Diamonds Ltd. ("H.M.S.") for $825,000.00. Attached as Exhibit "H" is a copy of the invoice from H.M.S. to the Plaintiff for Item JR0280.

35.     The Plaintiff and SB each financed one-half of the purchase price of Item JR0280 with the understanding that they would each have a one-half claim to (a) Item JR0280 until resold, and (b) the net proceeds received upon resale. Attached as Exhibit "I" is a copy of the invoice from the Plaintiff to SB for SB's fifty-percent (50%) share.

36.     SB consigned Item JR0280 to the Plaintiff. Attached as Exhibit "J" is a copy of the memo consigning the stone in Item JR0280 to the Plaintiff. Because of that consignment, the Plaintiff is authorized to deal with Item JR0280, consign it to others, and attempt to obtain customers to purchase it.

*Item JE0104*

37.     On or about October 12, 2006, the Plaintiff purchased "Item No. JE0104 A Pair of Emerald Pearl and Diamond Earring with Two Drop Emerald Briolettes" ("Item JE0104") at a Christie's auction for $352,000.00. Attached as Exhibit "K" is a copy of the Christie's invoice.

38.     The Plaintiff and RIMA Investors Corporation ("RIMA") each financed one-half of the purchase price of Item JE0104 with the understanding that they would each have a one-half claim to (a) Item JE0104 until resold, and (b) the net proceeds received upon resale. Attached as

Exhibit "L" is a copy of the invoice from the Plaintiff to RIMA for RIMA's fifty-percent (50%) share.

39.     Ultimate purchased RIMA's one-half interest in Item JE0104 and succeeded to all RIMA's rights in Item JE0104.

40.     By memo dated April 30, 2018, a copy of which is attached as Exhibit "M", Ultimate consigned Item JE0104 to the Plaintiff. Because of that consignment, the Plaintiff is authorized to deal with Item JE0104, consign it to others, and attempt to obtain customers to purchase it.

### Item JP0105

41.     On or about May 21, 2008, the Plaintiff purchased "Item No. JP 0105, one cross pndt with (7) FIPK diamonds 4.69cts ttl and 1.17cts white melee w black rope and (4) white melee 0.2 cts ttl on caps on end" ("Item JP0105") from GemCut for $420,000.00. Attached as Exhibit "N" is a copy of the invoice from GemCut to the Plaintiff for Item JP0105.

42.     The Plaintiff, Palawan, and Ultimate each financed one-third of the purchase price of Item JP0105 with the understanding that they would each have a one-third claim to (a) Item JP0105 until resold, and (b) the net proceeds received upon resale.

43.     Item JP0105 was consigned to the Plaintiff. Because of that consignment, the Plaintiff is authorized to deal with Item JP0105, consign it to others, and attempt to obtain customers to purchase it.

### Item No. JR0306

44.     In addition to the foregoing pieces, the Plaintiff sold "Item No. JR0306, Platinum Ring with Ruby 7.02 CT surrounded by 8 OV 3.43 CT with Micro Pave on Shank 35 CT" ("Item JR0306" or the "Ruby Ring" and, together with the Kashmir Sapphire, Item DM2950, Item

JR0280, Item JE0104, and Item JP0105, collectively, the "Precious Stones"), to SB for a sale price that included as part of the consideration a profit participation to the Plaintiff of fifty percent (50%) of any future sale by SB (or the Plaintiff) of the Ruby Ring. A copy of the invoice that was given in connection with the sale of the Ruby Ring from the Plaintiff to SB is attached is Exhibit "O",

45.     Upon information and belief, SB claims full ownership of the Ruby Ring.

46.     By memo dated December 4, 2018, a copy of which is attached is Exhibit "P", SB consigned the stone used in the Ruby Ring to the Plaintiff. Because of that consignment, the Plaintiff is authorized to deal with the Ruby Ring, consign it to others, and attempt to obtain customers to purchase it.

B.      *Essex made high-interest, unsecured loans to the Plaintiff, and Essex, through Paul, intentionally blurred the lending and consignment relationships with the Plaintiff to perpetrate tax fraud and other misconduct.*

47.     Commencing on or about August 31, 2012 and continuing through and including November 7, 2017, Essex allegedly made a series of predatory loans to the Plaintiff on an unsecured basis. During those years, the Plaintiff paid Essex a minimum of at least $9,599,000.00 in interest.

48.     As of the Petition Date, the outstanding amount of the loans was allegedly $6,500,000.00 (the "Essex Unsecured Claim"). Immediately before the Debtor filed its bankruptcy petition, however, the Essex Defendants exercised self-help remedies to the detriment of the Debtor's estate and its creditors and grabbed certain Precious Stones without authority or consent to protect itself and try to make itself whole. (*See* TRO Hr'g Tr. 10:22 – 11:3).[2]

---

[2] A copy of the transcript from the June 26, 2019 hearing on the Plaintiff's motion for a temporary restraining order and a preliminary injunction is attached as Exhibit "Q".

49.     Essex's principal, Paul, is a convicted felon, having pled guilty to securities fraud

and mail fraud in 2001 (relating to student loans). He was sentenced to 63 months in prison plus

three years supervised release thereafter.  (*See United States v. Paul*, Case No. 1:00-cr-00445

(E.D.N.Y.)).[3] More recently, the Essex Defendants were reportedly involved in a pawn transaction

related to a stolen Cartier diamond and sapphire bracelet.

50.     The Plaintiff began taking loans from Essex as a means of fixing a temporary cash

flow problem, and the Plaintiff attempted to pay off the loans in full several times. However, the

Essex Defendants threatened to spread unfounded rumors in the industry that the Plaintiff was

insolvent, unless it continued to take such high-interest loans and pay two percent (2%) a month

for the privilege.

51.     In addition, in connection with these predatory loans, on various occasions, Essex

through Paul, pressured the Plaintiff at various times to help Essex engage in tax fraud by

characterizing the payments as sales of goods rather than payments of interest to enable Essex to

avoid paying taxes on the interest it was receiving.  The Plaintiff always refused to participate in

such attempted tax fraud and recorded the payments truthfully on its books and tax returns as

interest payments.

52.     Essex and Paul intermingled their diamond business and the high-interest lending

business throughout the period commencing in 2012 to date. During that time, the Plaintiff

recorded a minimum of $9,599,000.00 in interest payments to Essex.  Upon information and belief,

as a result of such intermingling, the interest rates paid to Essex far exceed two percent (2%) per

month, as the goods were more valuable than the value Essex ascribed to them. Examples of

intermingling include deductions of interest by Essex from payments of invoices to the Plaintiff

---

[3] A recitation of the facts of the criminal complaint is contained in Judge Glasser's opinion in *United States v. Shvarts, et al*., 90 F.Supp. 2d 219 (E.D.N.Y. 2000), which is attached as Exhibit "R".

for goods and directions by the Essex Defendants to make repayments of principal and interest to third parties. Attached as Exhibit "S" is a copy of an invoice to Essex for a diamond necklace in which an interest payment is mischaracterized as a "Commission Expense."

53.     Moreover, upon information and belief, the effective interest rate, at times, far exceeded twenty-five percent (25%) as a result of such machinations as setoffs against invoiced goods, which Essex then turned around and sold within a short period of time at a profit, without giving the Plaintiff any credit for such profit and reducing the principal or interest on the predatory loans. If the "loans" are found to be valid, then the outstanding balance should be reduced by any profit that Essex made on the sale of such items.

54.     Upon information and belief, Essex failed to report most, if not all, of the Plaintiff's interest payments as interest payments and mischaracterized them.

