UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------

In re:

THE D & M CAPITAL GROUP, LLC,                     Chapter 11

                    Debtor.                   Case No. 19-11711 (SCC)

---------------------------------------------------------------

THE D & M CAPITAL GROUP, LLC,

                    Plaintiff,

    -against-                                    Adv. Pro. No. 19-01300 (SCC)

ESSEX GLOBAL TRADING, LLC, ALEKS PAUL,
and "JOHN DOES," said names being fictitious
and unknown,

                    Defendants,

-and-

RADWAN DIAMOND & JEWELRY TRADING,
ULTIMATE DIAMOND CO., S.B. DIAMOND CORP.,
PALAWAN HOLDINGS LIMITED and GEMCUT S.A.,

                    Nominal Defendants.

---------------------------------------------------------------

ESSEX GLOBAL TRADING, INC.,

                  Plaintiff,

    -against-

MOTY SPECTOR,

                  Third-Party Defendant.

---------------------------------------------------------------

**MEMORANDUM OF LAW IN OPPOSITION TO
DEBTOR'S APPLICATION FOR A PRELIMINARY
INJUNCTION ORDER ENJOINING THE TRANSFER OF SIX PRECIOUS
STONES, AND COMPELLING TRANSFER OF CERTAIN OF
THOSE STONES TO THE UNITED STATES**

**SAM P. ISRAEL P.C.**
Sam Israel, Esq.
Timothy Foster, Esq.
180 Maiden Lane, 6th Fl.
New York, New York 10038
Tel.: (646) 787-9880
samisrael@spi-pc.com
timfoster@spi-pc.com

*Attorneys for Defendants Essex Global Trading,
LLC and Aleks Paul*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................... *ii*

**BACKGROUND** ........................................................................................................................1

    The Prepetition Relationship Between the Parties ...................................................1

**I. LEGAL STANDARD FOR ENTRY OF PRELIMINARY INJUNCTION AND BURDEN OF PROOF ON OWNERSHIP OF STONES** ............................................5

    A.    Legal Standard for Issuing Preliminary Injunction ...............................................6

    B.    The Debtor Has the Burden of Proof as to Whether Stones Are Property of the Estate ...........................................................................................................9

**II. THE DEBTOR HAS FAILED TO MEET ITS BURDEN OF PROOF.** ................11

    A.    The Stones Were Collateral and Payment of the Debtor's Obligations, Not Consigned Goods ................................................................................................11

    B.    Essex Perfected its Security Interest in the Pledged Stones Through Possession Under Applicable Law .......................................................................12

    C.    By Agreement of the Parties, Essex Now Owns the Stones ..............................13

    D.    Essex's Interest in the Stones is Superior to That of the Debtor ......................14

**III. CONCLUSION** ..................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Babitt v. Vebeliunas (In re Vebeliunas)*, 252 B.R. 878, 885 (Bankr. S.D.N.Y. 2000) ........9

*Bailey v. Suhar (In re Bailey)*, 380 B.R. 486, 490 (B.A.P. 6th Cir. 2008) ..........................9

*Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016) ............................................................................................................ 14-15

*Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) ............................................................6

*Geron v. Peebler (In re Pali Holdings, Inc.),* 488 B.R. 841, 851-52 (Bankr. S.D.N.Y. 2013) .....................................................................................................................................15

*Gorenz v. State of Illinois Dept. of Agriculture,* 653 F.2d 1179 (7th Cir. 1981) ..................9

*In re Chateauguay Corp.*, 201 B.R. 48, 71 (Bankr. S.D.N.Y. 1996) .....................................6

*In re Fairfield Sentry Ltd.*, 458 B.R. 665, 683 (S.D.N.Y. 2011) .........................................15

*In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975, 979 (Bankr. S.D.N.Y. 1986) ..........................9, 10

*Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007) ..................................................................................................................................6, 7

