WINDELS MARX LANE & MITTENDORF, LLP          **Hearing: April 8, 2021 at 10:00 a.m.**
*Attorneys for Alan Nisselson, Chapter 7 Trustee*          **Objections: April 1, 2021 at 5:00 p.m.**
156 West 56th Street
New York, New York 10019
Tel. (212) 237-1000 / Fax. (212) 262-1215
Attorney Appearing:   Antonio J. Casas (acasas@windelsmarx.com)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X          Chapter 7
In re:
                                                                              Case No. 19-11711 (SCC)
THE D&M CAPITAL GROUP, LLC,

                                    Debtor.
-------------------------------------------------------------------X
THE D&M CAPITAL GROUP, LLC,                                                    Adv. Pro. No. 19-01300 (SCC)

                                    Plaintiff,

-against-

ESSEX GLOBAL TRADING, LLC, ALEKS PAUL,
and "JOHN DOES," said names being fictitious and
unknown,

                                    Defendants,

-and-

RADWAN DIAMOND & JEWELLERY TRADING,
ULTIMATE DIAMOND CO., S.B. DIAMOND CORP.,
PALAWAN HOLDINGS LIMITED, and
GEMCUT S.A.,

                                    Nominal Defendants.

-------------------------------------------------------------------X
-------------------------------------------------------------------X
ESSEX GLOBAL TRADING, INC.,

                                    Third-Party Plaintiff,

-against-

MOTY SPECTOR,

                                    Third-Party Defendant.
-------------------------------------------------------------------X

{11895607:2}

**NOTICE OF HEARING ON TRUSTEE'S MOTION FOR ENTRY OF AN ORDER
APPROVING SETTLEMENTS OF THE ADVERSARY PROCEEDING AND RELATED
BANKRUPTCY AND INSURANCE CLAIMS**

**PLEASE TAKE NOTICE** that on **April 8, 2021 at 10:00 a.m., prevailing Eastern
time**, or as soon thereafter as counsel may be heard, a hearing (the "***Hearing***") will be held
before The Honorable Shelley C. Chapman, United States Bankruptcy Judge, in her Courtroom
623 at the United States Bankruptcy Court for the Southern District of New York, One Bowling
Green, New York, New York 10004, to consider the motion (the "***Motion***") of Alan Nisselson
(the "***Trustee***"), Chapter 7 Trustee of plaintiff The D&M Capital Group, LLC, for an order
substantially in the form attached to the Motion as Exhibit "1" approving (i) a settlement
between the Trustee and defendants Essex Global Trading, Inc. *a/k/a* Essex Global Trading, LLC
and its principal Aleks Paul and (ii) a settlement between the Trustee and Certain Underwriters at
Lloyd's, London, including Ascot, AXA, Management Research Services, Arch, W/R/B and
Chubb Global Markets – Marine.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted
telephonically pursuant to General Order M-543 of the Bankruptcy Court, and Bankruptcy Judge
Chapman's Chambers Rules, which may be found on the Bankruptcy Court's website at
www.nysb.uscourts.gov (the "***Court's Website***").  Parties wishing to participate in the Hearing
telephonically must register with Court Solutions.  Information on how to register with Court
Solutions can be found in General Order M-543.

**PLEASE TAKE FURTHER NOTICE** that the Motion with exhibits, including the
settlement agreements, and all the other papers filed in support of the motion, including the
Declarations of the Trustee and Antonio J. Casas (with exhibits), are available for viewing on the
Internet through the Court's official website, www.nysb.uscourts.gov (the "***Court's Website***"), or

upon request to the undersigned or the Clerk of the Court. A Pacer password is required to access documents on the Court's Website.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion must be in writing; must conform to the Bankruptcy Code, the Bankruptcy Rules and the Court's Local Rules; must be electronically filed with the Bankruptcy Court in accordance with General Order No. M-399, which, along with the User's Manual for the Electronic Case Filing System, can be found at the Court's Website; and must be served so as to be **received by no later than April 1, 2021 at 5:00 p.m., prevailing Eastern time** (the "*Objection Deadline*") by (i) the Bankruptcy Judge (a hard copy clearly marked "Chambers Copy" must be delivered to the Court to the attention of Chambers of The Honorable Shelley C. Chapman), (ii) Windels Marx Lane & Mittendorf, LLP, 156 West 56th Street, New York, New York 10019, Attn. Antonio J. Casas, Esq., (iii) Wade Clark Mulcahy LLP, 180 Maiden Lane, Suite 901, New York, New York 10038, Attn: Dennis M. Wade, Esq., (iv) Sam P. Israel P.C., 180 Maiden Lane, 6th Floor, New York, New York 10038, Attn. Timothy Savitsky, Esq. and Sam P. Israel, Esq. and (v) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Greg Zipes, Esq.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed, served and received by the Objection Deadline will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Trustee without further notice. Parties who timely file responses or objections are required to attend the Hearing and failure to attend in person or by counsel may result in relief being granted or denied upon default. The Hearing may be adjourned from time to time without any further notice except for an announcement at the Hearing.

