## SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is made and entered into as of March 1, 2021, by and between Alan Nisselson (the "**Trustee**"), trustee for the Chapter 7 estate (the "**Estate**") of The D&M Capital Group, LLC (the "**Debtor**" or "**D&M**"), on the one hand, and Essex Global Trading, Inc. *a/k/a* Essex Global Trading LLC ("**Essex**") and Aleks Paul ("**Paul**"), principal of Essex, on the other hand. The Trustee, Essex and Paul together are the "**Parties**" to this Agreement, and each is a "**Party**."

## RECITALS

A.    The Debtor was formed in 2006 and specialized in buying and selling precious stones and fine jewelry. Moty Spector ("**Spector**") founded the Debtor and was its principal at all relevant times.

B.    Essex and Paul, also buyers and sellers of precious stones and fine jewelry, dealt with the Debtor on a regular basis. Essex had loaned the Debtor millions of dollars over the course of their business dealings.

C.    On May 28, 2019, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). (Case No. 19-11711, Doc. 1).

D.    The Debtor filed a complaint commencing an adversary proceeding against Essex (identifying Essex as an LLC) the following month. (Adv. Proc. No. 19-01300 (the "**D&M Adversary Proceeding**")). In a twenty-count amended complaint filed August 6, 2019 that added Paul as a defendant and certain alleged participants as "nominal defendants," the Debtor alleged Essex and Paul (the "**Essex Defendants**") "[t]hrough artifice and fraud" possessed or disposed of certain precious stones and fine jewelry the Debtor had consigned to Essex including the following items (the "**Items**"):

- A Kashmir sapphire ring (Item JR0182, the "**Kashmir Sapphire**");
- A pink diamond (Item DM2950, the "**Pink Diamond**");
- A yellow-gold diamond ring (Item JR0280, the "**Yellow Diamond**");
- A ruby ring (Item JR0306, the "**Ruby**");
- A pair of emerald pearl and diamond earrings (JE0104, the "**Earrings**"); and
- A diamond cross pendant (JP0105, the "**Cross Pendant**").

(Adv. Proc. No. 19-01300, Doc. 20 at ¶¶ 1-2, 25-46).

E.    The Debtor sought declaratory, statutory and compensatory relief, asserting causes of action rooted in both the Bankruptcy Code and the common law (*id.* at ¶¶ 85-268), and asked for an injunction directing the Essex Defendants to return the Items to the Debtor (*id.* at ¶¶ 260-68).

F.    The Essex Defendants filed an amended answer to the amended complaint on

November 22, 2019. In addition to denying the Debtor's claims, the Essex Defendants asserted counterclaims seeking, among other relief, a judicial declaration the Items belonged solely to Essex, in part, because they alleged the Debtor had issued memos asserting 100% ownership over the Items and pledging them as collateral on an outstanding $6.5 million loan Essex had made to the Debtor. The Essex Defendants further alleged that D&M had orally agreed to Essex's taking the Items in satisfaction of the loan. (Adv. Proc. No. 19-01300, Doc. 55 at pp. 46-72). The Essex Defendants also asserted third party claims against Spector for indemnification and seeking to hold him personally liable for rescission of the loan. (*Id.* at pp. 71-73).

G.    Essex separately (1) filed a proof of claim as a secured creditor for payment in the main bankruptcy case for the $6.5 million loan, in the event the Bankruptcy Court rejected Essex's claim to sole ownership of the Items (Case No. 19-11711, Claim 11-1 (the "**Proof of Claim**")); and (2) asserted a cross-claim against the Debtor in an adversary proceeding filed by S.B. Diamond Corp., the alleged sole owner of the Ruby and part owner of the Kashmir Sapphire and Yellow Diamond (Adv. Proc. No. 19-01332 (the "**SB Adversary Proceeding**," and together with the D&M Adversary Proceeding, the "**Adversary Proceedings**"), Doc. 8 at pp. 14-34).

