Platzer, Swergold,
Goldberg, Katz & Jaslow, LLP
*Attorneys for Shanghai Pearls & Gems, Inc. d/b/a*
*Ultimate Diamond Co.*
475 Park Avenue South, 18th Floor
New York, New York 10016
Henry G. Swergold, Esq.
Andrew S. Muller, Esq.
(212) 593-3000
hswergold@platzerlaw.com
amuller@platzerlaw.com

Our File No. 9768-1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 7 |
| THE D&M CAPITAL GROUP, LLC, | Case No. 19-11711 (SCC) |
| Debtor. | |

| | |
|---|---|
| THE D&M CAPITAL GROUP, LLC, | |
| Plaintiff, | Adv. Pro. No. 19-01300 (SCC) |
| -against- | |
| ESSEX GLOBAL TRADING, LLC, ALEKS PAUL, and "JOHN DOES," said names being fictitious and unknown, | |
| Defendants, | |
| -and- | |
| RADWAN DIAMOND & JEWELLERY TRADING, ULTIMATE DIAMOND CO., S.B. DIAMOND CORP., PALAWAN HOLDINGS LIMITED, and GEMCUT S.A., | |
| Nominal Defendants. | |

| |
|---|
| ESSEX GLOBAL TRADING, INC., |
| Third-Party Plaintiff, |
| -against- |
| MOTY SPECTOR, |
| Third-Party Defendant. |

**OBJECTION OF ULTIMATE DIAMOND TO TRUSTEE'S MOTION
PURSUANT TO 11 U.S.C. § 105(a) AND FEDERAL RULE OF
BANKRUPTCY PROCEDURE 9019(a) FOR AN ORDER APPROVING
SETTLEMENT AGREEMENTS OF THE ADVERSARY PROCEEDINGS
AND RELATED BANKRUPTCY AND INSURANCE CLAIMS**

Shanghai Pearls & Gems, Inc. d/b/a Ultimate Diamond Co. ("Ultimate"), by its

undersigned counsel, as and for its Objection to the Motion (the "Motion") of Alan Nisselson,

Chapter 7 Trustee (the "Trustee") of the estate of The D&M Capital Group, LLC, debtor herein

(the "Debtor"), for an Order approving the Settlement Agreements of the Adversary Proceedings

and related bankruptcy and insurance claims, respectfully sets forth and represents as follows:

**Preliminary Statement**

1.      The Court should not approve either the Essex Settlement[1] or the Insurance

Settlement (together, the "Settlements") for the reasons set forth herein.  The justifications asserted

by the Trustee for each of the Settlements is, in pertinent jewelry vernacular, "flawed" on multiple

levels, and lacking in sufficient detail and critical facts to either warrant the Trustee's support of

the Settlements or to permit creditors to assess them.

2.      Ultimate is well aware that bankruptcy courts afford significant deference to a

trustee's business judgment and that a trustee, *in most cases*, need only establish that a settlement

arises above the "lowest point in the range of reasonableness".  However, Ultimate vigorously

asserts that the Settlements, and particularly the Essex Settlement, emanate from extremely unique

facts involving "bad actors" and do not fall within the ambit of "*most cases*".  Thus, Ultimate

believes that it is imperative that the Court scrutinize the Settlements under a glaringly bright light.

The Settlements are inconsistent with established judicial philosophy and policy which (especially

in Bankruptcy Court) abhors "unclean hands" and refrains from rewarding those who harm the

---

[1] For purposes of consistency and the convenience of the Court, unless otherwise defined, capitalized terms utilized
herein shall have the meanings ascribed to them in the Trustee's Motion.

Estate, conduct themselves disingenuously, or flaunt the orders and directives of a court. The Settlements should not be approved simply for the financial or administrative convenience of the Trustee in moving toward closing this case; neither convenience nor expediency should prevail over the requirements of reasonableness and the principles of equity and fairness.

**The Essex Settlement**

3.     Approval of the Essex Settlement will result in Essex and its principal, Paul, being forgiven for their "artifice and fraud" by which they obtained the six (6) Items of valuable jewelry/loose stones in question in this Adversary Proceeding[2], being rewarded for their bad behavior, and leaving permanently unanswered the nature of Essex's relationship with, and indeed whether , Mollard and Joukova even exist. It additionally allows the Essex Defendants to reap a potential windfall in the event they ultimately regain possession of the Four "missing" Stones from the mysterious Mollard and Joukova to satisfy their own claims and interests to the detriment of all other creditors.

4.     Approval will also validate the Trustee's questionable exercise of business judgment in supporting the Settlements despite the Essex Settlement occurring in the following context and likely having the following ramifications:

   (i)     It forgives and knowingly ignores the fact that the Debtor itself asserted in its Amended Complaint, ¶¶ 55 – 84, and provided considerable evidence during the Preliminary Injunction evidentiary hearing held on December 9,

---

[2] As identified in the Motion, the six items of fine jewelry and precious stones are described as: the Kashmir Sapphire; the Pink Diamond; the Yellow Diamond; the Ruby; the Earrings; and the Cross-Pendant. The Earrings and the Cross-Pendant were repatriated to the United States and possession thereof was delivered to the Trustee. The Kashmir Sapphire, the Pink Diamond, the Yellow Diamond and the Ruby (collectively, the "Four Stones") are still missing and conveniently alleged by Paul to be unrecoverable. Ultimate has: (1) a 50% participation interest (together with the Debtor) in the Earrings, (2) a 33% participation interest (together with the Debtor (33%) and Gem Cut & Geneva (33%)) in the Cross Pendant; and (3) a 33% participation interest in the missing Pink Diamond. The Four Stones constitute the most valuable items to the Debtor's estate, and their recovery was the singular driving force for the commencement of the Debtor's bankruptcy case. The values of these Four Stones will be discussed *infra*.