C.     _The Plaintiff consigned the Precious Stones to Essex._

_The February 28, 2019 Transaction_

55.     On or about February 28, 2019, the Plaintiff consigned, on memo to Essex, Item JE0104, Item JE0105, and Item DM2950 (the "February 28, 2019 Transaction"). A copy of the memo relating to the February 28, 2019 Transaction ("Memo 5251") is attached as Exhibit "T".

56.     As of the date of Memo 5251, (a) Item JE0104 had a stated value of approximately $550,000.00; (b) Item JE0105 had a stated value of approximately $1,380,000.00; and (c) Item DM2950 had a stated value of approximately $4,500,000.00.

57.     Memo 5251 as well as the other "Essex Memos," as hereinafter defined, contain the following contractual language (the "Consignment Terms"):

> **The merchandise described above is delivered to you on memorandum**, at your risk from all hazards, regardless of the cause for the loss or damage, only for examination and inspection, **upon express condition that all such merchandise shall remain the**

*property of D&M Capital Group, LLC and shall be returned on demand, in full in its original form.* Until the merchandise is returned and actually received by us, you are fully responsible therefor, and in the event of damage or loss for whatever reason, whether caused by you or another, whether or not under your control, you will indemnify us immediately by payment of the amount in the column Amount (US$) above which represents the extent of the actual loss and is not intended to constitute a price of the sale of the merchandise. You acquire no right of authority to sell, pledge, hypothecate, or otherwise dispose of the merchandise, or any part thereof by memorandum or otherwise. It being expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this memorandum. *A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received a separate invoice.* Receipt of the merchandise constitutes your agreement to the foregoing terms *which represent the entire contract with respect to the merchandise herein* described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary customs of the trade. You consent to the personal jurisdiction of the Federal State Court in the City and State of New York in any lawsuit arising out of the consignment or any sale resulting therefrom. Any such lawsuits between us are may only be brought in one of such courts. Each of us consents to service of process by certified mail, return receipt requested.

(*See* Ex. T, Mem. 5251 at 2) (emphasis added).

58.     With respect to the February 28, 2019 Transactions, at Essex's demand and insistence, the Plaintiff's principal, Moty Spector, wrote on Memo 5251, "for collateral against 6.5m loan." (*See id.* at 1).

59.     Notwithstanding that notation, the Plaintiff never granted Essex a security interest in Item JE0104, Item JE0105, or Item DM2950 or any of the other Precious Stones.[4]

60.     Memo 5251 is not a security agreement.

---

[4] Throughout the Plaintiff's relationship with Essex, the Plaintiff has never granted Essex a security interest in any of its property. Their business dealings have been limited to unsecured lending and borrowing and the consignment and sale of goods.

61.     Memo 5251 bears the Plaintiff's letterhead, says "Memo # 5251," and provides that the goods are to be shipped to Essex at Essex's address. (*See id.*). It also lists the quantity and dollar amount for each piece. Although Memo 5251 was executed by the "Recipient," Essex (*see id*. at 2), it was not executed by the Plaintiff.

62.     There is neither a clause in Memo 5251 stating that the Plaintiff grants Essex a security interest in the Precious Stones described nor a financing statement on file with the New York Department of State pursuant to the Uniform Commercial Code, as adopted in New York (the "UCC").

63.     Memo 5251 is a consignment memo exclusively.

### The March 28, 2019 Transaction

64.     On March 28, 2019, the Plaintiff consigned, on memo to Essex, the Ruby Ring (the "March 28, 2019 Transaction"). A copy of the memo relating to the March 28, 2019 Transaction ("Memo 5276") is attached as Exhibit "U".

65.     As of the date of Memo 5276, the Ruby Ring had a stated value of approximately $2,500,000.00.

66.     Memo 5276 contains the Consignment Terms quoted above and was executed by Essex. (*See* Ex. U at 1).  No UCC financing statement was filed with respect to this memo.

### The May 9, 2019 Transaction

67.     On May 9, 2019, the Plaintiff consigned, on memo to Essex, Item JR0280 (the "May 9, 2019 Transaction"). A copy of the memo relating to the May 9, 2019 Transaction ("Memo 5296") is attached as Exhibit "V".

68.     As of the date of Memo 5296, Item JR0280 had a stated value of approximately $1,100,000.00.

69.     Memo 5296 contains the Consignment Terms quoted above and was executed by Essex. (*See* Ex. V at 1). No UCC financing statement was filed with respect to the goods identified in Memo 5296.

*The May 17, 2019 and May 21, 2019 Transactions*

70.     At the end of April 2019, Paul advised the Plaintiff that he had a possible customer for the Kashmir Sapphire and that he wanted the Kashmir Sapphire to be returned to the United States for it to be available for resale.

71.     At that time, the Kashmir Sapphire was out on consignment to Radwan. Attached as Exhibit "W" is a copy of the memo, dated February 28, 2019, pursuant to which the Plaintiff consigned the Kashmir Sapphire to Radwan.

72.     Based upon Paul's representations about a potential buyer (the "Fictitious Buyer") located in the Hamptons who needed the original certificate (the "Certificate") and special portfolio books (the "Portfolio Books") on the Kashmir Sapphire for immediate inspection, which would later prove false, the Plaintiff did the following:

a)      asked Radwan to return the Kashmir Sapphire, which it did;

b)      consigned the Kashmir Sapphire to Essex by memo dated May 17, 2019 ("Memo 5302" and, with Memo 5251, 5276, and 5296, the "Essex Memos" and each, an "Essex Memo"), a copy of which is attached as Exhibit "X", and provided Essex with the Certificate and the Portfolio Books for the Kashmir Sapphire; and

c)      in accordance with the Consignment Terms and Paul's instructions, on May 21, 2019, gave Paul (i) an invoice (the "May 2019 Invoice"), a copy of

which is attached as <u>Exhibit "Y"</u>, in the amount of $7,500,000.00 for the Kashmir Sapphire and Item DM2950, and (ii) the Certificate for DM2950.

73.     That same week, when Mr. Spector demanded payment on the May 2019 Invoice, Paul refused to speak to him. Instead, Paul asked to speak to the Plaintiff's employee, Raphaela Colandrea on the morning of May 24, 2019.

74.     On May 24, 2019, Ms. Colandrea went to Paul's office at Essex and was told by Paul that Essex was neither returning the goods (which had not been resold) nor making payment of the May 2019 Invoice but that it was retaining the Kashmir Sapphire, Item DM2950, and other "memo goods" to set off against the "loans" owing to Essex, unless the Plaintiff met certain demands. In the presence of Paul's son, who was there for part of the meeting, Paul boasted to Ms. Colandrea that he had no buyer, had lied to Moty Spector about having a buyer lined up in the first place, and had taken the May 2019 Invoice to "protect himself".

75.     As of the date of Memo 5302, the Kashmir Sapphire had a stated value of approximately $7,000,000.00. Like all the Essex Memos, Memo 5302 includes the Consignment Terms and was executed by Essex upon receipt.

D.     <u>*The Plaintiff demanded return of the Precious Stones, and the Essex Defendants refused to comply with their obligation.*</u>

76.     The Plaintiff's demands for the return of the Precious Stones both pre- and post-petition were met with refusal—despite the clear language of the Essex Memos that each of the goods transferred to Essex remained the Plaintiff's property and "shall be returned on demand, in its full and original form." (*See* Exs. T, U, V, X).

77.     On May 28, 2019, the Plaintiff filed for chapter 11 bankruptcy primarily to protect its property from further dissipation by the Essex Defendants and safeguard the interests of the Nominal Defendants.

78.     On May 29, 2019, after having yet to receive the Precious Stones from Essex, the Plaintiff sent Essex a demand letter (the "First Demand Letter") requesting their return or cash equivalent. A copy of the First Demand Letter is attached as Exhibit "Z".