*Spradlin v. Khouri (In re Bruner)*, 561 B.R. 397, 403 (B.A.P. 6th Cir. 2017) .....................9

*United States v. Chalmers (In re Wheeler)*, 252 B.R. 420, 425 (W.D. Mich. 2000) ...........9

**STATUTES, RULES, REGULATIONS**

11 U.S.C. §542 ...........................................................................................................5, 7, 9, 10
N.Y. U.C.C. § 9-313 ..............................................................................................................12, 13

# BACKGROUND

Essex Global Trading, Inc. ("Essex") will establish that the six stones[1] (the "Stones")[2] as to which The D & M Capital Group, LLC ("D&M" or the "Debtor") asserts an ownership interest were and are the property of Essex, or (with respect to four of the Stones) were the property of Essex at the time that it transferred them to its own lender, Mollard Equities, Inc. ("Mollard") to partially satisfy the payment obligations of Essex to Mollard. This Memorandum of Law provides a brief overview of the facts, the applicable legal standard for entry of a preliminary injunction here, authorities concerning the burden of proof on each of the relevant issues and argument on whether such burdens of proof have been met.

### *The Prepetition Relationship Between the Parties*

Prepetition, Essex made two secured loans to the Debtor, at the request of the Debtor's principal, Moty Spector. The first was funded in installments over several years beginning in 2012 (the "First Loan").[3] The balance of the First Loan to D&M rose as high as $10,500,000.00, and this debt was secured by numerous precious stones or jewelry pieces pledged by D&M as collateral. The First Loan was periodically paid down by a transfer of a stone or stones by the

---

[1] Essex notes that two of the pieces are more accurately described as jewelry pieces than stones.

[2] The six pieces comprising the Stones are: (1) A ring containing a 23.38 carat Kashmir sapphire, listed as "Class JR0182 – One PL Ring with 23.38 CTS, KASHMIR SAPPHIRE WITH (2) BLTS 0.89 AND 0.83 CTS JR0182" and known as the "Kashmir Sapphire" or "Item JR0182"; (2) A pink diamond listed as "CLASS DM2950 10.51 PS FDORPK VS1" and known as the "Pink Diamond" or "Item DM2950"; (3) A ring containing a 7.02 carat ruby listed as "Item No. JR0306, Platinum Ring with Ruby 7.02 CT surrounded by 8 OV 3.43 CT with Micro Pave on Shank 35 CT" and known as the "Ruby Ring" or "Item JR0306"; (4) A ring containing a yellow diamond listed as "Item No. JR0280 – YG Diamond Ring with SE 10 02CT FVY VS2 Set with FYI Melee 2 15 CT TW" and known as the "Yellow Diamond" or "Item JR 0280; (5) A pair of emerald and pearl earrings listed as "Item No. JE0104 A Pair of Emerald Pearl and Diamond Earring with Two Drop Emerald Briolettes" and known as the "Emerald Earrings" or "Item JE0104"; and (6) A cross-shaped pendant listed as "Item No. JP 0105, one cross pndt with (7) FIPK diamonds 4.69cts ttl and 1.17cts white melee w black rope and (4) white melee 0.2 cts ttl on caps on end" and known as the "Cross Pendant" or "Item JP0105".

[3] Essex entered into a loan agreement as borrower with other entities, including Mollard Equities, Inc., in order to ensure that it had sufficient funds to make the loans to the Debtor and maintain its own business. The series of loan agreements entered into by Essex (as borrower) with Mollard (as lender) are attached hereto as Exhibit A.

Debtor, and was fully satisfied in 2017, with Essex accepting a stone from the Debtor in lieu of a monetary payment, structured as Essex making a "purchase" from D&M and receiving a credit towards the purchase price in the amount that was due to Essex in connection with the First Loan. The D&M loan record detailing this transaction is attached hereto as Exhibit B.