Dated: New York, New York     WINDELS MARX LANE & MITTENDORF, LLP
       March 4, 2021        *Attorneys for Alan Nisselson, Chapter 7 Trustee*

By:    */s/ Antonio J. Casas*
       Antonio J. Casas (acasas@windelsmarx.com)
       156 West 56th Street
       New York, New York 10019
       Tel.  (212)  237-1000  /  Fax.  (212)  262-1215

WINDELS MARX LANE & MITTENDORF, LLP          Hearing: April 8, 2021 at 10:00 a.m.
*Attorneys for Alan Nisselson, Chapter 7 Trustee*          Objections: April 1, 2021 at 5:00 p.m.
156 West 56th Street
New York, New York 10019
Tel. (212) 237-1000 / Fax. (212) 262-1215
Attorney Appearing:   Antonio J. Casas (acasas@windelsmarx.com)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X   Chapter 7
In re:
                                                                            Case No. 19-11711 (SCC)
THE D&M CAPITAL GROUP, LLC,

                              Debtor.
------------------------------------------------------------------------X
THE D&M CAPITAL GROUP, LLC,                                                  Adv. Pro. No. 19-01300 (SCC)

                              Plaintiff,

-against-

ESSEX GLOBAL TRADING, LLC, ALEKS PAUL,
and "JOHN DOES," said names being fictitious and
unknown,

                              Defendants,
-and-

RADWAN DIAMOND & JEWELLERY TRADING,
ULTIMATE DIAMOND CO., S.B. DIAMOND CORP.,
PALAWAN HOLDINGS LIMITED, and
GEMCUT S.A.,

                              Nominal Defendants.

------------------------------------------------------------------------X
------------------------------------------------------------------------X
ESSEX GLOBAL TRADING, INC.,

                              Third-Party Plaintiff,

-against-

MOTY SPECTOR,

                              Third-Party Defendant.
------------------------------------------------------------------------X

{80261860:7}

**TRUSTEE'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENTS
OF THE ADVERSARY PROCEEDING AND RELATED BANKRUPTCY AND
INSURANCE CLAIMS**
_____

**TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE**

Alan Nisselson (the "**Trustee**"), trustee for the Chapter 7 estate (the "**Estate**") of plaintiff The D&M Capital Group, LLC (the "**Debtor**," or "**D&M**"), submits this motion (the "**Motion**") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and section 105 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**").

## PRELIMINARY STATEMENT

1.     This adversary proceeding concerns six precious stones or pieces of jewelry (the "**Items**") transferred by the Debtor to defendants Essex Global Trading, Inc. *a/k/a* Essex Global Trading, LLC ("**Essex**") and its principal Aleks Paul ("**Paul**," and together with Essex, the "**Essex Defendants**") during the 90-day preference period.  The Debtor alleges the Items belong to the Estate or the named "nominal" defendants (full or part owners of the Items) and the Essex Defendants unlawfully refused to return them after receiving them from the Debtor on consignment.  The Essex Defendants allege the Debtor and its principal Moty Spector ("**Spector**") not only pledged the Items as collateral on a loan Essex had made to the Debtor, but also agreed they could keep the Items in satisfaction of the loan.

2.     The Debtor sought interim relief, and after a three-day evidentiary hearing at which both principals and other witnesses testified, this Court entered a preliminary injunction ordering the Essex Defendants to return two Items they were still holding, a cross pendant and a pair of earrings, and refrain from transferring, selling, encumbering or otherwise disposing of the

other four Items, which they claimed no longer to possess.  The Essex Defendants returned the cross pendant and the earrings to the Estate.  The other four Items are still missing.

3.      The Trustee requests the entry of an order substantially in the form attached to this Motion as Exhibit "1" (the "**Proposed Order**") approving two settlements arising out of the claims in the adversary proceeding.

4.      A settlement between the Trustee and the Essex Defendants (a) resolves a $6.5 million bankruptcy claim filed by Essex by allowing the claim and subordinating it for purposes of distribution to all other allowed claims and interests, and by requiring Essex to transfer to the Estate any lien securing the subordinated claim; (b) requires the Essex Defendants to (i) transfer to the Estate any ownership or other interest they may have in precious stones or fine jewelry currently in possession of the Debtor or out on consignment from the Debtor to others, including the cross pendant and the earrings, and (ii) make a settlement payment of $350,000; (c) lifts a $195,000 floating lien in connection with an aborted sale of the Estate's interest in the cross pendant; (d) ends this adversary proceeding, which has already cost the Estate over $720,000 in attorneys' fees; and (e) further requires Essex to dismiss with prejudice a cross-claim it filed against the Debtor in an adversary proceeding filed by a sole or part owner of three of the missing Items (the "**Essex Settlement**," attached to this Motion as Exhibit "2").

5.      A settlement between the Trustee and Certain Underwriters at Lloyd's, London, including Ascot, AXA, Management Research Services, Arch, W/R/B and Chubb Global Markets – Marine (the "**Underwriters**"), resolves an insurance claim the Debtor filed for the loss of the missing Items by requiring the Underwriters to make a settlement payment of $450,000, which is just $25,000 shy of the applicable coverage limit taking into account the Debtor's deductible (the "**Insurance Settlement**," attached to this Motion as Exhibit "3").