H.    Early on in the D&M Adversary Proceeding, the Debtor moved for a temporary restraining order to prevent Essex from transferring any of the Items. (Adv. Proc. No. 19-01300, Doc. 2). The Bankruptcy Court denied the motion on July 1, 2019, except as to stipulated relief restraining and enjoining Essex from transferring the Earrings and the Cross Pendant pending further order of the Bankruptcy Court. (Adv. Proc. No. 19-01300, Doc. 10).

I.    The Debtor filed a second motion seeking similar relief, and on September 26, 2019 the Bankruptcy Court entered a temporary restraining order enjoining the Essex Defendants and all persons acting on their behalf "from transferring, selling, encumbering, or otherwise disposing of" the remaining Items (*i.e.*, the Kashmir Sapphire, Pink Diamond, Yellow Diamond and Ruby (the "**Four Stones**")) pending an evidentiary hearing. (Adv. Proc. No. 19-01300, Docs. 32, 43).

J.    The Bankruptcy Court held the evidentiary hearing on December 9, 10, and 12, 2019, and entered an amended order granting the Debtor's application for a preliminary injunction on December 19, 2019. (Adv. Proc. No. 19-01300, Doc. 62 (the "**Preliminary Injunction Order**")). "To maintain the status quo pending judgment or other resolution of the [D&M] Adversary Proceeding," the Bankruptcy Court enjoined the Essex Defendants "and all other persons known and unknown, including without limitation Mollard Equities Inc. ("**Mollard**") and Anna Joukova ("**Joukova**"), from "transferring, selling, encumbering or otherwise disposing of" the Four Stones, "except as otherwise specifically directed." (*Id.* at p. 2 and ¶ 3).

K.    The Bankruptcy Court further ordered the Essex Defendants to deliver the Earrings and Cross Pendant, to the Debtor's counsel "care of Malca-Amit ... to be stored by Malca-Amit in a secured vault under the custody and control of [the Debtor's] counsel." (*Id.* at ¶ 5).

L.    The Essex Defendants represented to the Bankruptcy Court they delivered the Four Stones to Joukova and Mollard in Russia in May 2019, prior to the bankruptcy filing, and they no longer had possession of, or control over, the Four Stones.

M.    The Essex Defendants delivered the Earrings and Cross Pendant to the Debtor's counsel within the time specified by the Preliminary Injunction Order.

N.    On August 11, 2020, the Bankruptcy Court entered an order converting the Debtor's case to a case under Chapter 7 of the Bankruptcy Code. (Case No. 19-11711, Doc. 96).

O.    The Trustee is the duly appointed, qualified, permanent trustee of the Estate.

P.    On October 2, 2020, the Trustee filed a motion in the main case seeking the Bankruptcy Court's approval of an asset purchase agreement (the "**APA**") between the Trustee and alleged participant Gemcut SA ("**Gemcut**") to sell the Debtor's one-third ownership interest in the Cross Pendant to Gemcut for $195,000, subject to higher and better offers. (*Id.* at Docs. 130, 152). Essex objected to the motion (*id.* at Doc. 140), maintaining the position it took in the D&M Adversary Proceeding relative to the Cross Pendant, and the Trustee responded (*id.* at Doc. 142).

Q.    On November 30, 2020, the Bankruptcy Court entered an Order authorizing the Trustee to transfer the Estate's interest in the Cross Pendant to Gemcut in accordance with the APA's terms, and resolved the objection of Essex by stating as follows:

(a) By this order, the Court does not resolve or determine the alleged ownership rights or security interests, if any, in the Cross Pendant held by any party or creditor. Accordingly, the sale of the Estate's interest in the Cross Pendant shall be without prejudice to the claims of Essex regarding the Cross Pendant in [the D&M Adversary Proceeding], which are subject to the claims, defenses, and counterclaims of the Trustee and any other party to [the D&M Adversary Proceeding];

(b) Essex shall receive adequate protection for those claims in the form of a floating lien on the net proceeds of the Trustee's sale of the Debtor's interest in its inventory other than the Cross Pendant up to the amount of $195,000.00 [the "**Floating Lien**"]; and

(c) The lien granted above will terminate or be enforceable only after a determination by the Court in [the D&M Adversary Proceeding] or otherwise on the question of whether Essex has any security or ownership interest in the Cross Pendant.