3

10 and 12, 2020 that, the Essex Defendants procured the Four Stones (in fact, all six Items) through "artifice and fraud";

(ii)     Paul orchestrated and caused Essex to breach its fraudulently obtained status as consignee or bailee, by transferring the Four Stones to Mollard and/or Joukova, parties ostensibly located in Russia, and clearly beyond the jurisdiction of this Court;

(iii)    Significantly, the Court has ruled in the context of the hearing on whether a preliminary injunction should be issued (see, Exhibit "A"[3], Tr. 12/12/2019 55:20 et seq.) that the Essex Defendants have no likelihood of success in establishing that they had any cognizable interest in the Four Stones, whether as owner or secured party, thus relegating them to the status of a mere consignee or bailee;

(iv)    The Essex Defendants have never provided a single document to substantiate their convenient claim that possession of the Four Stones was transferred to Mollard and/or Joukova in satisfaction of a purported $6 million debt owed by Essex and/or Paul, an assertion that is a "red herring" in any event because the Four Stones were never the Essex Defendants' property to dispose of;

(v)     Despite an Order of this Court directing that the Essex Defendants return the Four Stones and deposit them with the Trustee, they have failed to do

---

[3] Attached hereto as **Exhibit "A"** is the Amended Order Granting Plaintiff's Application for a Preliminary Injunction, dated December 19, 20219 and the referenced transcript of the hearing held before the Court on December 12, 2019 on the Debtor's Emergency Application of Ex Parte Relief, by Order to Show Cause, Why an Order Should Not Be Entered Granting a Temporary Restraining Order and Related Relief, hereinafter referred to as "Tr. 12/12/2019, ___:___".

so, relying on the same incredible story of an inability to regain possession from Mollard and Joukova (parties, it bears repeating, whose true identity or actual existence have never been established or corroborated);

(vi)     The valuation analysis by the Trustee as set forth in the Motion, ¶ 38 identifies a range of values for the Four Stones (excluding the other 2 Items that were returned) calculated to be between $8,066,212 and $11,100,000 combined, yet the Trustee is accepting a mere $350,000 from the Essex Defendants in settlement, an amount representing as little as 3.15% of the Trustee's top range of values or, at best, 4.34% at the low end of the Trustee's range;

(vii)    The Trustee provides no explanation of how the arbitrary settlement amount of $350,000 was agreed upon, why it is reasonable, or from what source the Essex Defendants are obtaining such funds in view of the Trustee's inconsistent assertions in the Motion that they are purportedly bereft of assets and judgment proof (*see* Motion, ¶ 56, Collectability portion).  If they can raise $350,000, why not more?;

(viii)   The $350,000 settlement sum is being paid in installments from, if not the Essex Defendants, an unknown source, *and* in the event of a payment default, the Trustee is entitled to submit for entry a judgment against the Essex Defendants for only the portion of the settlement sum that remains unpaid.  There is no claw back to a higher number as is frequently the case upon default (*see* Motion, Essex Settlement Agreement, ¶ 6(f));

(ix)    In exchange for receiving this paltry sum, the Trustee is providing the Essex Defendants with a *full release*;

(x)    In the event the Four Stones do "rematerialize" into the Essex Defendants' possession, there is no carve-out from the release being provided that would allow the Trustee to recover the value of the interests therein, or the proceeds of any sale, for the benefit of the Debtor's estate;

(xi)    A review of the transcript of the hearing held on January 30, 2020 on the Debtor's Motion for Contempt, and particularly of Paul's testimony regarding the identity and dynamics of his relationship with Joukova and Mollard (see, Exhibit "B"[4], Tr. 1/30/2020 26:8 *et seq.*) indicates consistent evasiveness and disingenuousness by Paul, and an abundance of well-placed skepticism about his testimony by the Court;

(xii)    Notwithstanding the Essex Settlement, there is no assurance or ability to monitor that the Essex Defendants will not "miraculously" recover the Four Stones from Mollard and Joukova in Russia post-settlement and have complete and undisclosed ownership of these valuable Items without the Trustee ever knowing.  It is not far-fetched to speculate that disputes tend to get resolved extra-judicially in Russia.

5.    Given the foregoing, it is respectfully submitted that it is incumbent on the Court to carefully scrutinize the true nature of the Essex Settlement and act affirmatively to avoid a

---

[4] Attached hereto as **Exhibit "B"** is the transcript of the hearing held before the Court on January 30, 2020 on the Debtor's Motion, by Order to Show Cause, Why an Order Should Not Be Entered Granting Plaintiff's Motion for Contempt, hereinafter referred to as "Tr. 1/30/2020, ___:___".

situation where the Trustee settles for an inexplicably low amount and is no doing, rewards the Essex Defendants for their bad conduct.

**The Insurance Settlement**

6.      The reasonableness of the Insurance Settlement raises many issues and seems to again raise concerns regarding the conflict between administrative convenience and legitimate justification.

7.      Ultimate would be remiss if it did not express its belief that the Trustee's presentation at the hearing on his Motion to Approve the Settlement with Radwan held on March 10, 2021 (the "Radwan Approval Hearing") caused this Court to analyze and approve that settlement as an overall "package deal" with the two (2) proposed Settlements herein – even though this Motion had not yet even been heard, let alone approved, by the Court.[5]  That same approach is once more being utilized by the Trustee who again portrays the instant two Settlements as a package in a single motion even though they have no direct connection to each other.  In so doing, the Trustee is trying to instill the subtle impression that the Essex situation is being resolved in a more attractive $800,000 aggregate influx of cash to the Estate instead of by two (2) separate and insufficient settlements.[6]

8.      However, standing independently from the deficiencies of the Essex Settlement (as summarized directly above and discussed in detail, *infra*), the Trustee's presentation of the proposed Insurance Settlement is equally lacking in providing a full analysis and rationale for the

---

[5] Ultimate duly notes that the Trustee brought to light his settlement with the Essex Defendants and the Underwriters by filing the instant Motion <u>one day after</u> objections to the approval of the Radwan settlement were due to be filed.

[6] During the Radwan Approval Hearing, the Trustee prematurely injected the within proposed Settlements in to his arguments supporting approval of the Radwan Settlement, despite the fact that the within Motion was not filed until the day after objections to the Radwan Settlement were filed.  The Court's focus on this aspect of the Trustee's argument in its analysis and ultimate approval of the reasonableness of the Radwan Settlement is one of the bases for Ultimate's filing of an appeal of the Order Approving the Radwan Settlement to the United States District Court filed on March 26, 2021.

settlement.  The Trustee's argument is carefully presented in broad strokes that explain *what* the Trustee did to analyze the Debtor's insurance claim and particularly the critical issue of whether there was a single loss or multiple losses to be pursued with the Underwriters.[7]

9.    Indeed, a close reading of the Declaration of Antonio J. Casas, Esq. dated March 4, 2021 (the "Casas Declaration") and particularly paragraphs "11" and "13" thereof, indicates that while "[t]his Firm questioned whether there was one or multiple losses for purposes of the applicable coverage limit" (i.e.; *what* was done), the Casas Declaration literally ends on that statement and never proceeds further in addressing *why* the Trustee accepted the Underwriter's position that there was a single, and not a multiple, loss.

10.    The Trustee's seemingly complacent acceptance of the "one loss" characterization relegated him to accepting $450,000[8] instead of seeking to obtain as much as $1.9 million, the maximum available under the Entrustee Infidelity Clause of the Policy after allowance for deductibles.  Ultimate again submits to the Court that expedience, convenience, and the lure of closure should not outweigh the Trustee's duty to expend reasonable efforts to maximize recovery for the Estate, especially in the context of the within Estate in which so many valuable assets have gone "missing".