79.     On June 21, 2019, the Plaintiff filed this adversary proceeding and, shortly thereafter, moved for temporary and preliminary injunctive relief against Essex with respect to the Precious Stones. (*See* ECF No. 2).

80.     At the hearing on that motion, Counsel for Essex stated that the Kashmir Sapphire and Item DM2950 were no longer in Essex's possession (*See* Ex. Q, TRO Hr'g Tr. 12:13 – 13:15; 19:1–6), and Item JR0280 and the Ruby Ring "may already be in transition." (*See id.* 23:23-25).

81.     Upon information and belief, if Essex transferred the Kashmir Sapphire at all, it was after the Petition Date and in violation of the automatic stay.

82.     On August 2, 2019, the Plaintiff sent another demand letter (the "Second Demand Letter") to Essex with certain of the Nominal Defendants copied. Attached as Exhibit "aa" is a copy of the Second Demand Letter.

83.     As stated in the Second Demand Letter, Essex has until 5:00 p.m. EST on August 9, 2019 (the "Return Deadline") to return the Precious Stones to the Plaintiff. Additionally, to the extent Essex transferred, sold, consigned, or otherwise disposed of the Precious Stones, the Plaintiff made a formal demand for an accounting by the Return Deadline.

84.     As of the filing of this Amended Complaint, Essex has failed and refused to return any of the Precious Stones or comply with the demand for an accounting.

## COUNT ONE

**(Declaratory Judgment Under 28 U.S.C. § 2201 Against the Essex Defendants and John Doe Defendants)**

85.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

86.     There is a real, substantial, and immediate controversy between the Plaintiff and the Essex Defendants.

87.     Upon information and belief, the Essex Defendants maintain that Essex's interests in the Precious Stones are superior to the Plaintiff's because (a) some or all of the Precious Stones secured the defaulted loans to the Plaintiff, and (b) based on that alleged default and in satisfaction of the Plaintiff's debt, Essex is entitled to retain and, if it chooses, transfer the Precious Stones to third parties without sharing any profits with the Plaintiff.[5]

88.     The Plaintiff disputes those contentions and submits that it never granted Essex a security interest in any of the Precious Stones and is entitled to immediate possession of the Precious Stones or payment equal to their value because the Plaintiff's interests in the Precious Stones are property of the estate. Essex is not the Plaintiff's secured lender but, rather, its consignee.

89.     If the Plaintiff is unable to transfer its interests in or liquidate the Precious Stones in order to satisfy or settle certain claims, the Plaintiff is unlikely to reorganize under chapter 11 of the Bankruptcy Code.

90.     As of the Petition Date, the Plaintiff owned the Precious Stones listed below in following percentages:

        a)      Thirty-three percent (33%) of the Kashmir Sapphire;

        b)      Thirty-three percent (33%) of Item DM2950;

---

[5] *See* Ex. Q, TRO Hr'g Tr. 10:22 – 11:3.

c)      Fifty percent (50%) of Item JR0280;

d)      Fifty percent (50%) of Item JE0104; and

e)      Thirty-three percent (33%) of Item JP0105.

91.     With respect to the Ruby Ring described in Essex Memo 5276, the Plaintiff in the sale of the Ruby Ring to SB, and as part of the consideration by SB, retained a profit participation and is entitled to fifty percent (50%) of the profits generated from the eventual sale of the Ruby Ring.

92.     Additionally, the Plaintiff has consignment rights, as both consignee and consignor, in the Precious Stones.

93.     Before filing for bankruptcy, the Plaintiff transferred possession of the Precious Stones to Essex on consignment pursuant to the Essex Memos.

94.     As the Essex Memos' Consignment Terms expressly state, the Precious Stones are property of the Plaintiff, and Essex is obligated to hold the Precious Stones in trust for the Plaintiff and return them upon demand. (*See* Exs. T, U, V, X).

95.     None of the Essex Memos are security agreements. Among other things, they lack language that would create a security interest and are not authenticated by the Plaintiff.[6]

96.     Instead, the Plaintiff and Essex intended to create true consignments under New York common law.

97.     The Plaintiff retained ownership of the Precious Stones (*see, e.g.,* Ex. T), and pursuant to the Essex Memos and industry practice, was the only one who could authorize the sale and its terms.  Resale could only occur if the Plaintiff and Essex agreed to it, and Essex received

---

[6] *See* N.Y. U.C.C. Law § 9-203 (McKinney); *see also* 11 U.S.C. §§ 101(37) (definition of lien), (51) (definition of security interest).

an invoice from the Plaintiff. (*See, e.g., id.*)  If the Plaintiff approved resale of the Precious Stones and invoiced Essex in accordance with the Consignment Terms, then Essex would sell the Precious Stones and pay the Plaintiff the proceeds in the invoiced amount. Consignments like this are common for parties dealing in diamonds and other gems.

98.    Although the Plaintiff delivered the May 2019 Invoice for the Kashmir Sapphire and Item DM2950 to Essex, the Plaintiff did so based upon the fraudulent misrepresentations of the Essex Defendants. Therefore, those items are still property of the estate and, if the Essex Defendants resold them post-petition, those transfers were void for having been made in violation of the automatic stay.

99.    Paul admitted that he lied about having procured a buyer, which was a material misrepresentation upon which the Plaintiff reasonably relied when deciding to give the May 2019 Invoice. The Plaintiff never would have given the May 2019 Invoice, Certificate, and Portfolio Books had it known the truth.

100.    Moreover, upon information and belief, as of the Petition Date, Essex had not yet sold the Kashmir Sapphire and Item DM2950. Even if these items were sold before the Petition Date, the Plaintiff was still entitled to the return of those pieces because the Plaintiff never agreed to *that* sale,[7] and Essex failed to remit the invoiced amount of $7,500,000.00.

101.    Nonetheless, the Essex Defendants continue to refuse to deliver this property or its cash value to the Debtor despite demand. Therefore, a declaratory judgment confirming that the Precious Stones or the cash proceeds of such "sale" are property of the estate pursuant to § 541 of the Bankruptcy Code is necessary and appropriate to prevent further harm to the estate.

---

[7] *See, e.g.,* Ex. T ("A sale of all or any portion of the merchandise shall occur only if and when we agree *and* you shall have received a separate invoice.") (emphasis added).

## COUNT TWO

**(Turnover Under 11 U.S.C. § 542 Against the Essex Defendants and the John Doe Defendants)**

102.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

103.     Upon information and belief, some of the Precious Stones are in the possession, custody, or control of one or both the Essex Defendants.

104.     Upon information and belief, the Essex Defendants transferred one or more Precious Stones to one or more third parties.

105.     By failing to return the Precious Stones after the Plaintiff's demands, the Essex Defendants converted property that rightfully belongs to the estate pursuant to § 541 of the Bankruptcy Code.

106.     The aggregate value of the Precious Stones is $17,030,000.00 and, therefore, they are not of inconsequential value or benefit to the Debtor's estate.[8]

107.     Any Precious Stones or cash in the custody, possession, or control of either Essex Defendant or any John Doe Defendant must be turned over to the Debtor pursuant to § 542 of the Bankruptcy Code.

## COUNT THREE

**(Avoidance and Recovery of Preferences from the Essex Defendants and John Doe Defendants Under 11 U.S.C. §§ 547, 550)**

108.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

---

[8] There are no secured claims scheduled against the estate. Excluding the disputed $6,500,000.00 Essex Unsecured Claim, general unsecured claims total $11,238,631.38. Accordingly, unsecured creditors would greatly benefit from the return of the Precious Stone or payment of their equivalent value.