Almost immediately thereafter, the Debtor requested another loan from Essex (the "Second Loan"). The Second Loan was originally funded in the amount of $5,500,000.00, and later increased to a balance of $6,500,000.00. As with the First Loan, Essex needed to borrow additional funds from its own creditors, primarily Mollard, in order to facilitate the Second Loan to D&M. The Second Loan was made on similar terms to the First Loan—the parties agreed that the Second Loan would be secured, and that interest would be paid monthly, and several stones were delivered to Essex to serve as collateral.

Numerous memos issued by the Debtor and delivered to Essex throughout the terms of the First Loan and the Second Loan state that the pieces listed are designated "collateral" (the "Collateral Memos"). Examples of some of these Collateral Memos are attached hereto as Exhibit C. Many of the Collateral Memos also certified that the stones pledged as collateral by D&M, including several of the Stones at issue here, were wholly owned by D&M—certifications which Essex now knows are likely false, given new statements by Mr. Spector and allegations by several third parties that some of the Stones were in reality owned only partially by D&M and partially by third parties (or, in the case of the Ruby Ring, not actually owned by D&M at all).

During the life of the Second Loan, the collateral stones were sometimes swapped for other stones of comparable value;[4] there was no unique property of any individual stone that required it

---

[4] Essex notes that while the Debtor has made repeated references in pleadings to the value of the Stones being in excess of $18 million, the statements provided by the Debtor reflecting the amounts paid for the Stones shows a total value of $6,827,000.

2

to be kept as collateral, and, as is customary in the industry, the parties made substitutions for similarly valued pieces when required, simply maintaining a roughly equivalent total value of the collateral pieces being held by Essex.

The Debtor made a few monthly interest payments in connection with the Second Loan, sometimes granting ownership of stones or jewelry pieces to Essex rather than making cash payments. However, by mid-2018, the Debtor had stopped making the required monthly payments on the Second Loan and was in default of its obligations to Essex. D&M issued a series of checks to Essex in connection with these payments but asked Essex not to deposit those checks (copies of these uncashed checks are attached hereto as Exhibit D). D&M acknowledged that it was in default under the Second Loan, and by November of 2018, after several conversations between Mr. Spector (on behalf of D&M) and Mr. Paul (on behalf of Essex), D&M and Essex agreed that the stones being held by Essex as collateral would become the property of Essex, in satisfaction of the principal amount and overdue interest outstanding under the loan. The stones held as collateral by Essex at that time included (i) the Kashmir Sapphire, (ii) the Pink Diamond, and (iii) the Yellow Diamond, and the parties agreed that D&M granted these three stones to Essex in satisfaction of the principal amount due on the Second Loan, but not the interest. Another piece then held by Essex and designated as collateral—and thus owned by Essex in November 2018—was a "One PL Ring with Cushion Ruby 'Burma' 28.59CTS With 2 PS 2.02 CT D VVS1 and 2.00 CT D VVS1" given Item No. JR0250 (the "Burma Ring"). D&M and Essex disagreed as to whether the Burma Ring should be taken by Essex to satisfy the unpaid interest on the Second Loan, and negotiations continued for several months. In early 2019, the parties agreed that two other pieces—the Cross Pendant and the Emerald Earrings—would be transferred to Essex, and that the Burma Ring would be returned to D&M in exchange for a different piece, the Ruby Ring, and that Essex's retention

3

of the Cross Pendant, the Emerald Earrings, and the Ruby Ring (in exchange for the Burma Ring) would fully satisfy the outstanding interest and the remaining debt of D&M under the Second Loan. Accordingly, D&M transferred the Cross Pendant and the Emerald Earrings to Essex, and Essex exchanged the Burma Ring (which D&M listed at a memo value of $6,000,000.00) for the Ruby Ring (which D&M listed at a value of $2,5000,000.00), and Essex considered the debt to be satisfied and made no further demands of D&M. D&M then prepared a loan statement reflecting the payoff of the Second Loan, which was delivered to Essex. A copy of this loan statement is attached hereto as Exhibit E.