6.    The settlements are in the Estate's best interest, because combined they subordinate the largest claim against the Estate, and transfer to the Estate any lien securing the subordinated claim; give the Estate a substantial influx of cash, totaling $800,000; clear the way for the Estate to sell its interests in certain valuable pieces of jewelry; allow the Estate to avoid protracted and costly litigation on factual and legal issues that call for extensive discovery and make a judgment hard to predict; and do not foreclose other owners of the missing Items from pursuing claims against the Essex Defendants.

7.    The settlements are a product of arm's length bargaining between the parties and the Trustee's review of numerous documents exchanged by the parties, deposition testimony, the considerable evidentiary record developed for the preliminary injunction and this Court's preliminary injunction ruling.  The settlements take into account critical open questions as to the Debtor's alleged intent to pledge the Items as collateral; the true value of the Items, as opposed to the prices listed on consignment documents; and the accidental or unforeseen nature of the loss.

## JURISDICTION

8.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## THE BANKRUPTCY

9.    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 28, 2019.  (Case No. 19-11711, Doc. 1).

10.    On August 11, 2020, this Court entered an order converting the Debtor's case to a case under Chapter 7 of the Bankruptcy Code.  (Case No. 19-11711, Doc. 96).

11.    The Trustee is the duly appointed, qualified, permanent trustee of the Estate.

## THE ADVERSARY PROCEEDING AND PRELMINARY INJUNCTION

12.    The Debtor filed a complaint commencing this adversary proceeding against

Essex on June 21, 2019.  (Adv. Proc. No. 19-01300 (the "**D&M Adversary Proceeding**"), Doc.

1).

13.    In a twenty-count amended complaint filed on August 6, 2019 that added Paul as

a defendant and full or part owners of the Items as nominal defendants (the "**Nominal**

**Defendants**"), the Debtor alleged the Essex Defendants "[t]hrough artifice and fraud" possessed

or disposed of certain precious stones and fine jewelry the Debtor had transferred to Essex on

consignment during the preference period, including the following Items:

- A Kashmir sapphire ring (Item JR0182, the "**Kashmir Sapphire**");

- A pink diamond (Item DM2950, the "**Pink Diamond**");

- A yellow-gold diamond ring (Item JR0280, the "**Yellow Diamond**");

- A ruby ring (Item JR0306, the "**Ruby**");

- A pair of emerald pearl and diamond earrings (JE0104, the "**Earrings**"); and

- A diamond cross pendant (JP0105, the "**Cross Pendant**").

(Adv. Proc. No. 19-01300, Doc. 20 at ¶¶ 1-2, 25-46).[1]

---

[1] The Nominal Defendants are Radwan Diamond & Jewelry Trading ("**Radwan**"), part owner of the Kashmir Sapphire and the Pink Diamond; Ultimate Diamond Co., part owner of the Pink Diamond, Earrings and Cross Pendant; S.B. Diamond Corp. ("**SB**"), sole owner of the Ruby and part owner of the Kashmir Sapphire and Yellow Diamond; Gemcut S.A. ("**Gemcut**"), part owner of the Cross Pendant; and Palawan Holdings Limited, which appears to be a current or former affiliate of Gemcut.  Upon the effective date of the Essex Settlement, the Trustee will file a stipulation dismissing this adversary proceeding as to the Nominal Defendants.

14.     The Debtor sought varied relief in counts for a declaratory judgment under 28 U.S.C. § 2201; turnover under 11 U.S.C. § 542; avoidance and recovery of preferences and constructive fraudulent transfers under 11 U.S.C. §§ 547 or 548(a)(1)(B) and 550; avoidance and recovery of voidable transfers under 11 U.S.C. §§ 544(b)(1), 550 and the New York Debtor & Creditor Law; avoidance and recovery of post-petition transfers under 11 U.S.C. §§ 549(a) and 550; disallowance of claims under 11 U.S.C. § 502(d); equitable subordination under 11 U.S.C. § 510(c); breach of contract; recovery on an account stated; fraudulent inducement; unjust enrichment; conversion; recovery of chattels under N.Y. Civ. Prac. Law & R. 7101, 7108; constructive trust; an accounting; and a permanent injunction under 11 U.S.C. §§ 105, 542(a) and Bankruptcy Rule 7065.  (*Id.* at ¶¶ 85-268).

15.     The Essex Defendants filed an Amended Answer, Counterclaims and Third-Party Complaint on November 22, 2019 in which they (a) denied the Debtor's claims; (b) asserted counterclaims seeking, among other relief, a judicial declaration the Items belonged solely to Essex, because they alleged the Debtor had issued memos asserting 100% ownership of the Items and pledging them as collateral on an outstanding $6.5 million loan Essex had made to the Debtor (the "**Loan**"), and further alleged the Debtor agreed Essex could take the Items in satisfaction of the Loan; and (c) included claims against Spector for indemnification and seeking to hold him personally liable for rescission of the Loan.  (Adv. Proc. No. 19-01300, Doc. 55 at pp. 46-73).