[*Id.* at Doc. 152 at ¶¶ 4, 8.]

R.    Gemcut demanded that the Trustee return a deposit it made in connection with the purchase of the Debtor's one-third ownership interest in the Cross Pendant because of the Bankruptcy Court's resolution of Essex's objection, which Gemcut believed encumbered the interest, and the Trustee agreed to return the deposit.

S.    The Parties mutually desire to reach a full and final settlement as set forth below,

to avoid the delay, expense, uncertainty and inconvenience of protracted litigation of their conflicting claims and defenses in or as to the Adversary Proceedings, the Items and the Proof of Claim.

## TERMS AND CONDITIONS

1.    <u>Recitals</u>.  The Recitals are incorporated by this reference and made a part of this Agreement.

2.    <u>Definitions</u>.  For purposes of this Agreement:

(a) "**Approval Order**" shall mean an order entered by the Bankruptcy Court approving this Agreement.

(b) "**Final Order**" shall mean an order of the Bankruptcy Court which is not subject to any stay of its effectiveness and (1) as to which (without regard to any time period under Bankruptcy Rule 9024) the time to appeal or petition for certiorari has expired and as to which no timely appeal or petition for certiorari shall then be pending; or (2) if a timely appeal or writ of certiorari has been sought, the order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing on remand shall have been denied or resulted in no modification of such order, and the time to take any further appeal or petition for certiorari shall have expired.

(c) "**Business Day**" shall mean a day that is a day of the year on which banks are not required or authorized by law to close in New York, New York.

(d) "**Claim**" or "**Claims**" shall have the meaning ascribed to it in Bankruptcy Code § 101(5), including, without limitation, any and all manner of action or actions, cause or causes of action, suits, claims, counter claims, damages, obligations, losses, debts, checks, liabilities, agreements, liens, contracts, promises, allegations of wrongdoing of any type, costs, expenses, losses and demands of every kind or nature whatsoever, whether or not suspected or unsuspected, known or unknown, at law or in equity or otherwise.

3.    <u>No Admission of Liability or Waiver of Claims or Defenses as to Third Parties</u>. This Agreement memorializes a settlement of disputed claims and is not in any way to be construed as an admission of liability, or of any issue of fact or law, by any Party.  In agreeing to dismiss or withdraw certain claims, as specified in <u>Section 5</u> below, no Party waives any claims or defenses as to persons not parties to this Agreement, including, without limitation, claims or defenses based on the same allegations pled/asserted in support of the dismissed or withdrawn claims.

{80262631:2}                                                          4

4.      Bankruptcy Court Approval; the Effective Date.

(a) This Agreement is subject to approval by the Bankruptcy Court. The Trustee shall prepare and file a Bankruptcy Rule 9019 motion (the "**Motion**") seeking the Bankruptcy Court's entry of an Approval Order, and Essex and Paul shall support the Motion.

(b) The terms and conditions of this Agreement shall become effective and enforceable on the date on which an Approval Order has become a Final Order (the "**Effective Date**").

(c) In the event the Bankruptcy Court does not enter an Approval Order, or the Effective Date does not occur, then (1) the Agreement shall be deemed null and void; (2) the Parties shall not be deemed to have waived any of their respective rights or to have settled any controversy between them that existed before the execution of the Agreement; (3) the Parties shall be restored *nunc pro tunc* to the respective legal positions that they were in immediately before the execution of the Agreement; (4) neither this Agreement or any exhibit (or document or instrument, if any) delivered under the Agreement, nor the Motion or anything submitted or said in connection with the Motion, shall be (i) with prejudice to any Party or person, (ii) deemed to be or construed as an admission by any Party of any act, matter, or proposition, or of the merit or lack of merit of any claim or defense, or (iii) used in any manner or for any purpose in any subsequent proceeding in this action, or in any other action in any court or in any other proceeding; (5) all negotiations, proceedings, and statements made in connection with the negotiation of this Agreement (i) shall be without prejudice to any Party or person, (ii) shall not be deemed as or construed to be an admission by any Party of any act, matter, or proposition, or of the merit or lack of merit of any claim or defense, and (iii) shall not be offered in evidence in any of the Adversary Proceedings, or any other action or proceeding, except in connection with this Agreement or its enforcement; and (6) the Trustee shall return the First Installment of the settlement amount paid pursuant to Section 6(a) below.