11.    As discussed, *infra*, the Trustee's heavy reliance on a single case law precedent in *OTC Int'l, Ltd. v. All Those Underwriters at Lloyd's of London Subscribing to Policy of Ins. Numbered HN99ABXC255,* 1 Misc. 3d 911(A) (Sup. Ct. Qns. Cty. Jan. 29, 2004) is unfounded. Indeed, that case is more properly interpreted to stand as a legal basis for the Trustee to have

---

[7] The Motion relies heavily on the fact that the claim form (attached as Exhibit "B" to the Insurance Settlement Agreement) indicates a single loss, but this unsigned, undated and cursory form of unclear origin is neither conclusive nor determinative.  The Trustee could have challenged or sought to amend it.

[8] Ultimate is not formally challenging the *de minimis* discount of $25,000 that the Trustee offered to the Underwriters in settlement.  But it nonetheless is questionable and consistent with the argument that the Trustee was motivated by administrative convenience.

challenged the vagueness and ambiguity of the Entrustee Infidelity Claus at issue in the hope of either succeeding on the merits or facilitating a settlement with the Underwriters in a higher amount.  The fact that the terms of the Insurance Settlement also provide that if the Trustee is able to recover and sell any of the Four Stones, the $450,000 will either be reduced or a portion refunded to the Underwriters, compounds the perception that the Insurance Settlement is a capitulation to administrative convenience rather than a true exercise in risk/reward assessment and negotiation.

## **Background**

12.     Ultimate is a creditor of the Debtor's bankruptcy estate with prepetition claims totaling $4,178,195.58 (Amended Claim #4), a Chapter 11 Administrative Claim in the amount of $62,642.63 (Claim #19), and a Chapter 7 Administrative Claim in the amount of $19,843.32 (Amended Claim #20).

13.     Ultimate is in the business of buying and selling precious gems and jewelry, including high-end pieces and, on occasion has entered into participation arrangements with the Debtor, and others in the industry, for the acquisition and sale of certain jewelry and precious gems.[9]  In addition, Ultimate was the sub-landlord of the Debtor.

## **Legal Standard**

14.     Rule 9019 of the Federal Rules of Bankruptcy Procedure provides that, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."

15.     In considering doing so, it is not necessary for the bankruptcy court to rule on disputed issues of fact and law or to conduct a "mini trial" on the merits of the underlying litigation. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr.S.D.N.Y.2007).  At the same time, a court may not simply defer to a debtor in possession's judgment, but <u>must independently evaluate</u>

---

[9] See footnote 2 regarding Ultimate's Participant Interests in three of the six items that are the subject of this Adversary Proceeding.

the reasonableness of the settlement. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Kayo v. Fitzgerald*, 91 Fed.Appx. 714, 716 (2d Cir.2004) (emphasis added).

16.    The Second Circuit has identified the following factors to consider when considering approving bankruptcy settlements:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).

17.    Notwithstanding the *Iridium* factors, the Second Circuit has explicitly instructed "that when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties." *In re Drexel Burnham Lambert Grp., Inc.*, 995 F.2d 1138, 1146–47 (2d Cir. 1993)); *see also In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval .... [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, [he/she] cannot just brush their complaints aside.").

18.     An independent evaluation of the Settlements reveals they are not in the best interests of the creditors.

## Objection to the Essex Settlement

19.     The Court should not approve the Essex Settlement Agreement and should deny the Motion, because the specific provisions of the Essex Settlement Agreement are, at best, a harmless sanction, and at worst, a reward and potential windfall for the conduct of bad actors.

20.     The substantive terms of the Essex Settlement Agreement are as follows:  (i) Essex is to pay the Debtor's estate a settlement sum of $350,000.00 in four (4) installments over a period of ninety (90) days; (ii) Essex is transferring to the Debtor's estate any interest, if any, it has in items in the Trustee's possession or out on consignment from the Debtor including the Cross-Pendant, the Earrings and the stones and jewelry set forth in Exhibit "A" of the Essex Settlement Agreement; (iii) The "floating lien" in the amount of $195,000.00 granted by the Court in connection with a cancelled sale to Gemcut of the Debtor's estate's interest in the Cross-Pendant is being "lifted"; (iv) the $6.5 million claim, incorrectly characterized by Essex as "secured", will be deemed allowed and subordinated for purposes of distribution to all other allowed claims and interests; and (v) Essex will transfer to the Debtor's estate any lien securing the subordinated claim.  In return, each of the Essex Defendants will receive a *full release* of claims by the Trustee.

## The Arbitrary and Unsubstantiated Settlement Sum

21.     The lack of reasonableness in the Trustee's proposed settlement with the Essex Defendants can be found in the paltry sum to be paid by the Essex Defendants in return for receiving a full release from the Trustee, the lack of any explanation justifying why this amount is appropriate given the full context of the Essex Defendants' fraudulent conduct in procuring possession of the Four Stones, and the potential for a windfall to these bad actors as summarized in the Preliminary Statement, *supra*.

22.     The Motion additionally fails to address how the arbitrary amount of $350,000 was decided upon or the source of such funds, particularly where the Trustee also argues that Essex and Paul are bereft of funds and judgment proof.

**The Alleged Litigation Risk and Validity of Essex Claim and Lien**

23.     In the Motion, the Trustee argues that the benefits of the Essex Settlement outweigh the possibilities of success against the Essex Defendants, but he does not show how this argument is justified or where there is a risk that the Trustee will not be successful in obtaining a judgment against the Essex Defendants.  In fact, it appears the Trustee is ignoring this Court's December 12, 2019 bench decision, in which the Court already determined that the Debtor made a *prima facie* showing that five of the six Items were property of the Debtor's estate, and that it demonstrated sufficient evidence to claim a possessory interest in the sixth Item (the Ruby Ring) as a consignee of S.B. Diamond Corporation; a determination which was not refuted by Essex (*see* Exhibit "A", 12/12/2019 Tr. 55:20 – 57:7).