109. Even if the transfers of the Precious Stones to Essex were, as Essex alleges, transfers in satisfaction of the Plaintiff's debt, such transfers are avoidable and recoverable preferences under §§ 547 and 550 of the Bankruptcy Code.

110. Essex asserts that it was a creditor of the Debtor before and on the Petition Date. (*See* Notice of Appearance, *In re the D&M Capital Group, LLC*, No. 19-11711(SCC) (Bankr. S.D.N.Y. June 27, 2019), ECF No. 21).

111. The Precious Stones were transferred to Essex on the dates set forth in the respective Essex Memos, the earliest date being February 28, 2019.

112. Within ninety (90) days prior to the Petition Date, the Debtor made transfers of its property in the total amount of $17,030,000.00. (*See* Exs. T, U, V, X).[9]

113. Essex asserts that some or all these transfers are collateral for a previously unsecured loan. (*See* Ex. Q, TRO Hr'g Tr. 10:22 – 11:3).

114. The transfers of the Precious Stones constitute transfers of interests in the Debtor's property.

115. The transfers of the Precious Stones were made to or for the benefit of Essex.

116. The transfers of the Precious Stones were made in part for or on account of an antecedent debt allegedly owed by the Debtor before such transfers of the Precious Stones were made.

117. The transfers of the Precious Stones were made while the Debtor was insolvent or alternatively rendered the Debtor insolvent.

118. As of the Petition Date, the value of the Debtor's assets totaled $14,033,469.15, and the value of its liabilities totaled $17,748631.38. (*See* Schedules of Assets and Liabilities, *In*

---

[9] The Plaintiff reserves the right to assert that the value of the Precious Stones was higher than $17,030,000.00.

*re the D&M Capital Group, LLC*, No. 19-11711(SCC) (Bankr. S.D.N.Y. June 18, 2019), ECF No. 11). Likewise, the Precious Stones are significant assets of the Debtor's estate that could not be liquidated because the Essex Defendants asserted possession and control without complying with their duty as consignee to find legitimate buyers for the Precious Stones.

119.    The transfers of the Precious Stones enabled Essex to receive more than the Essex would receive if: (a) the case was a case under chapter 7 of the Bankruptcy Code; (b) the transfers of the Precious Stones had not been made; and (c) Essex received payment of such debt to the extent provided by the Bankruptcy Code.

120.    The Debtor has demanded that Essex return the Precious Stones to the Debtor, but those demands has been ignored. (*See* Exs. Z & aa).

121.    The Debtor's estate has been damaged in an amount equal to the dollar value of the transfer of the Precious Stones, together with interest, attorneys' fees, and costs of suit and collection

122.    Based upon the foregoing, the transfers of the Precious Stones constitute avoidable preferential transfers pursuant to § 547(b) of the Bankruptcy Code. The transfers of the Precious Stones should be avoided, and the Precious Stones or their value, in an amount no less than $17,030,000.00, plus interest from the date of the transfers of the Precious Stones and the costs and expenses of this action including, without limitation, attorneys' fees, should be recovered pursuant to § 550(a) of the Bankruptcy Code from (i) Essex and/or Paul to the extent that Paul is a transferee or that the transfers were made for his benefit, and/or (ii) one or more John Doe Defendants as immediate or mediate transferees of the Precious Stones.

## COUNT FOUR
### (Avoidance and Recovery of Preferences from the Essex Defendants
### Under 11 U.S.C. §§ 547, 550)

123.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

124.     Essex has contended that the Plaintiff, by entering into the February 28, 2019 Transaction, granted Essex a collateral security interest in one or more of the Precious Stones. (*See* TRO Hr'g Tr. 10:22 – 11:3).

125.     To the extent that is what Essex has alleged, the Plaintiff disputes those allegations.

126.     And even if Essex's allegations were true, by granting security interests in the Precious Stones 90 days before the Petition Date in satisfaction of the $6,500,000.00 debt, the Plaintiff transferred its interests in its property, and those transfers are avoidable pursuant to § 547(b) of the Bankruptcy Code.

127.     The transfers of the purported security interests in the Precious Stones should be avoided, and the value of those interests, in an amount no less than $17,030,000.00, plus interest from the date of the transfers and the costs and expenses of this action including, without limitation, attorneys' fees, should be recovered pursuant to § 550(a) of the Bankruptcy Code from Essex and/or Paul to the extent the transfers were made for his benefit.

## COUNT FIVE
### (Avoidance and Recovery of Constructive Fraudulent Transfers from the Essex Defendants
### and John Doe Defendants Under 11 U.S.C. §§ 548(a)(1)(B), 550)

128.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

129. The Precious Stones, which the Plaintiff owns in various percentages or in which the Plaintiff has a financial interest, were delivered to Essex on consignment starting on February 28, 2019.

130. The transfers of the Precious Stones occurred within two years of the Petition Date.

131. The Plaintiff did not receive a reasonably equivalent value in exchange for the transfers of the Precious Stones.

132. To the extent that the Essex Defendants retained the Precious Stones as satisfaction of the $6,500,000.00 Essex Unsecured Claim, that retention was improper because the Plaintiff never granted Essex a security interest in the Precious Stones or otherwise authorized the Essex Defendants to keep the Precious Stones in satisfaction of any debt.[10]

133. Likewise, the Precious Stones have an aggregate stated value of approximately $17,030,000.00, which is significantly higher than the Essex Unsecured Claim.

134. On the dates of the transfers, the Plaintiff was insolvent or became insolvent as a result of the transfers.

135. As the Petition Date, which occurred shortly after the Precious Stones were transferred, the Plaintiff's debts exceeded the value of its assets. (*See* Schedules of Assets and Liabilities, *In re the D&M Capital Group, LLC*, No. 19-11711(SCC) (Bankr. S.D.N.Y. June 18, 2019), ECF No. 11).

136. Further, the Essex Defendants exercised possession and control over the Precious Stones without fulfilling their obligation to find real buyers or, if they did, failed to remit the sale proceeds to the Plaintiff. Because the Essex Defendants prevented the Plaintiff from reselling the

---

[10] It is unclear whether Essex has applied the value of the Precious Stones to the alleged outstanding debt and deems it fully satisfied. Likewise, consignment and possible resale—not satisfaction of any debt— were the only reasons that the Plaintiff transferred the Precious Stones to the Essex Defendants.

Precious Stones, the Plaintiff was without its primary source of income and was or became unable to meet its obligations when due in the ordinary course.

137.     Therefore, the transfers of the Precious Stones should be avoided pursuant to § 548(a)(1)(B) of the Bankruptcy Code. The Precious Stones or their value, in an amount no less than $17,030,000.00, should be recovered pursuant to § 550(a) of the Bankruptcy Code from (i) Essex and/or Paul to the extent that Paul is a transferee or that the transfers were made for his benefit, and/or (ii) one or more John Doe Defendants as immediate or mediate transferees of the Precious Stones.

## COUNT SIX
**(Avoidance and Recovery of Constructive Fraudulent Transfers from the Essex Defendants Under 11 U.S.C. §§ 548(a)(1)(B) and 550)**

138.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

139.     In the event the Court were to find that the Plaintiff granted Essex security interests in any of the Precious Stones, those security interests are avoidable and their value recoverable by the estate as constructively fraudulent transfers.

140.     The alleged security interests are transfers of the Plaintiff's interests in property and, if granted at all, were granted on February 28, 2019,[11] within two years of the Petition Date.

141.     The Plaintiff received less than a reasonably equivalent value in exchange for the security interests allegedly granted in the Precious Stones.

142.     The aggregate value of the purported liens is $17,030,000.00.

143.     The value of the Essex Unsecured Claim, however, is only $6,500,000.00.

---

[11] There is a notation on Memo 5251 that says, "for collateral against 6.5m loan." The Essex Defendants urged the Plaintiff to include this on that Essex Memo even though it was entirely false. As a matter of law, no security interest was ever created in any of the Precious Stones.