The loan statement created by D&M shows that no timely payments were made after early 2018, and that no interest *accrued* in late 2018 or in 2019. Further, Essex never wrote a demand letter to D&M or otherwise moved toward legal action to collect the debt upon which D&M was in default, precisely because Essex and D&M had agreed to satisfy the outstanding debt by transferring ownership of the collateral, which ultimately became the Stones.

Acting in reliance on the agreement it had reached with D&M in November of 2018 and finalized in 2019, Essex sent the Stones to Russia with a trusted courier, who left the United States on May 24, 2019 and arrived in St. Petersburg on May 27. Four of the Stones—the Kashmir Sapphire, the Yellow Diamond, the Pink Diamond, and the Ruby Ring (the "Mollard Stones")— had been granted to Mollard in order to satisfy Essex's outstanding debt to its own lender, which had been created in connection with Essex's issuance of the D&M Loans. The other two Stones— the Emerald Earrings and the Cross Pendant (the "Essex Stones")—were sent in hopes that a broker in Russia could find buyers for them for the benefit of Essex.

On May 28, 2019 (the "Petition Date"), D&M filed for Chapter 11 bankruptcy protection. Thus, as of the Petition Date, all six of the Stones were in Russia; Essex owned and had control of

4

two of the Stones, and the other four stones had been transferred from the ownership of Essex to the ownership of Mollard in partial satisfaction of Essex's loan obligations to Mollard.

Despite the continuous efforts of the Debtor to suggest otherwise, other than one minor inaccuracy regarding the date of travel to Russia, the statements made by Essex and Mr. Paul throughout this proceeding have been consistent with the above narrative, as detailed in the Declaration of Aleks Paul that was filed on September 25, 2019 [D.N. 42], a copy of which is attached hereto as Exhibit F.

### I. LEGAL STANDARD FOR ENTRY OF PRELIMINARY INJUNCTION AND BURDEN OF PROOF ON OWNERSHIP OF STONES

There is a gating issue that is relevant before turning to the legal standard for entry of a preliminary judgment. That issue is the fact that there are actually multiple legal standards applicable to the current adjudication, because a preliminary judgment is not the only relief requested in the amended complaint *and* it is not the only relief as to which the Debtor seeks a judicial determination at this time. Thus, in addition to *injunctive* relief as to what Essex and other parties in possession of the Stones shall do with the Stones, pending a final determination on the merits, the Debtor also asks for *affirmative* relief under §542(a), as it is seeking the *transfer* of the Stones.

The point of a preliminary injunction is to enjoin action pending a final determination on the merits. Here, that final determination would be an adjudication of the true ownership of each of the Stones, and the attendant values ascribed to each for purposes of claims and potential damages. Essex believed in good faith prior to the Petition Date, and still believes, that the four Mollard Stones were the property of Essex at the time of their transfer to Mollard, and that the other two Essex Stones were and still are the property of Essex. However, even if the Court decides otherwise with respect to one or more of the Stones, *i.e.*, that Essex has a collateral interest in one

5

or more Stones and not an outright ownership interest, the Court will then be faced with the question of whether Essex or the Debtor has the superior claim to the property. The Debtor is not entitled to turnover under the applicable legal standards because Essex still has a superior interest in the Stones, by virtue of its collateral rights.

To the extent the Court issues a final determination as to the actual ownership of the Stones, the injunctive relief requested may be moot. This distinction is relevant to the Court's consideration, not only in the context of the legal standard for issuance of a preliminary injunction, but also, perhaps even more, on the issue of whether the Debtor has met its burden of proof that its ownership of the Stones is not the subject of legitimate dispute. Each of those issues are addressed below.