16.     Early in the proceeding, the Debtor moved for a temporary restraining order to prevent Essex from transferring any of the Items.  (Adv. Proc. No. 19-01300, Doc. 2).  This Court denied the motion on July 1, 2019, except as to stipulated relief restraining and enjoining

Essex from transferring the Earrings and the Cross Pendant pending further order of the Court. (Adv. Proc. No. 19-01300, Doc. 10).

17.    The Debtor filed a second motion seeking similar relief, and on September 26, 2019 this Court entered a temporary restraining order enjoining the Essex Defendants and all persons acting on their behalf "from transferring, selling, encumbering, or otherwise disposing of" the remaining Items (i.e., the Kashmir Sapphire, Pink Diamond, Yellow Diamond and Ruby (the "**Four Stones**")) pending an evidentiary hearing.  (Adv. Proc. No. 19-01300, Docs. 32, 43).

18.    By the time the Court held the evidentiary hearing on December 9, 10, and 12, 2019, each side had deposed the other side's principal and the parties had exchanged 759 pages of documents.  *See* Declaration of Antonio J. Casas, Esq. ("**Casas Decl.**"), ¶ 4.

19.    Spector and his office manager/personal assistant Raphaela Colandrea testified at the hearing for the Debtor, and Aleks Paul and his former sales representative Justin Sachmechi and son Lawrence Paul testified for the Essex Defendants.  (Adv. Proc. No. 19-01300, Docs. 66, 67, 68).  The parties submitted a set of 198 joint exhibits to the Court.  *See* Casas Decl., ¶ 4.

20.    The Court read a decision on the last day of the hearing granting an injunction based on findings that (a) the Debtor made a prima facie showing as to its ownership or possessory interest in each of the Items, and "[t]he documentary and testimonial evidence adduced by Essex failed to refute the [D]ebtor's prima facie showing"; (b) the Debtor demonstrated a likelihood of success on the merits, because, among other reasons, while oral security agreements are permissible, intent is the determining factor, and the Essex Defendants failed to demonstrate the Debtor intended to pledge the Items as collateral on the Loan; and (c) the Debtor "would be irreparably harmed if a preliminary injunction was not granted" given (i) the uncertainties as to the "current location," "insured status" and "potential disposition" of the

Four Stones, (ii) the Essex Defendants' failure to demonstrate they had "sufficient funds to satisfy any money judgment," and (iii) the possibility the Essex Defendants "may in fact be judgment-proof."  (Adv. Proc. No. 19-01300, Doc. 62, Ex. A).

21.    The Court entered an amended order on December 19, 2019 in line with its decision from the bench.  (Adv. Proc. No. 19-01300, Doc. 62 (the "**Preliminary Injunction Order**")).  "To maintain the status quo pending judgment or other resolution of the [D&M] Adversary Proceeding," the Court enjoined the Essex Defendants "and all other persons known and unknown," including without limitation Mollard Equities Inc. ("**Mollard**") and Anna Joukova ("**Joukova**"), from "transferring, selling, encumbering or otherwise disposing of" the Four Stones, "except as otherwise specifically directed."  (*Id.* at p. 2 and ¶ 3).

22.    The Court further ordered the Essex Defendants to deliver the Earrings and Cross Pendant to the Debtor's counsel "care of Malca-Amit … to be stored by Malca-Amit in a secured vault under the custody and control of [the Debtor's] counsel."  (*Id.* at ¶ 5).

23.    The Essex Defendants delivered the Earrings and Cross Pendant to the Debtor's counsel within the time specified by the Preliminary Injunction Order.  *See* Casas Decl., ¶ 7.

24.    The Essex Defendants represented to the Court they delivered the Four Stones to Joukova and Mollard in Russia in May 2019, prior to the bankruptcy filing, and thus they no longer had possession of, or control over, the Four Stones.  *Ibid.*

25.    Counsel for the Trustee sent letters to the major auction houses and gem labs or institutes advising them of the preliminary injunction and the restraints on the Essex Defendants, Mollard, Joukova and all other persons.  Each letter enclosed a copy of the Preliminary Injunction Order and information as to each of the Four Stones and asked the recipients to contact counsel "immediately" should anyone contact them about any of the stones, or should

they receive any information as to the whereabouts or status of any of the stones.  *See* Casas
Decl., ¶ 8.

26.     The Debtor's previous counsel charged more than $720,000 in fees for their work
in the D&M Adversary Proceeding.  *See* Adv. Proc. No. 19-01300, Doc. 122.

## THE BANKRUPTCY CLAIM AND THE CROSS-CLAIM

27.     On August 29, 2019, Essex filed a proof of claim as a secured creditor for
payment on the Loan in the event the Court rejected Essex's claim to sole ownership of the Items
(Case No. 19-11711, Claim 11-1 (the "**Proof of Claim**")).

28.     Essex explained in an addendum to the Proof of Claim:

> [E]ssex files the instant claim in the alternative – if Essex remains the
> owner of the [Items], Essex considers the Loan as satisfied and, under
> such circumstances, Essex has no claim against the Debtor.  If, however, it
> is determined that Essex is not the owner of the [Items], then the Loan has
> not been satisfied and D&M remains in default of its debt to Essex in the
> amount of $6,500,000.
>
> [Claim 11-1, Part 2 at pp. 1-2.]