5.      Dismissal or Subordination of Claims; Lifting of Floating Lien; Transfer of Liens or Interests. Upon the Effective Date:

(a) All Claims asserted by the Debtor and the Essex Defendants against each other in the D&M Adversary Proceeding shall be dismissed with prejudice and without costs to any party.

(b) The cross-claim Essex asserted against the Debtor in the SB Adversary Proceeding shall be dismissed with prejudice and without costs to any party.

(c) The Proof of Claim shall be allowed and subordinated for purposes of distribution to all other allowed claims and interests, and any lien securing the subordinated claim shall be transferred to the Estate.

(d) The Floating Lien shall be lifted.

(e) The Essex Defendants shall be deemed to have transferred to the Estate any ownership or other interest they may have in the Cross Pendant, the Earrings or the precious stones and fine jewelry listed in Exhibit A to this Agreement.

6.    Settlement Payment. The Essex Defendants shall pay to the Trustee for the benefit of the Estate a total of $350,000.00 in four installments as follows:

(a) Upon execution of this Agreement, the Essex Defendants shall deliver to the Trustee by wire transfer pursuant to instructions to be provided, or by check made payable to "Alan Nisselson, Chapter 7 Trustee," the amount of $200,000.00 (the "**First Installment**"), which the Trustee shall hold in his trustee account pending Bankruptcy Court approval of this Agreement. As soon as practicable after his receipt and clearance of the First Installment, the Trustee shall move the Bankruptcy Court for the entry of an Approval Order. On the Effective Date, the First Installment shall be deemed to be released to the Trustee for the benefit of the Estate.

(b) On or before the first Business Day after 30 days from the Effective Date, the Essex Defendants shall deliver to the Trustee by wire transfer pursuant to instructions to be provided, or by check made payable to "Alan Nisselson, Chapter 7 Trustee," the amount of $50,000.00 (the "**Second Installment**").

(c) On or before the first Business Day after 60 days from the Effective Date, the Essex Defendants shall deliver to the Trustee by wire transfer pursuant to instructions to be provided, or by check made payable to "Alan Nisselson, Chapter 7 Trustee," the amount of $50,000.00 (the "**Third Installment**").

(d) On or before the first Business Day after 90 days from the Effective Date, the Essex Defendants shall deliver to the Trustee by wire transfer pursuant to instructions to be provided, or by check made payable to "Alan Nisselson, Chapter 7 Trustee," the amount of $50,000.00 (the "**Fourth Installment**").

(f) Should the Essex Defendants fail to make any one or more of the Second, Third or Fourth Installment payments on their respective due dates, the Essex Defendants shall be deemed in default ("**Default**") of this Agreement. The Trustee shall give notice to the Essex Defendants of any Default, in writing, by way of electronic mail to the Essex Defendants' attorneys as follows:

Timothy Savitsky
timsavitsky@spi-pc.com

Sam P. Israel
samisrael@spi-pc.com

The Essex Defendants shall then have five Business Days after their receipt of notice of Default to cure. If the Essex Defendants fail to cure a noticed default within five Business Days, they shall be deemed in breach of this Agreement. Upon their breach, the Essex Defendants agree they will be jointly and severally liable for the outstanding amount, plus interest, attorneys' fees and costs, and will consent to a judgment against them in the Bankruptcy Court in said amount.

7.    Release by Trustee.

(a) Effective on the Effective Date, and in consideration for the covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement, all of which are reserved, the Trustee, for the Debtor and the Estate, releases, remises and discharges Essex and Paul, and each of their heirs, attorneys, agents, successors and assigns, from any and all past, present or future Claims or causes of action (including any suit, petition, bankruptcy proceeding, demand or other claim in law, equity or arbitration) and from any allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants or accounts) of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs, or disbursements), known or unknown, liquidated or contingent, that are, have been, could have been, or might in the future be, asserted based on, arising out of, or relating in any way to, the Estate, the Items, the actions of the Debtor, Spector, Essex, or Paul, or the allegations in the Adversary Proceedings.