24.     The Trustee also asserts in the Motion that discovery may reveal facts that are harmful to the Debtor's position that it did not intend to create a pledge of security.  However, this statement also wholly ignores the fact that the Court already determined that: (a) Essex does not have a written security agreement granting it a security interest in the Stones pursuant to UCC § 9-203(b)(3)(A) that would provide it with a lien in the Items (*see* Exhibit "A", 12/12/2019 Tr. 59:2 – 7); and (b) Essex has failed to provide sufficient evidence to support its claim that the Debtor had agreed  to an oral security agreement as to the Stones because there was no credible evidence of the Debtor's intent to grant Essex with a security interest which is required in order to claim a lien (*see* Exhibit "A", 12/12/2019 Tr. 61:8 – 11).  The Debtor's principal testified, during the course of the three-day evidentiary hearing, that he "vehemently denies any intention to grant a security interest to Essex" (*see* Exhibit "A", 12/12/2019 Tr. 59:24 – 60 :1).  As the Court stated:

> Based on the testimony of Mr. Spector and full record of the evidentiary
> hearing, the Court finds that the evidence fails to support a determination
> that a security interest was granted to Essex by the Debtor with respect to
> any of the six [Stones]." Exhibit "A", 12/12/2019 Tr. 61:11 – 15.

Without a security interest, there can be no lien.  Given the prior legal conclusions of the Court,

there is no valid lien in favor of Essex being transferred to the Debtor's estate.

25.     Further to the point that Essex's possession of the Four Stones was unlawful after

due demand for their return was denied, the Court also determined that even if it was assumed that

the Debtor and Essex entered into an oral security agreement sufficient to grant Essex a valid

security interest in the Four Stones, Essex's claim that it owns the Four Stones as a result of an

agreed-upon strict foreclosure failed as a matter of law.  *See*, Exhibit "A", 12/12/19 Tr. 61:16 –

63:25.  Under UCC § 6-620(a), only if a debtor consents, may a secured creditor accept collateral

in full or partial satisfaction of an underlying debt.  A debtor's consent must be agreed to in a

signed writing sent by the secured creditor and received by the debtor after the debtor's default to

the secured creditor.  Paul admitted to failing to send any written proposal stating that Essex

intended to keep the Four Stones, and as stated above, Moty Spector, the Debtor's principal

testified that on behalf of the Debtor he did not give Essex permission to keep any of the Four

Stones.  *Id.* at 63:11 – 16.  Accordingly, Essex's purported lien which is being transferred to the

Debtor's estate is of dubious validity.

26.     Furthermore, the Court's determinations that Essex does not have a lien on the

Debtor's property also dilutes the strength of the Trustee's claim that under the Essex Settlement,

Essex must transfer to the Debtor's estate any ownership or other interest in, among other items,

the Earrings and Cross-Pendant, which the Essex Defendants were previously directed to turnover

(*see* Exhibit "A", 12/12/2019 Tr. 66:25 – 67:8) and which are already in the possession of the

Trustee.  Thus, there appears to be little, if any, litigation risk for the Trustee on these points and certainly not one that outweighs the potential reward.

**Subordination of the Essex Claim**

27.     The component of the Essex Settlement that Essex's claim will be subordinated in payment to all other claims is hardly a hard-fought for benefit.  In its Amended Complaint, the Debtor made detailed allegations of: (a) Essex's predatory lending practices and that had the Essex Defendants not threatened the Debtor's reputation by spreading unfounded rumors in the industry that the Debtor was insolvent, Essex's unsecured claim would have never accrued (*see*, Amended Complaint, ¶¶ 47 – 54, 187 – 191); and (b) the Essex Defendants' fraudulent inducement of the Debtor to issue the May 2019 Invoice for the Kashmir Sapphire and the Pink Diamond by knowingly misrepresenting to the Debtor of the existence of a buyer for those items (*see*, Amended Complaint, ¶¶ 70 – 74, 98 – 99, 192 – 193), as also testified to by the Debtor's office manager, Raphaela Colandrea, during the evidentiary hearing to consider entry of a preliminary injunction (*see* Exhibit "C"[10], 12/9/2019 Tr. 122:17 – 123:7; 125:22 – 25), both of which can form the basis on which to make a determination that a claim should be subordinated.  Further, the additional allegations of the Essex Defendants' transfer of the Four Stones to third parties (Mollard and Joukova) without the Debtor's authorization and without remitting the proceeds to the Debtor (*see*, Amended Complaint, ¶¶ 76 – 84, 187 – 191) additionally supports the argument that Essex's claim should be subordinated.

28.     As additional support for his presentation that the Essex Settlement should be approved, the Trustee touts the fact that the subordination of Essex's claim has the effect of

---

[10] Attached hereto as **Exhibit "C"** is the transcript of the hearing held before the Court on December 9, 2019 on the Debtor's Emergency Application of Ex Parte Relief, by Order to Show Cause, Why an Order Should Not Be Entered Granting a Temporary Restraining Order and Related Relief, hereinafter referred to as "Tr. 12/9/2019, ___:___".

reducing the total amount of claims senior to it to receive a distribution, thereby hinting at the notion that such creditors will receive a greater distribution.  However, this argument begs the question of what benefit is obtained by whittling down the size of the unsecured creditor class if the Debtor's estate is not going to obtain enough funds to make a meaningful distribution to that creditor class in any event?

**Valuation Range of Four Stones**

29.     The Trustee also attempts to show litigation risk by creating an issue as to the value of the Stones vis-à-vis the amount of Essex's unsecured claim, and whether Essex's "taking" of the Four Stones did or did not enable it to collect more than it was owed.  The total memo value of the Four Stones is $11,100,000 as compared to Essex's claim of $6.5 million allegedly owed on account of usurious loan(s) made to the Debtor.  In his attempt to demonstrate that the valuation of the Stones is overstated, the Trustee appears to argue that the value of the Stones should be determined by applying the percentage of value (42.4% of the memo price) received upon the Estate's aborted sale of its one-third interest in the Cross-Pendant across the board to all of the other pieces.

30.     However, the Trustee's reference to a valuation equal to 42.4% of the memo prices, based upon the sale price of the 1/3 interest in the Cross-Pendant to Gemcut, one of three co-owning Participants in the Cross-Pendant, is absurd.  The $195,000 sale price that Gemcut agreed to pay for the Debtor's one-third interest in the Cross-Pendant does not mean, as the Trustee would have the Court believe, that the Cross-Pendant is only worth $585,000.  It merely represents the amount Gemcut was willing to pay to protect the full value of its already existing partial interest in the Cross-Pendant, and represents an amount the Trustee was willing to accept for its interest in a piece that was subject to partial ownership of two other parties.

15

31.     An owner of a partial interest in a valuable piece of jewelry does not control the
fate, marketing, cutting, or sale of the piece, but must reach an agreement with its co-owners
regarding the same.  The market will not place the same value on a partial interest in a piece of
jewelry where the future disposition of same is determinative on other parties.  The offer from
Gemcut to purchase a 1/3 interest, and the Trustee's acceptance of same, without the benefit of an
appraisal, is certainly not indicative of the total value of the piece in question.  Even if the Trustee
was correct in evaluating the Cross-Pendant on the basis of the offer to purchase the 1/3 interest,
it is nonsensical to try to extrapolate that offer, on a single piece of jewelry, to the Four Stones.  If
the *entire* Cross-Pendant was sold, rather than a *partial* interest, conventional wisdom holds it
would garner a total sale price much higher than $585,000.