144. On February 28, 2019, the Plaintiff was insolvent or became insolvent because of the security interests that it allegedly granted Essex. As of the Petition Date, which occurred shortly after the alleged transfers, the dollar amount of the Plaintiff's debts exceeded the dollar amount of its assets. (*See* Schedules of Assets and Liabilities, *In re the D&M Capital Group, LLC*, No. 19-11711(SCC) (Bankr. S.D.N.Y. June 18, 2019), ECF No. 11).

145. The security interests allegedly granted in the Precious Stones should be avoided and their value recovered pursuant to §§ 548(a)(1)(B) and 550(a) of the Bankruptcy Code from Essex and/or Paul to the extent that the transfers were made for his benefit.

## COUNT SEVEN
**(Avoidance and Recovery of Voidable Transfers from the Essex Defendants and John Doe Defendants Under 11 U.S.C. §§ 544(b)(1), 550 and N.Y. Debt. & Cred. Law §§ 271–73, 278)**

146. The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

147. Within the last six years, the Plaintiff delivered the Precious Stones to Essex. The Plaintiff has co-ownership interests or financial interests in the Precious Stones and interests as a consignee and consignor.

*A.* *Lack of Fair Consideration*

148. The Plaintiff's transfers of the Precious Stones to Essex were made without "fair consideration," as defined in section 272 of the New York Debtor and Creditor Law.

149. Essex did not, ***in good faith***, convey any property to the Plaintiff or render an antecedent debt satisfied that was the fair equivalent of the Precious Stones transferred.

150. The antecedent debts, if any, were unsecured, arose from predatory lending, and were far less than the value of the Precious Stones.

151.    Further, the Essex Defendants failed to deal openly and honestly with, and intended to take unconscionable advantage of, the Plaintiff.

152.    Essex, through Paul, coerced the Plaintiff into borrowing when the Plaintiff no longer wanted to, charged outrageously high interest, and refused to accept the Plaintiff's offer to pay off the loans in full at a time when the Plaintiff had the ability to do so.

153.    The Essex Defendants knew that they had no right to deprive the Plaintiff of its lawful possession of the Precious Stones but did so anyway.

154.    As reflected in the Essex Memos, Essex and the Plaintiff never intended for the Precious Stones to serve as collateral for any debts (notwithstanding the notation, "for collateral against 6.5m loan," printed on Memo 5251).

155.    Moreover, in April 2019, Essex, through Paul, intentionally misrepresented that there was a buyer for the Kashmir Sapphire and Item DM 2950. This was done to fraudulently induce the Plaintiff into transferring the gem and providing the May 2019 Invoice. But the Essex Defendants have never paid the Plaintiff the invoice amount.

156.    Accordingly, even if it appeared that an antecedent debt was being satisfied, the Essex Defendants were fully aware that the transfers of the Precious Stones for that purpose was not legitimate, and that failure to return the Precious Stones upon demand violated the Consignment Terms of each Essex Memo.

*B.*     *Insolvency*

157.    The Plaintiff was insolvent when it transferred the Precious Stones to the Essex Defendants or, alternatively, the transfers rendered the Plaintiff insolvent.

158.    The transfers of the Precious Stones occurred shortly before the Petition Date. Therefore, the Plaintiff's bankruptcy Schedules, which were filed with the Court on June 18, 2019, should reflect whether the Plaintiff was insolvent at the time of the transfers.

159.    The Plaintiff's bankruptcy Schedules show total assets worth $14,033,469.15 and total liabilities of $17,748,631.38. (*See* Schedules of Assets and Liabilities, *In re the D&M Capital Group, LLC*, No. 19-11711(SCC) (Bankr. S.D.N.Y. June 18, 2019), ECF No. 11). Because the value of the Plaintiff's liabilities far exceeded the value of its assets near the time of the transfers, the Plaintiff was insolvent.

160.    Alternatively, the transfers of the Precious Stones rendered the Plaintiff insolvent. The Precious Stones are significant assets of the Plaintiff's estate. The Essex Defendants converted the Precious Stones and, upon information and belief, sold one or more of them to one or more third parties without remitting the proceeds to the Plaintiff. Therefore, the Plaintiff could not liquidate the Precious Stones to meet its expenses as they became due.

C.    *Recovery for the Benefit of the Estate Pursuant to 11 U.S.C. § 550(a) and N.Y. Debt. & Cred. Law § 278*

161.    The Precious Stones or their value, in an amount no less than $17,030,000.00, should be recovered from (i) Essex and/or Paul to the extent that Paul is a transferee or that the transfers were made for his benefit, and/or (ii) one or more John Doe Defendants as immediate or mediate transferees of the Precious Stones.

**COUNT EIGHT**
**(Avoidance and Recovery of Voidable Transfers from the Essex Defendants Under 11 U.S.C. §§ 544(b)(1), 550 and N.Y. Debt. & Cred. Law §§ 271–73, 278)**

162.    The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

163. The purported security interests in the Precious Stones, if granted at all, were granted within the last six years.

A.   *Lack of Fair Consideration*

164. If it is determined that the Plaintiff granted security interests in the Precious Stones, then those transfers of the Plaintiff's interests in property were made without "fair consideration," as defined in section 272 of the New York Debtor and Creditor Law.

165. Essex did not, ***in good faith***, convey any property to the Plaintiff or render an antecedent debt satisfied that was the fair equivalent value of the security interests allegedly granted.

166. The antecedent debt, which, if it existed at all, was at most $6,500,000.00. However, the value of the purported liens in favor of Essex and encumbering the Precious Stones was far greater—$17,030,000.00 in the aggregate.

167. Further, the Essex Defendants failed to deal openly and honestly with, and intended to take unconscionable advantage of, the Plaintiff.

168. The antecedent debt that Essex has alleged is secured by the Precious Stones arose from predatory loans. Essex, through Paul, coerced the Plaintiff into borrowing when the Plaintiff no longer wanted to, charged outrageously high interest, and refused to accept the Plaintiff's offer to pay off the loans in full at a time when the Plaintiff had the ability to do so.

169. Likewise, the Essex Defendants insisted that the Plaintiff make the notation, "for collateral against 6.5m loan," on Memo 5251 even though the Essex Defendants knew that the parties did not intend for the Plaintiff to grant Essex a security interest in any of the Precious Stones.

170.     Therefore, even if an antecedent debt was satisfied in exchange for the purported security interests in the Precious Stones (and it is unclear whether that actually occurred), the Essex Defendants were fully aware that those transactions were illegitimate and nonconsensual.

B.     *Insolvency*

171.     On February 28, 2019, the Plaintiff was insolvent or became insolvent because of the security interests that it allegedly granted Essex.

172.     As of the Petition Date, which was shortly before the alleged security interests were granted, the dollar amount of the Plaintiff's debts exceeded the dollar amount of its assets. (*See* Schedules of Assets and Liabilities, *In re the D&M Capital Group, LLC*, No. 19-11711(SCC) (Bankr. S.D.N.Y. June 18, 2019), ECF No. 11).

C.     *Recovery for the Benefit of the Estate Pursuant to 11 U.S.C. § 550(a) and N.Y. Debt. & Cred. Law § 278*

173.     The value of the security interests allegedly granted in the Precious Stones should be recovered from Essex and/or Paul to the extent the transfers were made for his benefit.

**COUNT NINE**
**(Avoidance and Recovery of Post-Petition Transfers from the John Doe Defendants Under 11 U.S.C. §§ 549(a), 550)**

174.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

175.     The Precious Stones are property of the Debtor's bankruptcy estate.

176.     Upon information and belief, Essex transferred one or more of the Precious Stones to one or more third parties after the Petition Date.