### A. *Legal Standard for Issuing Preliminary Injunction*

Within the Second Circuit, courts have applied "the traditional preliminary injunction standard as modified to fit the bankruptcy context" in determining whether injunctive relief is warranted. *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007); *see also In re Chateauguay Corp.*, 201 B.R. 48, 71 (Bankr. S.D.N.Y. 1996). The traditional standards for seeking a preliminary injunction are that the party seeking the injunction must show: (1) a likelihood of *irreparable harm* in the absence of the injunction; and (2) either a likelihood of success on the merits or *sufficiently serious questions going to the merits* with a balance of hardships tipping decidedly in the movant's favor. *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

Bankruptcy courts have incorporated the following, more bankruptcy-specific factors in determining whether there is irreparable harm and which party is likely to prevail on the merits: "(1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent

6

irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harm tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction." *In re Calpine Corp.*, 365 B.R. at 409. The courts considering these factors have taken a flexible approach, with no single factor being determinative.

Essex has concerns regarding whether the Debtor is likely to succeed in its reorganization. The fact that the Debtor borrowed a total of up to $10,500,000.00 from Essex from 2012 until early 2017, satisfied that debt in 2017, and then immediately requested another, loan, does not suggest that the Debtor ever had a healthy business. But more tellingly, and more problematically, the Debtor repeatedly states in its adversary complaint that the Stones are integral to its reorganization.

The Stones were the property of Essex prior to the Petition Date, by virtue of the accord reached by the parties in November of 2018. And as Essex has previously and consistently disclosed, certain of the Stones continue to be the property of Essex, while others have been surrendered to a third party (Mollard) in partial payment of Essex's obligations to that third party. The Debtor does not have the right to use Essex's property in furtherance of the Debtor's reorganization efforts, yet it appears to be wholly relying on that property in its discussions of the reorganization of its business.

Essex submits that this entire adversary proceeding– which includes a request for injunctive relief, a turnover action under section 542(a) and preference allegations – is improper and does not support the Debtor's reorganization, given that the Debtor has not and cannot establish that the Stones are property of the estate.

As to the second factor, there is no imminent irreparable harm to the estate in the absence of an injunction. Two of the Stones belong to Essex, while four were the property of Essex and are now the property of Mollard. These Stones will continue to belong to Essex and Mollard

respectively, whether or not an injunction is issued. Meanwhile, the parties are on notice as to the Debtor's claims, the location of the Stones is known and their value is ascertainable. Furthermore, the Debtor has not presented any evidence or theory that supports an argument that these Stones are somehow unique or have special value such that their absence could not be fully compensated through a simple monetary judgment in the event that the Debtor is ultimately successful on its claims against Essex, even if the Stones somehow became lost and unrecoverable in the interim.

The balance of harm tips in favor of Essex, as the Debtor has not even met its burden of proof as to the Stones, which, as discussed below, are not property of the estate. As explained above, the worst-case scenario for the Debtor, if successful on its claims against Essex, would be a monetary judgment for the value of the Stones in the event that the Stones could not be recovered—thus, the Debtor stands to suffer little or no harm regardless of the issuance of the injunction. In stark contrast, Essex would suffer significant harm if ordered to somehow recover the Mollard Stones, because in order to do so Essex would somehow need to raise sufficient capital to immediately "buy back" the Mollard Stones from its creditor, a scenario which, if even possible, is likely to both cause Essex to incur significant debt and to severely damage its standing with its long-time creditor, to whom it promised and transferred the Mollard Stones. Therefore, the issuance of the requested injunction would be highly punitive and prejudicial to Essex, while the denial of the injunction would cause little or no harm to the Debtor.

To the extent that public interest is relevant to a contractual dispute such as this, public interest sides with Essex as injunctive relief is extraordinary and, again, the Debtor cannot demonstrate that the Stones belong to it. Additionally, Essex acted in good faith when it transferred the Mollard Stones, which it owned due to the agreement Essex made with D&M to satisfy the Second Loan, prior to the Petition Date—an agreement that is evidenced in multiple ways,

8

including D&M's own documents that reflect interest accruals having ceased on the Second Loan. To force Essex to undo that good-faith transaction, to the severe detriment of Essex, would go against sound public policy and allow D&M to harm Essex greatly prior to a final determination on the many claims at issue in this adversary proceeding.