29.     Essex's Proof of Claim is the largest claim against the Estate.  Casas Decl., ¶ 6.

30.     Also in August 2019, SB commenced an adversary proceeding against the Debtor
and Essex.  (Adv. Proc. No. 19-01332 (the "**SB Adversary Proceeding**"), Doc. 1).

31.     SB sought declaratory relief in the form of a judgment finding (a) the Ruby is the
property of SB and not the property of the Debtor or the Estate; and (b) 33% ownership of the
Kashmir Sapphire and 50% ownership of the Yellow Diamond is the property of SB and not the
property of the Debtor or the Estate.  (*Id.* at ¶¶ 40-52).

32.     SB additionally sought injunctive and other relief with the aim of securing
possession of the three Items from the Debtor or Essex.   (*Id.* at ¶¶ 53-74).

33.     Essex answered the complaint on September 16, 2019 and included a 114-paragraph cross-claim against the Debtor for common law indemnification (the "**Cross-Claim**"). (Adv. Proc. No. 19-01332, Doc. 8).

34.     The Debtor answered the Cross-Claim on October 7, 2019, denying the gravamen of Essex's allegations and asserting a number of affirmative defenses.  (Adv. Proc. No. 19-01332, Doc. 10).

### THE ABORTED SALE OF THE DEBTOR'S INTEREST IN THE CROSS PENDANT

35.     On October 2, 2020, the Trustee filed a motion in the main case seeking the Court's approval of an asset purchase agreement (the "**APA**") between the Trustee and Gemcut to sell the Debtor's one-third ownership interest in the Cross Pendant to Gemcut for $195,000 (the "**Cross Pendant Sale**")[2], subject to higher and better offers.  (Case No. 19-11711, Doc. 130).  Essex objected to the motion (*id.* at Doc. 140), maintaining the position it took in the D&M Adversary Proceeding relative to the Cross Pendant, and the Trustee responded (*id.* at Doc. 142).

36.     On November 30, 2020, the Court entered an Order authorizing the Trustee to transfer the Estate's interest in the Cross Pendant to Gemcut in accordance with the APA's terms, and resolved the objection of Essex by stating as follows:

> (a) By this order, the Court does not resolve or determine the alleged ownership rights or security interests, if any, in the Cross Pendant held by any party or creditor.  Accordingly, the sale of the Estate's interest in the Cross Pendant shall be without prejudice to the claims of Essex regarding the Cross Pendant in [the D&M Adversary Proceeding], which are subject to the claims, defenses, and counterclaims of the Trustee and any other party to [the D&M Adversary Proceeding];

---

[2] The Debtor stated a price of $1,380,000 for the Cross Pendant when it issued Memo # 5251 consigning the Item to Essex in February 2019.  *See* Casas Decl., Ex. A.  The October 2020 sale price for the Debtor's one-third ownership in the Cross Pendant indicates the Item is worth approximately $585,000 ($195,000 x 3) or 42.4% of the memo price.

(b) Essex shall receive adequate protection for those claims in the form of a floating lien on the net proceeds of the Trustee's sale of the Debtor's interest in its inventory other than the Cross Pendant up to the amount of $195,000.00 [the "**Floating Lien**"]; and

(c) The lien granted above will terminate or be enforceable only after a determination by the Court in [the D&M Adversary Proceeding] or otherwise on the question of whether Essex has any security or ownership interest in the Cross Pendant.

[*Id.* at Doc. 152 at ¶¶ 4, 8.]

37.     Gemcut cancelled the purchase and the Trustee agreed to return Gemcut's deposit.

*See* Casas Decl., ¶ 6.

## THE VALUE OF THE ITEMS

38.     The following table breaks down the range of possible values of the Items based on certain information available to the Trustee:

| | Listed Memo or Invoice Price Upon Transfer to Essex[3] | Prior Purchase of Ownership Interest[4] | 42.4% of Memo or Invoice Price (based on the Cross Pendant Sale, *see* n. 2 above) | Range (high to low) |
|---|---|---|---|---|
| Kashmir Sapphire | $5,350,000 | $3,900,000 | $2,268,400 | $5,350,000 - $2,268,400 |
| Pink Diamond | $2,150,000 | $2,131,212 | $911,600 | $2,150,000 - $911,600 |
| Yellow Diamond | $1,100,000 | $825,000 | $466,400 | $1,100,000 - $466,400 |
| Ruby | $2,500,000 | $1,210,000 | $1,060,000 | $2,500,000 - $1,060,000 |
| Cross Pendant | $1,380,000 | $420,000 | $585,120 | $1,380,000 - $420,000 |
| Earrings | $550,000 | $352,000 | $233,200 | $550,000 - $233,200 |
| | | | | **$13,030,000 - $5,359,600** |

## THE INSURANCE CLAIM AND INVESTIGATION

39.     The Underwriters issued a Jewelers Block Insurance policy to the Debtor (the "**Policy**"). *See* Insurance Settlement Ex. A. The relevant policy period ran from December 25, 2018 to December 24, 2019 (the "**Policy Period**").

---

[3] *See* Casas Decl., ¶ 6 and Ex. A.

[4] *See* Casas Decl., ¶ 6 and Ex. B.