(b) As part of this release and without limiting its scope, but subject to approval by the Bankruptcy Court and the enforceability of the other terms and conditions set forth herein including the release issued in his favor, the Trustee expressly covenants that he shall not assert a cross-claim or third-party claim against Essex or Paul in the SB Adversary Proceeding or any other proceeding or action brought by a non-Party.

8.    Release by Essex and Paul.

(a) Effective on the Effective Date, and in consideration for the covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement, all of which are reserved, Essex and Paul, on behalf of themselves and each of their heirs, attorneys, agents, successors and assigns, release, remise and discharge the Trustee, the Debtor and the Estate, and each of their heirs, attorneys, agents, successors and assigns, from any and all past, present or future Claims or causes of action (including any suit, petition, bankruptcy proceeding, demand or other claim in law, equity or arbitration) and from any allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies,

agreements, promises, damages, responsibilities, covenants or accounts) of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs, or disbursements), known or unknown, liquidated or contingent, that are, have been, could have been, or might in the future be, asserted based on, arising out of, or relating in any way to, the Estate, the Items, the actions of the Debtor, Spector, Essex or Paul, or the allegations in the Adversary Proceedings.

(b) As part of this release and without limiting its scope, but subject to approval by the Bankruptcy Court and the enforceability of the other terms and conditions set forth herein including the release issued in their favor, Essex and Paul expressly covenant that they shall not assert a cross-claim or third-party claim against the Trustee, the Debtor or the Estate in any proceeding or action brought by a non-Party.

9.    No Prejudice to Rights, Defenses or Claims the Parties Have or May Have as to or Against Non-Parties. Except as between the Parties hereto, nothing in this Agreement is intended to be nor shall serve as a waiver of any rights, defenses or claims the Parties have or may have in the SB Adversary Proceeding or any other proceeding or action. For example, this Agreement shall not prevent Essex and/or Paul from asserting in the SB Adversary Proceeding that Essex is a secured creditor of the Estate based upon its allegation that the Debtor pledged the Items, which were in its inventory at the time, to Essex as collateral on a $6.5 million loan and then transferred the Items to Essex in perfection of that pledge.   As another example, nothing in this Agreement shall affect in any way whatsoever the rights, claims, defenses, or interests that Essex or Paul have or may have against any non-Party to this Agreement—including but not limited to the Debtor's principal, Spector—in relation to the 6.5 million loan or the Four Stones.

10.    Insolvency-Related Provisions.

(a) Any payment or dismissal, withdrawal or release of claims made pursuant to this Agreement is intended to constitute a contemporaneous exchange for new value given to Essex and Paul pursuant to Bankruptcy Code § 547(c)(1); and in reliance on the settlement, the Trustee is contemporaneously providing the benefits to Essex and Paul set forth in this Agreement, including the releases and covenants by the Trustee set forth in Section 7 and Section 9 above.

(b) Essex and Paul each represent to the Trustee, to the best of their knowledge, information and belief, that (1) they are solvent within the meaning of Bankruptcy Code §§ 547(b)(3) and 548(a)(1)(B)(ii)(I) and are able to pay their debts when due; and (2) the payments and other transactions contemplated by this Agreement shall not render them insolvent.

(c) If Essex or Paul commence, or a third party commences against them, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or

relief from creditors, they shall not argue or otherwise take the position that (1) their obligations under this Agreement may be avoided under Bankruptcy Code §§ 547 or 548; (2) they were insolvent at the time of entry into, or became insolvent as a result of payments made under, this Agreement; and (3) the mutual promises, covenants and obligations under this Agreement do not constitute a contemporaneous exchange for new value given to them.