32.     Further, one does not have to be an expert in the field to recognize the fact that
selling an "ordinary" piece of jewelry such as the Cross-Pendant does not set a precedent for what
"extraordinary" items such as the Kashmir Sapphire, the Ruby, or the Pink Diamond will yield at
auction.

**The Preferential Transfers**

33.     Regardless of the above-mentioned deficiencies in the Trustee's presentation in the
Motion, there is also no serious dispute, or ascertainable defense, that both the delivery of the
Stones, and the purported granting of any security interest to Essex by the Debtor (which the
Debtor denies doing) occurred within the 90-day preference period, and are thus avoidable under
§ 547 of the Bankruptcy Code.  The Trustee's articulated concern of an inability to avoid a
"transfer" pursuant to § 547(c)(5) is totally misplaced, because pre-petition Essex never had a
"floating lien" on property of the Debtor.  Bankruptcy Code § 547(c)(5) states that an improvement
in position by a creditor during the 90-day preference period is a preference to the extent of the
improvement in position  In this case, immediately before the preference period, Essex was not in

possession of the Stones and held a wholly unsecured claim (assuming for the sake of discussion that Essex had a legitimate claim against the Debtor).  *See*, *In re Qualia Clinical Serv., Inc.*, 652 F.3d 933 (8th Cir. 2011) (creditor that held unperfected security interest in debtor's accounts receivable improved its position when it perfected that interest less than 90 days before debtor's Chapter 7 filing, making the security interest voidable as a preferential transfer); *In re McLean Indus., Inc.*, 132 B.R. 247, 264 (Bankr. S.D.N.Y. 1991), *aff'd,* 162 B.R. 410 (S.D.N.Y. 1993), *rev'd on other grounds,* 30 F.3d 385 (2d Cir. 1994) ([S]ection 547(c)(5) presupposes that the creditor had a perfected security interest prior to the 90-day preference period.)

34.    During the preference period, Essex "through artifice and fraud" seized possession of the six Stones of the Debtor, thereby improving its position from having an unsecured claim immediately prior to the preference period to a claim allegedly secured by property of the Debtor. Clearly, this was an attempt by Essex to "improve its position", and those actions harmed the other unsecured creditors of the Debtor.  That is a textbook preference that is avoidable from Essex and cannot be prevented by the application of the safe harbor provided by § 547(c)(5) of the Bankruptcy Code.

**The Illegitimacy of the Essex Defendants' "Taking" of the Four Stones**

35.    In addition, in the portion of para. 56 of the Motion regarding the issue of the "Value of the Items" as it pertains to the uncertainties/risks in proceeding with the Adversary Proceeding, the Trustee states:

> [e]ven assuming Essex is not a secured claimant but still has a valid claim for $6.5 million … any judgment in an amount at or near the low end of the range in the table would mean the Essex Defendants did not take more than they were owed …".

This assertion is misleading because it proceeds from the incorrect premise that there is a legitimate basis on which the Essex Defendants were allowed "to take" the Stones in the first place.  As has

been pointed out above, this Court has already determined that Essex has no ownership interest in the Stones, nor did it demonstrate that it had a valid security interest in them. Thus, the only basis on which to explain the Essex Defendants' taking of the Stones was that it was an unauthorized, *ultra vires*, taking of property from the Debtor by the Essex Defendants.[11]  Regardless of the judgment amount to be obtained, the fact remains that the judgment would be a valid obligation of the Essex Defendants to the Debtor's estate in the *full* amount thereof regardless of the size of their claim on which, at best, there will be a *low percentage pro rata* distribution.

**Collectability, the Evasiveness of Essex/Paul, the Unsubstantiated Dealings with Mollard/Joukova, and the Court's skepticism of Paul's Veracity**

36.    Regarding collectability, the Motion is devoid of any information pertaining to what due diligence the Trustee conducted concerning the financial wherewithal of either or both of the Essex Defendants should he prevail in getting a judgment against them for the amount owed. This glaring deficiency is even more apparent when you consider that Paul testified to having no problem with generating millions of dollars at the drop of a hat.  *See* Exhibit "C", 12/9/2019 Tr. 180:9 – 182:4.

37.    The Motion is equally silent as to what investigation the Trustee conducted concerning the identity and collectability against the "John Doe Defendants" who, based on the testimony of Paul are Mollard and Joukova.  This omission is conspicuous given Paul's testimony before the Court at the hearing on the Debtor's Motion for Contempt that Essex gave the Four Stones to Joukova and that now Mollard is in possession of them, wrongfully keeping them as repayment of a loan.[12]    However, the Essex Defendants have *never* produced a writing

---

[11] In addition, as mentioned immediately above, any "taking" by Essex during the 90-day preference period was a preferential transfer requiring avoidance.

[12] As amply demonstrated herein and by the observations of the Court (see 1/30/2020 Transcript, 32:1 – 4; 36:7 – 17; 37:12 – 21), the Essex Defendants had no right to use the Debtor's property which it wrongfully obtained to give to third parties (i.e.; Mollard and Joukova) in payment of their own purported obligations.

substantiating the delivery of the Four Stones, the acceptance by Mollard, and the offset or

satisfaction of the purported loan:

> THE COURT: Who owns the four stones right now?
> MR. PAUL: I believe Mollard.
> THE COURT: So, from your perspective, that means you don't owe Mollard that money anymore, right?
> MR. PAUL: I still owe them some money.
> THE COURT: Do you have a piece of paper from Mollard that says, Dear Mr. Paul, thank you so much. We now have the stones, and you no longer owe us $6 million?
> MR. PAUL: No, I don't have that piece of paper.
> THE COURT: Wouldn't you think that would be a good piece of paper to get?
> MR. PAUL: (No response.)

*See* Exhibit "B", 1/30/2020 Tr. 31:7 – 18, and follow up questioning of Paul by Debtor's counsel:

> Q    … Did you ever give me records showing Anna Zhukova accepted the goods? Did she ever sign a memo or any other documents saying, I have the goods?
> A    No.

*See* Exhibit "B", 1/30/2020 Tr. 33:13 – 16.

38.    In fact, Paul's entire story is an illustration of his gamesmanship in this case.

> Q    Okay. Who is Mollard?
> A    Mollard is the lender.
> Q    Who is Mollard, what person?
> A    The contact is Anna Zhukova.
> Q    So, Anna Zhukova acts as your agent, correct?
> A    The chief.
> Q    And she also acts as Mollard's agent?
> A    Correct.
> Q    Anna Zhukova is a real person?
> A    Yes.