177.     None of those transfers, if made, were authorized under § 303(f) or 542(c) of the Bankruptcy Code.

178.    None of those transfers, if made, were authorized by any other section of the Bankruptcy Code or order of this Court.

179.    Therefore, the Debtor may avoid any post-petition transfers of any Precious Stones and, pursuant to § 550(a) of the Bankruptcy Code, may recover them or their equivalent value from the John Doe Defendants.

## COUNT TEN
### (Disallowance of Claims Under 11 U.S.C. § 502(d))

180.    The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

181.    The Precious Stones are recoverable from the Essex Defendants and the John Doe Defendants under §§ 542 and 550 of the Bankruptcy Code.

182.    Essex and/or Paul, and, upon information and belief, one or more John Doe Defendants are transferees of the Precious Stones, and the transfers of the Precious Stones are avoidable. (*See supra* Counts Three, Five, Seven, Nine).

183.    If it is determined that the Plaintiff granted Essex security interests in one or more of the Precious Stones, then Essex is a transferee of those interests. And the transfers of those interests are avoidable. (*See supra* Counts Four, Six, Eight).

184.    Therefore, the Court must disallow the Essex Unsecured Claim and any other claim asserted by Essex, and/or Paul, and/or any John Doe Defendant in its entirety unless the Plaintiff is paid the value of the Precious Stones transferred to any John Doe Defendant in an aggregate amount up to $17,030,000.00, or such Precious Stones are returned to the Plaintiff.

## COUNT ELEVEN
### (Equitable Subordination Under 11 U.S.C. § 510(c))

185.    The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

186.     The Essex Defendants deceived and manipulated the Plaintiff in several respects. In addition to harming the Plaintiff, this inequitable conduct has harmed the Plaintiff's bankruptcy estate and has given the Essex Defendants an unfair advantage over other stakeholders.

A.     *Predatory Lending*

187.     The terms of the predatory loans that Essex made to the Plaintiff had terms that were extremely unfavorable to the Plaintiff, including obscenely high interest rates.

188.     Had the Essex Defendants not threatened the Plaintiff's reputation and good will (*see supra* ¶ 50), the Plaintiff would have ceased borrowing from Essex.

189.     In turn, the Essex Unsecured Claim, if this claim even exists, would have never accrued.

190.     Likewise, had the Essex Defendants permitted the Plaintiff to satisfy the entire debt when it had the means, undoubtedly there would be no Essex Unsecured Claim and, most likely, no need for the Plaintiff to seek bankruptcy protection.

191.     Therefore, if the Essex Defendants had not engaged in predatory lending, the estate's unsecured creditors could have exercised their state law remedies and would have been spared sharing the Plaintiff's assets pro rata with each other and Essex, whose disputed claim, if allowed, would far exceed many of the other unsecured claims.

B.     *Fraudulent Inducement*

192.     The Essex Defendants obtained the May 2019 Invoice for the Kashmir Sapphire and Item DM2950 by knowingly misrepresenting to the Plaintiff that there was a buyer for those items.

193.     In addition to impacting the Plaintiff, the Essex Defendants' fraud impacted Radwan, a party in interest and Nominal Defendant that had been consigned the Kashmir Sapphire

immediately before Essex. But for the Essex Defendants' misrepresentation, the Kashmir Sapphire would have remained with Radwan on consignment.

C.     *Fictitious Security Interests and Failure to Return the Precious Stones*

194.     The Essex Defendants continued their scheme by failing to return the Precious Stones upon demand (relying upon the fraudulently procured May 2019 Invoice to legitimize their misconduct) and transferring certain Precious Stones to third parties without the Plaintiff's authorization and without remitting the proceeds to the Plaintiff.

195.     The Essex Defendants prodded the Plaintiff to make the notation, "for collateral against 6.5m loan," on Memo 5251 even though all parties knew that there was no such security interest in any Precious Stones. The Essex Defendants did this to justify keeping the Precious Stones and keeping the proceeds when they had no basis to do that.

196.     By engaging in this egregious behavior, Essex, through Paul, has tried to obtain complete satisfaction of the Essex Unsecured Claim before and ahead of other similarly situated creditors of the Debtor's estate. Indeed, the aggregate value of the Precious Stones that are or were in Essex's possession exceed the alleged value of the Essex Unsecured Claim.

197.     Moreover, the Essex Defendants have jeopardized the Nominal Defendants' interests in the Precious Stones.

198.     The Essex Defendants' activities were calculated to give Essex an improper and inappropriate advantage with respect to all the Plaintiff's other creditors and parties in interest.

199.     If the Essex Unsecured Claim is not disallowed pursuant to § 502(b), then the Plaintiff demands judgment granting equitable subordination of the Essex Unsecured Claim and any other claims Essex or Paul may have against the Plaintiff or its estate pursuant to § 510(c)(1) of the Bankruptcy Code.

## COUNT TWELVE
### (Breach of Contract Against Essex)

200.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

201.     The Essex Memos memorialize agreements between the Plaintiff and Essex, pursuant to which the Plaintiff delivered to Essex on memo, i.e., consigned, the specific Precious Stones that the Essex Memos identify.

202.     Each Essex Memo contains the essential terms of this arrangement, including the quantity, value, and description of the memo good or goods being consigned; assignment of the risk of loss; and the conditions that must occur before Essex may resell. (*See* Exs.T, U, V, X).

203.      Essex agreed to these terms, including the Consignment Terms, by receiving the Precious Stones and executing each Essex Memo upon receipt. (*See* Exs. T, U, V, X).

204.     The Consignment Terms provide that the merchandise is delivered "upon express condition that all such merchandise shall remain the property of D&M Capital Group, LLC and shall be returned on demand, in full in its original form." (*See* Exs. T, U, V, X).

205.     The Consignment Terms further provide that the sale of the memo goods is prohibited unless the parties agree on the sale, **"*and*"** Essex received an invoice from the Plaintiff. (*See* Exs. T, U, V, X).

206.     These terms are unequivocal and without exception.

207.     Essex breached the Consignment Terms by failing to return the Precious Stones it received from the Plaintiff on memo after the Plaintiff's many demands.

208.     Essex also breached the Consignment Terms by, upon information and belief, reselling the Kashmir Sapphire and Item DM2950 without obtaining the Plaintiff's agreement by informed consent, but only through fraud and artifice, to those sales.

209.    As a result of these breaches, the Plaintiff has incurred damages of at least $17,030,000.00, plus prejudgment interest and reasonable attorneys' fees.

## COUNT THIRTEEN
### (Recovery on an Account Stated Against Essex)

210.    The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

211.    On or about May 21, 2019, the Plaintiff sent Essex the May 2019 Invoice.

212.    As set forth in the May 2019 Invoice, the unpaid balance due is $7,500,000.00. (*See* Ex. Y).

213.    Essex never objected or otherwise disputed the May 2019 Invoice.

214.    Essex never disputed the Essex Memos for the Precious Stones named in the May 2019 Invoice.

215.    Essex has implicitly acknowledged the debt reflected in the May 2019 Invoice by improperly holding the Precious Stones as collateral against the Essex Unsecured Claim.

216.    The Plaintiff is entitled to immediate payment of $7,500,000.00.

## COUNT FOURTEEN
### (Fraudulent Inducement Against the Essex Defendants)

217.    The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

218.    The Essex Defendants told the Plaintiff that there was a buyer interested in purchasing the Kashmir Sapphire and Item DM2950.

219.    Shortly thereafter, Paul admitted that this was a lie. When Paul told the Plaintiff that there was a buyer, he knew that there was in fact no buyer ready and willing to purchase these consigned goods.