Coming full circle to the traditional standard for granting a preliminary injunction, the Debtor simply cannot prove irreparable harm or a likelihood of success on the merits. The Debtor has not and cannot satisfy the threshold issue, which is demonstrating that the Stones are property of the estate. The evidence and the law both support that the Stones belong to Essex. Even were the Court to determine that ownership was not definitive, the Debtor cannot prove a likelihood of success on the merits in a turnover action under section 542(a) of the Bankruptcy Code when there is a credible dispute as to ownership of the property at hand, because a Debtor's turnover powers are limited to property that is indisputably that of the estate.

### B. The Debtor Has the Burden of Proof as to Whether Stones Are Property of the Estate

It is indisputable that the burden of proof in a turnover proceeding under section 542 of the Bankruptcy Code is at all times on the party seeking turnover. *Babitt v. Vebeliunas (In re Vebeliunas)*, 252 B.R. 878, 885 (Bankr. S.D.N.Y. 2000); *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986) (citing *Gorenz v. State of Illinois Dept. of Agriculture,* 653 F.2d 1179 (7th Cir. 1981)). Here, that party is the Debtor.

The party seeking the injunction must establish a *prima facie* case, proving by a preponderance of the evidence that the property in question is property of the estate. *Spradlin v. Khouri (In re Bruner)*, 561 B.R. 397, 403 (B.A.P. 6th Cir. 2017); *Bailey v. Suhar (In re Bailey)*, 380 B.R. 486, 490 (B.A.P. 6th Cir. 2008) (citing *United States v. Chalmers (In re Wheeler)*, 252 B.R. 420, 425 (W.D. Mich. 2000)).

9

The fact pattern present in *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986) is similar to the facts of this case. In *Weiss-Wolf*, the debtor was engaged in the business of buying, selling and manufacturing diamonds. As of the petition date, the debtor's lenders had possession of certain of the debtor's stones. The Weiss-Wolf debtor sought turnover of the stones, alleging that they had been consigned with the lenders, while the lenders asserted that the stones were pledged as collateral to secure the loan. And as in this case, the lenders still had possession of some of the stones, but had liquidated or otherwise ceded possession of others for various business purposes. The complaint asserted the debtor's turnover rights under Section 542 as well as allegations of conversion by the lenders with respect to the stones they no longer possessed. The lenders moved for summary judgment, which was granted by the Court (J. Abram) in connection with its denial of the debtor's turnover request.

With respect to the counts of the *Weiss-Wolf* complaint involving stones that the debtor claimed to own (on a theory that it had merely consigned them to its lenders), and which the lenders asserted had been pledged as collateral, the Court held that the debtor did not meet its burden of proof in establishing that the stones were its property. *Id.* at 979. In analyzing the counts to the complaint where (as here) third parties asserted their own property rights in the stones at issue, such that the debtor did not own the stones to the extent they had been pledged, the debtor's success "depends on the Debtor's ability to show that the Diamonds are property of the estate and that the Debtor's rights to the Diamonds are superior to any interests of the Banks." *Id.* at 975. The Court held that although it is well-known that diamond merchants regularly both own and consign stones, there was not sufficient cause to believe that the lenders knew that the stones were subject to ownership disputes and that the lenders were entitled to trust the debtor's representations of ownership without a duty to investigate provenance. As long as there was no evidence that the

10

lenders failed to act in good faith, the Court determined that the collateral pledge would be upheld. Similarly here, there is no evidence whatsoever that Essex had any reason, prior to the Petition Date, to doubt the statements made by D&M that the Stones pledged as collateral to Essex were wholly owned by D&M and were not subject to any dispute, or that Essex acted in anything other than good faith in acting in reliance upon the accord made between Essex and D&M to satisfy the debt on the Second Loan through the transfer of the Stones.