40.     The Policy covers the Debtor's stock (among other things) and "insures against all risks of physical loss of or damage" to stock "arising from any cause whatsoever," except, in relevant part,

(a) Loss, damage or expense caused by or resulting from sabotage, theft, conversion or other act or omission of a dishonest character, ...

2. on the part of any person to whom the [stock] may be delivered or entrusted by whomsoever for any purpose whatsoever ....

[*Id.*, Contract Wording at pp. 1-2, Section 5(a)(2).]

41.     Pursuant to the Policy's "Entrustee Infidelity Clause," however, "Insurance is extended to include Infidelity of dealer(s) in the jewelry trade and the individual(s) in the jewelry trade to whom the Insured has entrusted [stock] up to a limit of USD 500,000 each and every loss or one event." *Id.* at p. 32.  The clause provides for a deductible of "USD 25,000 each and every loss." *Ibid.*

42.     In June 2019, the Debtor submitted a claim to the Underwriters for the loss of the Items.  The Debtor reported a date of loss/damage of May 9, 2019.  *See* Insurance Settlement Ex. B.

43.     The Underwriters took a statement from Spector about the loss and agreed in a letter dated July 15, 2019 calling certain Policy terms to the Debtor's attention to conduct an investigation of the claim under a full reservation of rights.  *See* Casas Decl., ¶ 11.

44.     Spector and the Debtor's counsel cooperated with the Underwriters' investigation, including by making corrections to the transcript of the statement and responding to two requests for documents/information.  *See* Casas Decl., ¶¶ 11-12.

## THE TRUSTEE'S INVESTIGATION

45.     Before engaging in settlement negotiations with the Essex Defendants, the Trustee counsel's reviewed the Proof of Claim and hundreds of pages of documents exchanged

by the parties, deposition transcripts, briefs and other submissions on the Debtor's application for a preliminary injunction, transcripts of the three-day preliminary injunction hearing, and the Court's decision and Preliminary Injunction Order, as well as the Proof of Claim.  *See* Casas Decl., ¶¶ 4-5.

46.     In connection with the Debtor's insurance claim, the Trustee's counsel reviewed the Policy, correspondence from the Underwriters' counsel and Spector's statement to the Underwriters.  *See* Casas Decl., ¶ 11.

47.     The Trustee and his counsel then discussed with the Essex Defendants or the Underwriters, and their respective counsel, a number of critical open questions, including how Essex came to receive the Items from the Debtor; what the Debtor intended when it transferred the Items to Essex; what the Items were worth at the time of the transfers; whether the loss was a fortuitous event for insurance purposes; and whether there was one or multiple losses for purposes of the coverage limit.  *Id.* at ¶¶ 9, 13.

48.     The resulting settlements are the product of the Trustee's careful weighing of the evidence and the risks, costs and delays of proceeding with the D&M Adversary Proceeding. *See* Declaration of Alan Nisselson (the "**Nisselson Decl.**").

## OVERVIEW OF THE SETTLEMENTS

49.     The principal terms of the Trustee's separate settlements with Essex and Paul and the Underwriters are as follows:

The Essex Settlement

- All claims asserted by the Debtor and the Essex Defendants against each other in the D&M Adversary Proceeding will be dismissed with prejudice and without costs to any party.  *See* attached Ex. 1, ¶ 2; Ex. 2, Section 5.

- The Cross-Claim will be dismissed with prejudice and without costs to any party. *Ibid.*

- The Proof of Claim will be allowed and subordinated for purposes of distribution to all other allowed claims and interests, and any lien securing the subordinated claim will be transferred to the Estate. *Ibid*.

- The Floating Lien will be lifted. *Ibid*.

- The Essex Defendants will transfer to the Estate any ownership or other interest they may have in precious stones or fine jewelry currently in possession of the Debtor or out on consignment from the Debtor to others, including the Cross Pendant and Earrings. *See* attached Ex. 2, Section 5.

- The Essex Defendants will make a $350,000 settlement payment to the Trustee for the benefit of the Estate. *Id.* at Section 6.

- The Trustee and Essex and Paul will exchange releases while maintaining their right to make any argument, take any position or assert any claim or defense as to third parties. *Id.* at Sections 7-9.

The Insurance Settlement

- The Underwriters will make a $450,000 settlement payment to the Trustee for the benefit of the Estate. *See* attached Ex. 3, Section 6.

- Should the Trustee recover and sell any of the Four Stones, he will accept a reduced settlement payment or turn over to the Underwriters a percentage of any sales proceeds. *Id.* at Section 7.

- The Trustee and the Underwriters will exchange releases. *Id.* at Sections 8-9.

## **LEGAL BASIS**

50.    Bankruptcy Rule 9019(a) states, in pertinent part, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Before issuing an approval, a court should find the compromise proposed is supported by adequate consideration, reasonable, and in the best interest of a debtor's estate. *See Air Line Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

51.    A court should not decide the numerous questions of law and fact raised by the

compromise; rather it should "canvass the issues and see whether the settlement 'fall[s] below

the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.),* 699

F.2d 599, 608 (2d Cir.) (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972)), *cert.*

*denied,* 464 U.S. 822 (1983); *see also In re Chemtura Corp.,* 439 B.R. 561, 594 (Bankr.