11.    General Representations and Warranties.

(a) The Trustee represents and warrants that, subject to the approval of the Bankruptcy Court as set forth in Section 4 above, (1) he has the full power, authority and legal right to execute and deliver this Agreement and to perform his obligations hereunder; (2) this Agreement has been duly executed and delivered by the Trustee and constitutes a valid and binding agreement of the Trustee enforceable against him in accordance with its terms; and (3) this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

(b) Essex and Paul each represent and warrant to the Trustee that (1) they have the full power, authority and legal right to execute and deliver this Agreement and to perform their obligations hereunder; (2) this Agreement has been duly executed and delivered by them and, subject to the approval of the Bankruptcy Court as set forth in Section 4 above, constitutes a valid and binding agreement of Essex and Paul enforceable against them in accordance with its terms; (3) this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever; (4) in executing this Agreement, they had the opportunity to obtain independent legal advice from their attorneys with regard to the facts relating to the underlying controversies and with respect to their rights arising out of said facts; and (5) no person has any interest in the released Claims pursuant to Section 8 above, and they have not assigned or transferred, or purported to assign or transfer, to any person all or any portion of those released claims.

12.    Entire Agreement.  This Agreement constitutes the complete agreement between the Parties with respect to the issues covered by this Agreement.  This Agreement may not be amended except by signed, written consent of the Parties.

13.    Successors.  This Agreement is binding on the Parties' successors, transferees, heirs, attorneys, agents, and assigns.

14.    Costs.  Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

15.    Further Assurances.  Each Party shall execute and deliver any document or instrument reasonably requested and needed by the other Party after the date of this Agreement to effectuate the intent of this Agreement, including without limitation any stipulations the Parties

{80262631:2}    9

need to file with the Bankruptcy Court confirming, as per Section 5 above, the claims they asserted against each other in the Adversary Proceedings have been dismissed; the Proof of Claim has been subordinated, and any lien securing the subordinated claim has been transferred to the Estate; and the Floating Lien has been lifted.

16.    Construction.  For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and therefore shall not be construed against any Party for that reason in any subsequent dispute.  The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.  Any reference in this Agreement to a section is to a section of this Agreement.  "**Including**" is not intended to be a limiting term.

17.    No Third-Party Beneficiaries.  The Parties do not intend to confer any benefit by or under this Agreement upon any person other than the Parties hereto and their respective successors.

18.    Governing Law.  This Agreement and the rights and obligations of the Parties shall be governed by and construed and interpreted in accordance with the laws of the State of New York, without regard to conflicts of law principles.

19.    Exclusive Jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction over the enforcement of this Agreement and every dispute between or among the Parties, whether in law or equity, arising out of or relating to this Agreement.  The Parties consent to the entry of final orders or judgments by the Bankruptcy Court if it is determined that consent of the Parties is required for the Bankruptcy Court to enter final orders or judgment consistent with Article III of the Constitution.

20.    Counterparts; Electronic Copy of Signatures.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed an original and all of which shall constitute the same document.  Each Party or signatory may evidence its execution of this Agreement by delivery to the other Party or signatory of scanned or faxed copies of its signature, with the same effect as the delivery of an original signature.

**IN WITNESS WHEREOF**, each Party or signatory has caused this Agreement to be duly executed and delivered.

**[Signature pages follow]**

{80262631;2}                                               10

**TRUSTEE**

_Alan Nisselson / AJC_

Alan Nisselson
CHAPTER 7 TRUSTEE OF
THE D&M CAPITAL GROUP, LLC
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019

[TRUSTEE SIGNATURE PAGE TO SETTLEMENT AGREEMENT]

**ESSEX GLOBAL TRADING, INC.**

**ESSEX GLOBAL TRADING, INC.**
*a/k/a Essex Global Trading, LLC*

By: _____

    Aleks Paul, Principal
    580 Fifth Avenue, 21st Floor
    New York, New York 10036

[ESSEX GLOBAL TRADING, INC. SIGNATURE PAGE TO SETTLEMENT AGREEMENT]

**ALEKS PAUL**

_____

Aleks Paul
100 United Nations Plaza, Apt. 44C
New York, New York 10017

[ALEKS PAUL SIGNATURE PAGE TO SETTLEMENT AGREEMENT]