> *        *        *

> Q    You testified that Ms. Zhukova, you spoke to her several times a day and almost every day. is that correct?
> A    I talk with her often.
> Q    How often do you talk to her now?
> A    Sometimes I speak to her two times per day. Sometimes I talk with her once a week.
> Q    So, you do a lot of business with her, right?
> A    We stopped doing business.

> Q    When did you stop doing business?
> A    We did some small businesses. We used to do very good business before the Chapter 11.
> Q    When did you stop doing business with her, Mr. Paul?
> A    When I stopped doing business?
> Q    When?
> A    I continue to do business with her. I don't do what I did before.

*See* Exhibit "B", 1/30/2020 Tr. 28:19 – 28:3, 29:9 – 24.

39.    In fact, prior to the preceding questioning of Paul, Debtor's counsel reminds the Court that, "We have testimony at length, in both Mr. Paul's deposition and at a three-day evidentiary hearing where he testified repeatedly, … that he's in constant communication with Ms. Zhukova [sic], and that he's received millions of dollars in loan proceeds from Mollard.  *See* Exhibit "B", 1/30/2020 Tr. 13:1 – 6.  But later on during the same hearing but prior to the above questioning, counsel for the Essex Defendants reports:

> MR. ISRAEL: I don't know that they're doing business. I don't know that Mr. Paul is doing any business right now. But he has been in contact with Ms. Zhukova [sic], that's true.
> THE COURT: Okay. But if he's in contact with Ms. Zhukova [sic], and there is the prospect of doing business, then why would he continue to do business with someone that he knows is willfully disobeying a court order?

*See* Exhibit "B", 1/30/2020 Tr. 17:16 – 22.

40.    This exercise in evasiveness and misdirection continued:

> Q    Since December 19, 2019, have you spoken to Mollard?
> A    No.
> Q    Why not?
> A    I don't have direct contact with him. I get emails; I send emails. When I have --
> Q    And your position is, you've never met Mollard, right?
> A    Never.
> Q    Never. He just sends you money.
> A    I saw him by face once in the --
> THE COURT: Who is he? It's a person. What's his name?
> MR. PAUL: I contact with the director of the company by email. I have a few contacts. They have six-seven contacts between us. I used to borrow money from him. I used to sell the pieces. I used to pay them.  …

THE COURT: I'm asking you a very specific question.  Who is the person that you deal with or dealt with at Mollard?

MR. PAUL: I deal with Anna Zhukova.

*See* Exhibit "B", 1/30/2020 Tr. 32:9 – 33:2.

41.    The Court's recognition of, and frustration with, Paul's evasiveness is apparent:

THE COURT: … Mr. Paul, there's nothing funny about this. It is highly likely that we're going to go to trial, and there's a reasonable possibility that they're going to be able to make a case for conversion. Do you know what conversion is? Conversion is the civil equivalent of theft. So, there's nothing at all funny about this. ... The question here is, whether you took the law into your won [sic] hands by sending those stones over there. So, don't think for a moment that because I declined their request to impose sanctions on you for contempt that we're done. Because we're a long way from done. You understand? There's nothing, nothing funny about this.

*See* Exhibit "B", 1/30/2020 Tr. 14:11 – 16, 19 – 24.

42.    The Court's skepticism of the truth and veracity Paul's testimony is justified:

THE COURT: It would be good if you had owed a debt of several million dollars to someone and you took property from someone else and gave it to them, and enabled them to take it in satisfaction of your debt to them, I would think you would want a piece of paper that makes clear that you don't owe that money anymore. You don't have that piece of paper, do you?

MR. PAUL: I don't have this piece of paper.

THE COURT: No, you don't have that piece of paper.  Because it's actually not true that Mollard owns those stones right now, is it? It's not true. It's your position when it's  convenient. Right?

MR. PAUL: That's not true.

THE COURT: Go ahead, Ms. Cassirer.

*See* Exhibit "B", 1/30/2020 Tr. 31:19 – 32:6.

THE COURT: Right. So, what you're telling us in essence is that you have a business relationship with Anna Zhukova, but it's very selective. Anna Zhukova does business for you, and makes money for you, but when you tell Anna Zhukova that you're under court order to return the stones that subject to this Court jurisdiction, she's not going to do that. And notwithstanding that, you're going to continue to do business with Anna Zhukova, and you're going to be on the receiving end of money that Anna Zhukova is going to make for you. Right?

MR. PAUL: (No response.)

THE COURT: Right?

MR. PAUL: We did prior business with Anna Zhukova. It was established many, many years ago.

THE COURT: I'm not asking you about the past; I'm asking you about the present and the future. And what you're telling me is that, yes, you have a business relationship with Anna Zhukova. She may have some pieces of yours. She's going to engage in transactions, which are going to result in you getting money. But in the same breath, there's nothing you can do to get Anna Zhukova to return those stones because she's acting as an agent on your behalf, but also on behalf Mollard, who you refer to as him, by the way, and then refuse to name a person. Anna Zhukova is not a him. Maybe he is. I have no idea. But doesn't sound like it. And you've referred to Anna Zhukova as a she. So, to be perfectly clear, your story isn't exactly hanging together.

*       *       *

THE COURT: And you previously testified that Mollard now owns the stones, so you couldn't get them back. And that the reason that Mollard now owns the stones is in satisfaction of another debt that you had to Mollard. But yet, you have not documentation that Mollard has taken the stones and has cancelled your debt. So, none of this hangs together in any meaningful way. And what I think is happening is that you are hanging your hat on the fact that this Court does have jurisdiction to enforce its order against Anna Zhukova. That's what I think is going on.

See Exhibit "B", 1/30/2020 Tr. 36:7 – 37:10, 12 – 21.

43.    Taking all of the above testimony in context, Ultimate questions why the Trustee is giving this bad actor a general release in exchange for $350,000.00.  It's clear the Essex Settlement basically *rewards* Paul for his bad conduct, or at the very least does not really punish Essex or Paul for their actions and conduct and instead accepts a very small and arbitrary amount from them while affording them the "magic ticket" of complete releases.  Paul's machinations here were *ultra vires* and resulted in his company seizing possession of property it neither owned nor had a legitimate interest in, resulting in the use of fraudulent self-help to satisfy Essex's claims without regard for, and to detriment of, all other creditors.