36

220. Upon information and belief, the Essex Defendants made this misrepresentation to induce the Plaintiff to send the May 2019 Invoice for the Kashmir Sapphire and Item DM2950. With the May 2019 Invoice in hand, it seems that the Essex Defendants (falsely) believed that they could resell those goods and cut the Plaintiff out of the deal without consequences.

221. It was reasonable for the Plaintiff to rely on the Essex Defendants' misrepresentation about the Fictitious Buyer. During their consignment relationship, the Essex Defendants had procured for the Plaintiff real and legitimate buyers of diamonds and precious gems. On this occasion, there was nothing out of the ordinary that should have made the Plaintiff doubt the Essex Defendants' truthfulness.

222. The Plaintiff was injured by the Essex Defendants' misrepresentation. The Plaintiff bargained to receive the purchase price of $7,500,000.00 in exchange for the Kashmir Sapphire and Item DM2950. Instead, and directly because of the Essex Defendants' lie, the Plaintiff has not received any payment, nor has it been able to retrieve the Kashmire Sapphire and Item DM2950. Upon information and belief, these Precious Stones have been resold, and the Essex Defendants have taken the profits.

223. The Plaintiff is entitled to its out-of-pocket losses of at least $7,500,000.00.

## COUNT FIFTEEN
### (Unjust Enrichment Against the Essex Defendants)

224. The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

225. By failing to return the Precious Stones or pay the Plaintiff their cash equivalent, the Essex Defendants have benefitted at the expense of the Plaintiff and its estate.

226. The Precious Stones have an aggregate value of $17,030,000.00. The Essex Defendants have unlawfully kept this value for themselves and, in doing so, have jeopardized the Plaintiff's prospects for proposing and confirming a chapter 11 plan.

227. Equal treatment of similarly situated creditors is one of the fundamental tenants of bankruptcy law. Therefore, it would be against equity and good conscience to permit the Essex Defendants to retain the Precious Stones or their value.

## COUNT SIXTEEN
### (Conversion Against Essex Defendants)

228. The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

229. The Plaintiff has ownership and consignment interests in the Precious Stones.

230. Pursuant to the Essex Memos, the Essex Defendants took physical possession of the Precious Stones.

231. Once the Plaintiff demanded that the Essex Defendants return the Precious Stones and the Essex Defendants refused, the Essex Defendants' dominion or control over the Precious Stones was unauthorized.

232. This wrongful taking interfered with the Plaintiff's possessory and other rights. Among other things, the Plaintiff has been unable to consign the Precious Stones to another consignee.

233. Upon information and belief, the Essex Defendants resold certain of the Precious Stones to an unidentified third-party or parties. Accordingly, the Essex Defendants have unlawfully dispossessed the Plaintiff of its property and attendant rights.

234. The Plaintiff is entitled to at least $17,030,000.00 as damages for the Essex Defendants' conversion of the Precious Stones.

## COUNT SEVENTEEN
### (Recovery of Chattels Against the Essex Defendants Under
### N.Y. Civ. Prac. Law & R. 7101, 7108)

235.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

236.     The Plaintiff has an immediate and superior right to possess the Precious Stones.

237.     The Plaintiff co-owns or has financial interests in the Precious Stones.

238.     The Plaintiff is also both consignee and consignor of the Precious Stones.

239.     Although Essex, as consignee, came into possession of the Precious Stones lawfully, Essex's right to possess ceased when the Plaintiff demanded possession and Essex, acting through Paul, refused.

240.     Upon information and belief, Essex or Paul are in possession of at least some of the Precious Stones. (*See* Ex. Q, TRO Hr'g. Tr. 17:12-16).[12]

241.     The Plaintiff respectfully requests judgment awarding possession of the Precious Stones to the Plaintiff or, alternatively, the value of the Precious Stones in an amount to be determined at trial but no less than $17,030,000.00.

## COUNT EIGHTEEN
### (Constructive Trust Against the Essex Defendants)

242.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

243.     The Plaintiff is entitled to a constructive trust over the Precious Stones.

244.     A consignment is a bailment with an agency.

---

[12] The Plaintiff's rights are also superior to the Nominal Defendants. As of the Petition Date, the Nominal Defendants had not demanded from the Plaintiff the return of any of the Precious Stones.

245.     As consignee of the Precious Stones, Essex was the Plaintiff's agent. Essex had fiduciary duties with respect to matters within the scope of its agency and a duty of undivided loyalty to the Plaintiff.

246.     This fiduciary relationship is evidenced by the Essex Memos, each of which provide that the Plaintiff retains title to the Precious Stones and that the Precious Stones must be returned on demand. The Essex Memos further provide that no sale can occur unless the Plaintiff agrees to it. (*See* Exs. T, U, V, X).

247.     Essex promised that it would not sell the Precious Stones without the Plaintiff's consent and would return them to the Plaintiff if it demanded. Essex also promised that it would pay the invoices that it received from the Plaintiff and, specifically, that it had procured a buyer for the Kashmir Sapphire and Item DM2950.

248.     In reliance on these promises, the Plaintiff transferred the Precious Stones to the Essex Defendants.

249.     In reliance on these promises, the Plaintiff gave the May 2019 Invoice to the Essex Defendants.

250.     Because the Essex Defendants failed to keep their promises, they were unjustly enriched. (*See supra* Count Fifteen).

251.     The Plaintiff lacks an adequate remedy at law because the Precious Stones are rare and unique.

252.     Therefore, the Plaintiff respectfully requests that the Court impose a constructive trust on the Precious Stones.

## COUNT NINETEEN
### (Equitable Action Against the Essex Defendants for an Accounting)

253.     The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

254.     Essex, acting through Paul, was the Plaintiff's consignee and, in turn, agent.

255.     Thus, Essex was required to act as a fiduciary for the Plaintiff. As the Essex Memos expressly provide, Essex could only sell or otherwise dispose of the Precious Stones with the Plaintiff's consent and was required to return the Precious Stones upon the Plaintiff's demand.

256.     The Plaintiff entrusted the Precious Stones to the Essex Defendants when it consigned them to Essex. Essex is, therefore, obligated to disclose its dealings with respect to the Precious Stones.

257.     The Plaintiff lacks an adequate remedy at law. The Precious Stones are rare and unique.

258.     The Plaintiff demanded turnover of the Precious Stones or their equivalent value, but the Essex Defendants refused. (*See* Exs. Z & aa).

259.     Therefore, the Essex Defendants must provide the Plaintiff with an accounting, that includes, but is not limited to, the following:

(a) whether the Precious Stones were sold, consigned, or transferred by other means;

(b) the date of the sale, delivery, consignment, or transfer of the Precious Stones;

(c) the name of the consignee, recipient, or purchaser of the Precious Stones;

(d) if consigned, copies of all related memorandums and consignment documentation;

(e) if sold, copies of all related invoices, bills of sale, and sale documents; and

(f) the purchase price paid for the Precious Stones and any proof or receipt of payment.

## COUNT TWENTY

### (Permanent Injunction Against the Essex Defendants and John Doe Defendants Under 11 U.S.C. §§ 105 and 542(a) and Bankruptcy Rule 7065)

260.    The Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

261.    The Plaintiff requires a permanent injunction directing the Essex Defendants and John Doe Defendants to return the Precious Stones or cash equivalent to the Plaintiff. Without that or similar relief, the Essex Defendants will continue their misconduct untethered and threaten the integrity of the reorganization process. Permitting the Essex and John Doe Defendants to retain estate property under these circumstances undermines one of the most basic and essential principles of bankruptcy law; equal treatment of similarly situated creditors.