## II. THE DEBTOR HAS FAILED TO MEET ITS BURDEN OF PROOF

The Debtor here has not, and cannot, meet its burden of proof. The preponderance of the evidence, which will be set forth at the hearing and is discussed below, illustrates that the Stones belong to Essex.

### A. *The Stones Were Collateral and Payment of the Debtor's Obligations, Not Consigned Goods*

The Collateral Memos indisputably designated certain property (which ultimately became the Stones) as security for the Second Loan; in the Collateral Memos, D&M further represented that the pieces pledged as collateral were wholly owned by D&M. By early 2018, D&M had stopped making the required payments under the Second Loan and the parties entered negotiations that culminated in an agreement to satisfy the debt by the granting to Essex of certain pieces that had been pledged to it as collateral per the Collateral Memos.[5] This practice was consistent with the course of the parties' dealings throughout the term of the First Loan, for which D&M had pledged certain stones as collateral, and which debt was ultimately satisfied in 2017 by the granting to Essex of valuable jewelry. At D&M's insistence, during the course of the parties' culmination

---

[5] To the extent that the Collateral Memos contain boilerplate language suggesting that the pieces depicted thereon are only given on consignment and remain full property of D&M, this general pre-printed form language is negated and superseded by the unique and specific contradictory notation that the listed pieces are indeed designated as collateral to Essex.

11

of the new agreement, Essex refrained from cashing checks that were issued to it by D&M for ongoing payments on the Second Loan. Essex had no reason to refrain from cashing these checks were it not receiving similar value from D&M in some other form—namely, ownership of the pieces of jewelry had been holding as collateral. Simply put, everything Essex did between the issuance of the Second Loan in 2017 and the Petition Date—from issuing the Second Loan in the first place, to refraining from cashing D&M's checks, to not declaring D&M's default and pursuing collection on the Second Loan after D&M stopped paying, to taking possession of the Stones, to sending the Mollard Stones to the ownership of Essex's creditor—is consistent with Essex's account that the Second Loan was secured by the Stones and, upon its default, D&M entered into a new agreement with Essex to satisfy the Second Loan debt by transfer of the Stones, and makes no sense through the lens of D&M's argument that the gems were not collateral but merely "consignments."

### B. *Essex Perfected its Security Interest in the Pledged Stones Through Possession Under Applicable Law*

The Debtor tendered the Stones to Essex as collateral for its loan. As Essex held possession of the Stones, its security interest in such collateral was properly perfected in accordance with applicable law. Section 9-313 of the New York Uniform Commercial Code provides, in relevant part:

> § 9-313. WHEN POSSESSION BY OR DELIVERY TO SECURED PARTY PERFECTS SECURITY INTEREST WITHOUT FILING
>
> (a) [Perfection by possession or delivery.] Except as otherwise provided in subsection (b), **a secured party may perfect a security interest in** tangible negotiable documents, **goods**, instruments, money, or tangible chattel paper **by taking possession of the collateral**.

N.Y. U.C.C. § 9-313. Perfection is automatic and does not require a paper filing when a secured party takes actual possession of collateral, such as Essex did with respect to the Stones. For the

12

avoidance of doubt, even in circumstances where a lender gives possession of the collateral to a third-party (for the lender's benefit), the security interest remains and possession is not ceded. *See* N.Y. U.C.C. § 9-313(h).

Essex physically held the Kashmir Sapphire, the Yellow Diamond, and the Pink Diamond as collateral pledged by D&M long before the parties finalized their accord in November 2018, as evidenced by numerous Collateral Memos dated in 2017 and 2018. As of November 2018, pursuant to the parties' agreement, Essex took full ownership of those three stones and retained that ownership until those stones were assigned to Mollard in May of 2019. Any movement of the stones, including to or from D&M, between November 2018 and May 2019 was on consignment *by Essex* of its property.