S.D.N.Y. 2010).  "[T]he court need not conduct a 'mini-trial' to determine the merits of the

underlying litigation."   *In re Purified Down Prods. Corp.,* 150 B.R. 519, 522 (S.D.N.Y. 1993).

52.    The factors courts consider when approving bankruptcy settlements are well

established:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and
> delay, including the difficulty in collecting on the judgment; (3)
> the paramount interests of the creditors, including each affected
> class's relative benefits and the degree to which creditors either do
> not object to or affirmatively support the proposed settlement; (4)
> whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and [t]he
> experience and knowledge of the bankruptcy court judge
> reviewing, the settlement; (6) the nature and breadth of releases to
> be obtained by officers and directors; and (7) the extent to which
> the settlement is the product of arm's length bargaining.

*Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d. 469, 487-488 (S.D.N.Y. 2012) (quoting

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC)*,

478 F.3d 452, 462 (2d Cir. 2007) (internal quotation marks and citations omitted)), *aff'd,*

740 F.3d 81 (2d. Cir. 2014).

53.    Even though a court has discretion to approve settlements and must independently

evaluate the reasonableness of a settlement, *see In re Rosenberg*, 419 B.R. 532, 536 (Bankr.

E.D.N.Y. 2009), it should consider the business judgment of the Trustee and his counsel in

determining whether a settlement is fair and equitable.  *See In re Chemtura Corp.*, 439 B.R. at

594. Finally, a court should be mindful of the principle that "the law favors compromise."

*Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),*

134 B.R 499, 505 (Bankr. S.D.N.Y. 1991) (quoting *In re Blair*, 538 F.2d 849, 851 (9th Cir.

1976)).

54.     Here, the Trustee's separate settlements with the Essex Defendants and the

Underwriters are fair and equitable and in the best interest of the Estate and its creditors.  The

following considerations influenced the Trustee's decision to settle:

**A. The Possibility of Success against the Essex Defendants is Outweighed by the Benefits of the Essex Settlement.**

55.     The Trustee has weighed the possibilities of success against the Essex Defendants

and the Essex Settlement's benefits and has determined the balance tilts in favor of the

settlement.

56.     The Trustee's determination was informed by the following uncertainties/risks in

proceeding with the D&M Adversary Proceeding:

- The Debtor's Intent and the Secured Status of Essex's Claim:  In its decision from the bench, the Court affirmed that oral security agreements are permissible under the law and flagged the critical question of whether the Debtor intended to pledge any of the Items as collateral on the Loan.  The issue is complicated by notations on certain consignment memos issued by the Debtor indicating there was some connection to the Loan and "collateral."  *See, e.g.,* Casas Decl., Ex. A (Memo # 5251).  Discovery may reveal facts that are helpful or harmful as to the Debtor's position that no security pledge was intended by those notations or otherwise. Should the Court ultimately find the Debtor did intend to pledge any of the Items as collateral on the Loan, the Trustee might not be able to avoid the pledge as a preference and other creditors could receive little or no benefit from a judgment against the Essex Defendants.  *See* 11 U.S.C. § 547(c)(5) (providing that trustee may not avoid a transfer "that creates a perfected security interest in inventory or a receivable or the proceeds of either," except to the extent the pledge places the transferee in a better secured position relative to the debt).

- The Value of the Items:  The amount of any judgment against the Essex Defendants will depend in large part on a finding as to the true value of the Items. As illustrated in the table in paragraph 38 above, the memo or invoice prices

appear to overstate the value of the Items. Even assuming Essex is not a secured claimant but still has a valid claim for $6.5 million (the Trustee has no reason to dispute the Debtor received the loaned monies), any judgment in an amount at or near the low end of the range in the table would mean the Essex Defendants did not take more than they were owed and, given the size of Essex's bankruptcy claim, unsecured creditors would generally benefit very little from any distribution.

- Collectability: For it to be worth the time, effort and expense of seeing the D&M Adversary Proceeding through to the end, any judgment would need to be in the millions – ideally, an amount greater than the $6.5 million the Debtor owes Essex. As the Court recognized in its decision, there are no assurances the Essex Defendants have sufficient funds to pay a multi-million dollar judgment and they may be judgment-proof, particularly if, as it appears, the valuable Four Stones are in Russia and unrecoverable.

57.    The Trustee believes these uncertainties/risks present too much of a headwind, especially when weighed against the real benefits of the Essex Settlement, notably (a) Essex would agree to subordinate its claim and transfer to the Estate any lien securing the subordinated claim[5], ensuring any distributions would not be swallowed or eaten up by Essex's claim; (b) the Essex Defendants would be deemed to have transferred to the Estate any ownership or other interest they may have in a number of items, including the Cross Pendant and Earrings, clearing the way for the Trustee to sell the items for the benefit of the Estate;  and (c) the $350,000 settlement payment would give the Estate a much-needed injection of cash.

**B.  The Underwriters Have Offered to Settle the Insurance Claim for a Fair Amount.**

58.    The Trustee carefully reviewed the language of the Policy and agrees with the Underwriters that, given the Debtor's allegations in the D&M Adversary Proceeding, the only possible coverage is under the Entrustee Infidelity Clause, which provides for a $500,000 coverage limit and a $25,000 deductible for "each and every loss" or "one event."