**Settlement Payment Default Remedy**

44.    The terms of the Essex Settlement also provide the Essex Defendants with a "free pass" because there is no consequence for committing a payment default under the Essex Settlement.  As set forth *supra*, the settlement sum of $350,000.00 is to be paid in four (4)

installments over a period of 90 days.  As to the Essex Defendants' failure to make the installment

payments by their respective due dates, the Essex Settlement Agreement provides that: (a) the

Trustee shall give notice of the default to the Essex Defendants via email to their counsel; (b) the

Essex Defendants will have five (5) Business Days after receipt of the email notice to cure the

payment default; and (c) upon the Essex Defendants' failure to cure, they shall be deemed in

breach of [the Essex] Agreement.  *See*, Essex Settlement Agreement, § 6(f).  However, the penalty

for defaulting under the Essex Settlement Agreement is insignificant relative to the claims being

asserted against the Essex Defendants.  Section 6(f) of the Essex Settlement Agreement further

provides:

> Upon their breach, the Essex Defendants agree they will be jointly and
> severally liable for the outstanding amount, plus interest, attorneys' fees and
> costs, and will consent to a judgment against them in the Bankruptcy Court
> in said amount.

Ignoring the penalty of "interest[13], attorneys' fees and costs", it is patently clear from this provision

that the consequence for defaulting under the Essex Settlement Agreement is that a judgment will

be entered *only* for that portion of the $350,000 settlement sum that remains unpaid, rather than

the *total amount sought in the Amended Complaint*.  This, again, is an indication that merely by

entering into the Essex Settlement, the Essex Defendants have gained a victory by avoiding a

liability of several millions of dollars for their self-help acquisition of the Four Stones.

    45.    Moreover, the amount of the $350,000 settlement sum which the Trustee is willing

to take on faith will be paid by the Essex Defendants, is wholly arbitrary.  The Motion is devoid

of any explanation of how this amount was determined, and on what basis a conclusion (or even

an assertion) can be made that it represents a reasonable sum to accept as a settlement.  As set forth

---

[13] It is also noted that the Essex Settlement Agreement is silent as to the rate of interest to be charged and the date
from which interest begins to accrue.  Notwithstanding this omission, it is apparent that interest accrues from the date
the Essex Defendants default in making the settlement installment payment under the Essex Settlement Agreement.

supra, the Trustee himself indicates the Four Stones have a total combined value ranging from $4,706,400 to $11,100,000, but is agreeing to accept only $350,000 in settlement of the Estate's claims for, among other claims, turnover, fraud, and a preference, which amounts to as a little as 3.15% of the top range of values for the missing Four Pieces, or, at best, 4.34% at the hereinabove disputed low end of the range.

**Waiver of Subsequent Recovery**

46.     Finally, when all is said and done after the Essex Settlement is approved and this bankruptcy case is closed (or even before closure), and given the close and opaque relationship between Paul and Joukova, the disingenuousness of Paul's testimony about which was implicitly castigated by the Court, there is nothing in the Essex Settlement that assures creditors that Paul will not recover or otherwise regain possession of the Four Stones and realize value therefrom to the detriment of not only Ultimate and the other co-Participants but all other creditors of the Debtor.  Regardless of the likelihood of this happening, in any event, the release provided to the Essex Defendants by the Trustee does not carve-out an exception for this scenario, which means the Trustee has given up all opportunities for recourse and recovery for the benefit of the Debtor's estate should the Four Stones appear, which is another reason the Essex Settlement should be not be approved.

47.     Consequently, it is apparent that the Essex Settlement is not in the best interests of the Debtor's estate.  There is no acknowledgement or admission that property of the Debtor was illegally obtained and withheld from the Debtor by the Essex Defendants, there has been no substantiation of how the Four Stones were disposed of by the Essex Defendants, there is no basis provided by the Trustee in the Motion to allow creditors to ascertain how or why the Essex Settlement was arrived at, or why the amount to be paid by the Essex Defendants is suitable or appropriate, or that there is a consequence for the Essex Defendants to opt not to pay the rest of

the settlement sum, and no protection for the creditors should the Four Stones "magically" re-appear – all while the Essex Defendants receive a full release.

### Objection to Insurance Settlement

48.     The Court should also not approve the Insurance Settlement Agreement between the Trustee and Certain Underwriters at Lloyd's, London, including Ascot, AXA, Management Research Services, Arch, W/R/B and Chubb Global Markets – Marine (the "Underwriters"), and should deny the Motion, because the Motion fails to provide a sufficient basis to support the conclusion that a settlement payment of $450,000.00 to the Debtor's estate is reasonable.

49.     At the outset, the Insurance Settlement cannot be viewed in a vacuum given both the context in which the Trustee (and the Court, to a large extent in the hearing to approve the Radwan settlement) has treated the Insurance Settlement as a package with the Essex Settlement. Ultimate has made clear its position herein that the proposed Essex Settlement is: (a) unreasonable and, indeed, utterly tainted by rewarding "bad actors" for their bad, uncorroborated and evasively explained conduct with alleged third parties outside the jurisdiction of this Court; and (b) being granted in exchange for an inexplicably low settlement payment in an arbitrary amount, a full release and an unrestricted potential (if not likelihood) to recover the "missing" Four Stones and sell them for their sole benefit for millions of dollars.

50.     In view of the unreasonableness and shortfalls on one side of the Trustee's "package" settlement, it was incumbent on the Trustee to maximize and completely justify the Insurance Settlement, which is, at least, a transaction with responsible and credible parties.  As summarized in the Preliminary Statement, *supra*, and the arguments below, the Trustee has failed to do so and has again chosen the path of least resistance.

51.     In the Motion (at ¶ 47), the Trustee framed the issue for settlement with the Underwriters as, *inter alia*, "whether the loss was a fortuitous event for insurance purposes; and

whether there was one or multiple losses for purposes of the coverage limit."  The importance of why this issue is material was further explained by the Trustee as follows: "the only possible coverage [pursuant to the Policy] is under the Entrustee Infidelity Clause, which provides for a $500,000 coverage limit and a $25,000 deductible for 'each and every loss' or 'one event.'" Motion, ¶ 58.

52.    The Trustee, however, wholly failed to support its conclusion that a settlement of $450,000.00 with the Underwriters was reasonable given the case law, which the Trustee cited in the Motion, holding that an infidelity clause, like the Entrustee Infidelity Clause at issue, was ambiguous and *construed in favor of the insured.  OTC Int'l Ltd. v. All Those Underwriters at Lloyd's of London Subscribing to Policy Ins. Numbered HN99ABXC255,* 1 Misc.3D 911(a) (Sup. Ct. Qns. Cty. Jan. 29, 2004) (cited in Motion, ¶ 59).  More specifically, the Trustee failed to explain why the $450,000 proposed settlement ($500,000 coverage limit, less the $25,000 deductible, less a $25,000 litigation risk discount) is reasonable when the maximum coverage limit for what is arguably (with merit) four (4) separate "events" or "losses" is $1.9 million (four separate losses each with coverage limits of $500,000, less the $25,000 deductible).  Stated somewhat differently, the Trustee's proposed settlement is closer to $0 than it is to the maximum coverage limit of $1.9 million.  In light of the misinterpreted legal precedent cited by the Trustee, Ultimate respectfully contends that the Trustee has not satisfied its burden to show that the proposed Insurance Settlement is reasonable.