262.    The Plaintiff is likely to succeed on the merits of its claims asserted in this action.

263.    Certain of the Plaintiff's claims require the Plaintiff to prove its interests in the Precious Stones and establish that the Essex Defendants have failed to return the Precious Stones after demand.

264.    It is undisputed that the Plaintiff demanded that the Essex Defendants return the Precious Stones (*see* Exs. Z & aa), and, as of the date of this Amended Complaint, they failed to comply with those demands—notwithstanding the Essex Memos' clear and unambiguous language requiring them to do so.

265.    Upon information and belief, the Essex Defendants allege that they are entitled to retain some or all the Precious Stones as collateral for loan debt. (*See* Ex. Q, TRO Hr'g Tr. 10:22 – 11:3). The Essex Memos, however, are clearly not security agreements, and the Plaintiff never granted the Essex Defendants a security interest in any of the Precious Stones.

266.    The Plaintiff along with the Nominal Defendants financed the purchases of the Precious Stones and, therefore, the Plaintiff's estate shares ownership or other financial interests

in the Precious Stones with the Nominal Defendants.[13] The Plaintiff also has a superior right to the Precious Stones as consignor.

267.    The Plaintiff will be irreparably harmed without injunctive relief because, *inter alia*, the Precious Stones are highly valuable property, easily sold or transferred, and subject to easy concealment. The Essex Defendants, by ignoring the Plaintiff's demand letters (*see* Exs. Z & aa), have made it clear that they intend to imminently secrete, conceal, sell, hypothecate, or encumber the Precious Stones. Indeed, upon information and belief, they may have already done that with respect to some of the Precious Stones.

268.    The Plaintiff demands a permanent injunction pursuant to §§ 105 and 542(a) of the Bankruptcy Code and Fed. R. Civ. P. 65, as incorporated by Bankruptcy Rule 7065, directing the Essex Defendants and John Doe Defendants to return the Precious Stones to the Plaintiff, subject to the Bankruptcy Code's protections and safeguards.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that this Court grant the following relief:

        a)      declaratory judgment against the Essex Defendants and the John Doe Defendants and in favor of the Plaintiff confirming that the Precious Stones are property of the Debtor's estate pursuant to § 541 of the Bankruptcy Code;

---

[13] To the extent the Plaintiff's prospects for a successful reorganization are relevant to its request for injunctive relief, a successful reorganization seems reasonably likely if the Precious Stones are returned or the Plaintiff receives their equivalent value. It is still early in the bankruptcy case, so the Plaintiff respectfully submits that it should be given the benefit of the doubt.

b)      judgment against Essex, and/or Paul, and/or the John Doe Defendants and in favor of the Plaintiff directing immediate turnover of the Precious Stones to the Debtor pursuant § 542 of the Bankruptcy Code;

c)      judgment against Essex, and/or Paul, and/or the John Doe Defendants and in favor of the Plaintiff avoiding and recovering the transfers of the Precious Stones, or their value, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, from the Essex Defendants and/or the John Doe Defendants as preferences pursuant to §§ 547 and 550 of the Bankruptcy Code;

d)      judgment against Essex and/or Paul and in favor of the Plaintiff avoiding and recovering the alleged security interests in the Precious Stones from Essex and/or Paul or their value, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, as preferences pursuant to §§ 547 and 550 of the Bankruptcy Code;

e)      judgment against Essex and/or Paul and/or the John Doe Defendants and in favor of the Plaintiff avoiding and recovering the transfers of the Precious Stones or their value, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, from Essex and/or Paul and/or the John Doe Defendants as constructively fraudulent transfers pursuant to §§ 548 and 550 of the Bankruptcy Code;

f)      judgment against Essex and/or Paul and in favor of the Plaintiff avoiding and recovering the alleged security interests in the Precious Stones or their value, in an amount to be determined at trial, but no less than

$17,030,000.00 plus prejudgment interest, from Essex and/or Paul as constructively fraudulent transfers pursuant to §§ 548 and 550 of the Bankruptcy Code;

g) judgment against Essex and/or Paul and/or the John Doe Defendants avoiding and recovering the transfers of the Precious Stones or their value, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, from Essex and/or Paul and/or the John Doe Defendants as voidable transfers under 11 U.S.C. §§ 544(b)(1), 550 and N.Y. Debt. & Cred. Law §§ 271–73, 278.

h) judgment against Essex and/or Paul avoiding and recovering the security interests in in the Precious Stones or their value, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, from Essex and/or Paul as voidable transfers under 11 U.S.C. §§ 544(b)(1), 550 and N.Y. Debt. & Cred. Law §§ 271–73, 278.

i) judgment against the John Doe Defendants avoiding and recovering any post-petition transfers of the Precious Stones or their value, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, from one or more of the John Doe Defendants.

j) judgment against the Essex Defendants and the John Doe Defendants (as applicable) and in favor of the Plaintiff disallowing pursuant to § 502(d) of the Bankruptcy Code the Essex Unsecured Claim or any other claims that Essex, Paul, and/or any John Doe Defendants may have or assert against the estate;

k)   judgment against the Essex Defendants and in favor of the Plaintiff equitably subordinating pursuant to § 510(c) of the Bankruptcy Code the Essex Unsecured Claim or any other claims that Essex and/or Paul may have or assert against the estate;

l)   judgment against Essex and in favor of the Plaintiff, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, for breach of contract;

m)   judgment against Essex and in favor of the Plaintiff, in an amount to be determined at trial, but no less than $7,500,000.00 plus prejudgment interest, on an account stated;

n)   judgment against the Essex Defendants and in favor of the Plaintiff, in an amount to be determined at trial, but no less than $7,500,000.00 plus prejudgment interest, for fraudulent inducement;

o)   judgment against the Essex Defendants and in favor of the Plaintiff, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, for unjust enrichment;

p)   judgment against the Essex Defendants and in favor of the Plaintiff, in an amount to be determined at trial, but no less than $17,030,000.00 plus prejudgment interest, for conversion;

q)   judgment against the Essex Defendants and in favor of the Plaintiff awarding possession of the Precious Stones to the Plaintiff or, alternatively, awarding the Plaintiff the value of the Precious Stones in an amount to be

determined at trial, but no less than $17,030,000.00 plus prejudgment interest;

r)    judgment against the Essex Defendants and in favor of the Plaintiff imposing a constructive trust on the Precious Stones or their equivalent value;

s)    judgment against the Essex Defendants and in favor of the Plaintiff directing the Essex Defendants to perform an accounting of the Precious Stones;

t)    a permanent injunction directing the Essex Defendants and/or the John Doe Defendants to return the Precious Stones to the Plaintiff pursuant to §§ 105 and 542(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

Dated: New York, New York
      August 6, 2019                    TROUTMAN SANDERS LLP

                                By: */s/ Aurora Cassirer*
                                     Aurora Cassirer
                                     Brett D. Goodman
                                     Alissa K. Piccione
                                     875 Third Avenue
                                     New York, New York 10022
                                     Tel.: (212) 704-6000
                                     Fax: (212) 704-6288

                                *Proposed Counsel for the Plaintiff The D&M Capital Group, LLC*

# VERIFICATION

## VERIFICATION OF MOTY SPECTOR

STATE OF NEW YORK      )
                              ) ss.:

COUNTY OF NEW YORK    )

      I am Manager of the Plaintiff Limited Liability Company in this Action, and set forth that that I have read the foregoing Complaint and know the contents thereof; the same is true to Deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

/s/
MOTY SPECTOR

Sworn to before me this
6th day of August 2019

Notary Public

Janet Gerena
Notary Public, State of New York
No. 01GE6223275
Qualified in Dutchess County
Commission Expires 11/21/2022

48