Essex took possession of the Ruby Ring no later than March 28, 2019; this Ring was contemporaneously exchanged, along with the Cross Pendant and the Emerald Earrings, for like value with the Burma Ring, which Essex had held as collateral no later than November of 2018, and to the detriment of Essex according to the respective values of the two rings listed on D&M's memos. This final exchange was the culmination of months of ongoing negotiations between the parties in conjunction with their November 2018 agreement to resolve the debt on the Second Loan through transfers of gemstones. Upon Essex's taking possession of each of the Stones, or, in the case of the Ruby Ring, the Cross Pendant, and the Emerald Earrings, the piece for which it was contemporaneously exchanged for like value (the Burma Ring), Essex's security interest in that particular stone became perfected.

### C. By Agreement of the Parties, Essex Now Owns the Stones

Because the Stones were pledged as collateral and were then used as payment by D&M in satisfying its indebtedness to Essex, Essex owns the Stones outright. The agreement by the parties

13

to pay down the principal and interest owed to Essex under the Second Loan is evidenced not only by Essex's pattern of activity between November 2018 and May of 2019, which, as previously discussed, is fully consistent not only with Essex's account of the parties' dealings (and would make little sense if D&M's competing account is to be believed instead), but also with the documentary evidence, which includes the Collateral Memos (which unquestionably designate the Stones as security for the Second Loan), the checks tendered by D&M to Essex which were not deposited by Essex, and D&M's own records of the D&M Loans, which show that monthly interest payments on the Second Loan were not made, and indeed, stopped accruing, in late 2018.

### D. *Essex's Interest in the Stones is Superior to That of the Debtor*

If the Court was to find that Essex does not own one or more of the Stones outright, the Stones, at a minimum, are collateral to secure the pre-petition Second Loan. Accordingly, the Debtor's turnover request should be denied because Essex's interest in the Stones—a properly perfected security interest—outweighs that of the estate. Essex will adduce evidence that though the Debtor contends that the Stones have a certain precise value in its papers, this is contrary to industry standard which belies dollar-for-dollar precision but operates as to approximate values when replacing one stone for another, whether in the context of a trade, or where serving as collateral. The point here is that whereas the Debtor assigns a very high "value" to the Stones in the Collateral Memos, those values are wildly overinflated. All that can be known to a certainty is that Essex has senior and superior rights to the Stones, whether through ownership, collateral rights, or a combination of both.

For the estate's turnover power to be properly invoked, it must be to recover property that is *already* property of the estate. In fact, it is the clear title to the property that is the source of the Court's *in rem* jurisdiction over the bankruptcy *res*. *Ball v. Soundview Composite Ltd. (In re*

14

*Soundview Elite Ltd.)*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016); *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 851-52 (Bankr. S.D.N.Y. 2013). "[T]he turnover power can be improperly invoked, especially when it is used…as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. It is well established that the turnover power may not be used for such purposes." *Id.* at *851* n.39 (emphasis added); *see also In re Fairfield Sentry Ltd.*, 458 B.R. 665, 683 (S.D.N.Y. 2011) (Preska, C.J.) ("Numerous courts have therefore held that an action is non-core when property which is the subject of a significant dispute between the parties is sought to be recovered through a turnover action...."). As the Debtor has not met its burden of proof in establishing conclusively that the Stones are property of the estate, both the injunctive relief and the turnover request should be denied.

### III. CONCLUSION

For all of the foregoing reasons, along with the oral and documentary evidence that will be presented at the upcoming evidentiary hearing, Essex should be adjudged to be the rightful owner of the Stones, and the preliminary injunction sought by the Debtor should be denied.

Dated: New York, New York
November 25, 2019

Sam P. Israel, P.C.

By: _____

Sam P. Israel (SPI-0270)
Timothy L. Foster (TF-8896)
180 Maiden Lane, 6th Floor
New York, New York 10006
T: (646) 787-9880; F: (646) 787-9886
samisrael@spi-pc.com
timfoster@spi-pc.com

15