---

[5] *See* 11 U.S.C. § 510(c) (authorizing the Court to grant such relief).

59.    Based on those same allegations, the Trustee believes it would be difficult to succeed on an argument that there was more than one loss or event for purposes of the coverage limit.  *See OTC Int'l, Ltd. v. All Those Underwriters at Lloyd's of London Subscribing to Policy of Ins. Numbered HN99ABXC255,* 1 Misc. 3d 911(A) (Sup. Ct. Qns. Cty. Jan. 29, 2004) (finding Employee Infidelity Extension Clause in jeweler's block policy "may reasonably be construed in such a manner that there was just one loss within the meaning of the policy, not multiple losses," assuming alleged thefts were attributable to one employee); *cf. Michigan Chemical Corp. v. American Home Assur. Co.*, 728 F.2d 374, 379 (6th Cir. 1984) (noting "[t]he vast majority of courts ... have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims") (citations omitted)).

60.    The Trustee also believes it is reasonable to give the Underwriters what amounts to a small credit of $25,000 in consideration of (a) the potential argument there is <u>no</u> coverage for the loss because it was caused by Spector's intentional misconduct (*see AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 187 F. Supp. 3d 428, 438 (S.D.N.Y. 2016) (noting that all-risk policies cover losses caused by any fortuitous peril not specifically excluded under the policy, and that a loss is not fortuitous if, in relevant part, it is caused by the intentional misconduct of the insured)); and (b) the partial recovery on account of the Essex Settlement.[6]

---

[6] The Insurance Settlement reasonably provides for a similar adjustment upon any further recoveries.  *See* attached Ex. 3, Section 7.

### C.  The Settlements are in the Paramount Interest of Creditors.

61.     Given the magnitude of the Proof of Claim, there could be a minimal distribution for unsecured creditors of the Estate unless the Debtor prevails on all its claims <u>and</u> is able to collect on a multi-million dollar judgment against Essex.

62.     Essex's agreement to subordinate its claim to all other allowed claims and interests and transfer any lien to the Estate substantially enhances the probability for a more meaningful distribution to the Debtor's unsecured creditors.

63.     What is more, nothing in the Essex Settlement prevents SB and the other owners of the Four Stones from pursuing claims against the Essex Defendants.

### D.  The Settlements Avoid Protracted and Costly Litigation.

64.     The settlements allow the Trustee to avoid costly and time-consuming discovery and a trial in the D&M Adversary Proceeding, and a potentially costly and time-consuming dispute with the Underwriters over the coverage for the Debtor's insurance claim.

65.     This is no small consideration given the more than $720,000 in legal fees the Estate has already incurred to recover only two, lower-value Items.

66.     The Debtor has a limited amount of assets and the costs of litigating instead of settling with the Essex Defendants and the Underwriters could severely deplete Estate assets that would otherwise be available to pay creditors.

67.     Litigating the case instead of resolving it would likely postpone any distribution for a long time, particularly if there are appeals, and the delay itself could potentially harm creditors.

**E.  The Settlements Provide Finality.**

68.     The Essex Settlement fully resolves the counterclaims against the Debtor in the

D&M Adversary Proceeding, the Proof of Claim and the Cross-Claim, which account for the

largest potential liability of the Estate.

69.     The Insurance Settlement finally resolves the Debtor's insurance claim in favor of

the Estate, and includes a mechanism to account for any future recoveries in connection with the

Items, assuring there will be no further disputes between the Debtor and the Underwriters.

**F.  The Settling Parties are represented by Experienced Counsel**

70.     The Trustee, the Essex Defendants and the Underwriters are each represented by

sophisticated and experienced counsel who fully understand the difficulties and risks of litigating

the complex factual and legal issues discussed above.

**G.  The Settlements are a Product of Arm's Length Negotiations.**

71.     The settlements are the product of separate arm's length, good faith negotiations

between the Trustee and the Essex Defendants, and the Trustee and the Underwriters.  The

parties exchanged information and documents and conducted a series of open discussions.  *See*

the Nisselson and Casas Decls.

*** 

72.     For all of these reasons, the settlements are well within the "range of

reasonableness," *In re W.T. Grant Co.*, 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d at

693), and confer a substantial benefit on the Estate and its general unsecured creditors.

## <u>NOTICE</u>

73.     In accordance with Bankruptcy Rules 2002 and 9019, notice of this motion is

being given to (a) all parties to the D&M and SB Adversary Proceedings; (b) the Office of the

United States Trustee; (c) the Underwriters; (d) all parties who filed notices of appearance in the

bankruptcy case; and (e) all creditors of the Estate.  The Trustee submits that no other notice is required.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in the form of Exhibit 1 granting the relief requested in the Motion

Dated: New York, New York
       March 4, 2021

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Alan Nisselson, Chapter 7 Trustee*

By:    /s/ Antonio J. Casas
       Antonio J. Casas (acasas@windelsmarx.com)
       156 West 56th Street
       New York, New York 10019
       Tel. (212) 237-1000 / Fax. (212) 262-1215