53.    The weakness of the Trustee's position is best exemplified by the analysis of the court in *OTC Int'l*.  In *OTC Int'l*, the insured was a jewelry manufacturer which had an employee who had been surreptitiously stealing multiple pieces of jewelry over an undetermined period of time.  *Id*. at *2.  After the thievery was discovered, the jewelry manufacturer conducted an

inventory and surmised that the thief/employee had likely stolen, out of thousands of missing pieces, not much more than the 10% of the inventory that was in the employee's possession at the time of being caught and arrested.  The total loss was $736,000.  *Id.*

54.    The policy at issue, included what was termed an "Employee Infidelity Extension Clause," which differed from the Entrustee Infidelity Clause in the Debtor's policy in that losses had to be reported within 72 hours of the loss occurring and in that there was a $100,000 deductible per loss with a $1 million cap. *Id.* The insurer in *OTC Int'l* disclaimed coverage on the basis, *inter alia*, that the insured could not establish that only one loss occurred within 72 hours of discovering the theft. The reason why the *insurer* wanted to contend that there were multiple losses was, because of the type of jewelry at issue, the $100,000 per loss deductible would have left the insured, effectively, without coverage. *Id.*

55.    The court in *OTC Int'l* found that the *insured's* interpretation that a series of thefts could be construed as a single loss was reasonable after determining that the terms "loss" and "occurrence" were *undefined* and *ambiguous*. *Id.* at *3. The court then set forth the well-settled insurance law principles that "where the meaning of a policy of insurance is in doubt or is subject to more than one reasonable interpretation, all ambiguity must be resolved in favor of the policy-holder and against the company which issued the policy … This rule is enforced even more strictly when the language at issue purports to limit the company's liability. *Id.*

56.    Thus, the court, viewing the facts through the prism that all ambiguities were to be construed against the insurer found that, assuming all of the losses were attributable to the employee/thief, "there was just one cause of the 'loss' within the meaning of the policy, not multiple losses." *Id.*

57.     Extrapolating this reasoning to the case at bar which is entirely on point, albeit with converse facts, the terms "loss" and "event" are *undefined* in the Policy and are *ambiguous*. Construing this ambiguity against the Underwriters would result in this Court finding that the "loss" of the Kashmir Sapphire, Pink Diamond, Yellow Diamond and Ruby (defined, *supra*, as the "Four Pieces") was four "losses" that are not attributable to a single "event."  Additionally, all the Trustee would have had to do to seek to obtain insurance recovery over *4 times larger* than the Insurance Settlement being proposed is advance a reasonable interpretation of "each and every loss" and "event" in order for this Court to construe these terms against the Underwriters. This is not a high bar.

58.     Moreover, there is little dispute that the Debtor sustained four separate losses when the Four Pieces were not returned by Essex to the Debtor.  Despite the fact that the Debtor's principal, Moty Spector, testified at deposition that each of the Four Stones was separately delivered to Essex/Paul, the Trustee appears to have accepted the Underwriters' position that there was a single loss without meaningful opposition or negotiation; indeed the Underwriters were given a $25,000 settlement discount reduction of the full amount of a single loss.  While the Motion, as supported by the Casas Declaration, attempts to create the impression that the Trustee "fought the good fight" with the Underwriters, the Casas Declaration goes no further than to carefully say that "[t]his Firm *questioned* whether there was one or multiple losses for purposes of the applicable coverage limit". (Casas Dec'l, ¶ 13)(emphasis added).  Significantly, the Motion does not indicate that the Trustee or his counsel made sincere and affirmative efforts to advocate for treatment as a multiple loss in the hope of obtaining an award of as much as $1.9 million (or some lesser amount in settlement but at least greater than the truly minimal amount of $450,000).

59.    In another case where the *insured* claimed under the policy at issue that multiple thefts were a single "occurrence" and not multiple "occurrences" (as the insurer contended) because the aggregation of deductibles would effectively negate coverage, the court (Judge Woods of the S.D.N.Y.) denied summary judgment and held that "[b]ecause the undefined term 'occurrence' is ambiguous, a finder of fact must determine its meaning. In this case, a jury will determine whether the series of thefts should be understood [as] a single occurrence, subject to a single deductible, or multiple occurrences, subject to multiple deductibles." *Rokeach v. Hanover Ins. Co.*, 2015 WL 2400097, *6 (S.D.N.Y. May 19, 2015).

60.    Accordingly, the Underwriters in this case would be facing the possibility that the Entrustee Liability Clause is interpreted by this Court as ambiguous, with a concomitant impact on its business whenever the Entrustee Liability Clause is challenged by an insured, and that a trial judgment could be entered for $1.9 million.  Additionally, the Underwriters would also have to bear its attorneys' fees upon a motion for summary judgment and/or trial.  Thus, it would appear that the Underwriters have just as much to gain from a more reasonable settlement as the Estate does from obtaining more than the token $450,000 offered by the Underwriters.

61.    Consequently, the Objector respectfully submits that the Trustee has not proposed a reasonable settlement with the Underwriters under the law or the facts of this matter.

62.    Accordingly, Ultimate feels compelled to object to the Motion and submits approval of both the Essex Settlement and the Insurance Settlement should be denied.  In the alternative, Ultimate suggests that the Motion be adjourned until an informed assessment of the prudence of both Settlements can be made, and if necessary, adjusted to provide a just benefit to the creditor body of the estate.

**WHEREFORE**, Ultimate respectfully requests that the Court either deny the Motion, or adjourn the Motion until an informed assessment of the prudence of both settlements can be made, and if necessary, adjusted to provide a just benefit to the creditor body of the estate, and otherwise grant such other and further relief as is just and proper.

Dated: New York, New York
    April 27, 2021

> Platzer, Swergold,
>   Goldberg, Katz & Jaslow, LLP
> *Attorneys for Shanghai Pearls & Gems, Inc. d/b/a*
> *Ultimate Diamond Co.*
>
> By: */s/ Henry G. Swergold*
>     Henry G. Swergold, Esq.
>     Andrew S. Muller, Esq.
>     475 Park Avenue South, 18th Floor
>     New York, NY 10016
>     Tel.: (212) 593-3000
>     hswergold@platzerlaw.com
>     amuller@platzerlaw.com