**MORRISON COHEN LLP**
909 Third Avenue
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan
Terence K. McLaughlin
Christopher Milito

*Attorneys for S.B. Diamond Corp.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>THE D&M CAPITAL GROUP, LLC,<br><br>                                                    Debtor. | Chapter 7<br>Case No. 19-11711 (SCC) |
| THE D&M CAPITAL GROUP, LLC,<br><br>                                                    Plaintiff,<br><br>        v.<br><br>ESSEX GLOBAL TRADING, LLC, ALEKS PAUL, AND "JOHN DOES," said names being fictitious and unknown,<br><br>                                                    Defendants.<br><br>        -and-<br><br>RADWAN DIAMOND & JEWELLERY TRADING, ULTIMATE DIAMOND CO,., S.B. DIAMMOND CORP., PALAWAN HOLDINGS LIMITED, and GEMCUT S.A.,<br><br>                                    Nominal Defendants. | Adversary Proceeding<br><br>Case No. 19-01300 (SCC) |
| ESSEX GLOBAL TRADING, INC.,<br><br>                                    Third-Party Plaintiff,<br><br>        v.<br><br>MOTY SPECTOR,<br><br>                                    Third-Party Defendant. | |

**OBJECTION OF S.B. DIAMOND CORP. TO TRUSTEE'S MOTION
PURSUANT TO 11 U.S.C. § 105(A) AND FEDERLA RULE OF
BANKRUPTCY PROCEDURE 9019(A) FOR AN ORDER APPROVING
SETTLEMENT AGREEMENTS OF THE ADVERSARY PROCEEDINGS
AND RELATED BANKRUPTCY AND INSURANCE CLAIMS**

S.B. Diamond Corp. ("**SB Diamond**"), a nominal party to the above-captioned

adversary proceeding ("**Adversary Proceeding**") and a party in interest in this

chapter 7 case, respectfully submits this objection ("**Objection**") to the Motion (the

"**Settlement Motion**") of Alan Nisselson, Chapter 7 Trustee ("**Trustee**") of the

estate of The D&M Capital Group, LLC ("**Debtor**") for an Order approving a proposed

settlement ("**Proposed Essex Settlement**") of the Debtor's claims in the Adversary

Proceeding against Defendants Essex Global Trading, LLC and Aleks Paul

("**Defendants**").[1] In support of its Objection, SB Diamond states as follows:

## PRELLIMINARY STATEMENT

1.      SB Diamond is mindful that the Trustee is afforded considerable

latitude under Rule 9019 of the Federal Rules of Bankruptcy Procedure

("**Bankruptcy Rules**") when it comes to settling or compromising claims pertaining

to property of the ***Debtor's*** estate. However, this Adversary Proceeding is unusual

because, from its inception, certain of the property that the Debtor has sought to

recover from the Defendants (and which now forms a part of the settlement

consideration) ***does not belong to the Debtor***.

---

[1]      The Motion also seeks approval of an unrelated Insurance Settlement (as described more fully
in the Motion), as to which SB Diamond takes no position.

2.      The Debtor acknowledged this when it filed its Complaint in 2019 and expressly alleged therein that SB Diamond has "interests in [three of] the Precious Stones that are the subject of this adversary proceeding." (*See* Debtor's Complaint, ECF No. 20, at ¶ 22.) That is precisely why the Debtor named SB Diamond as a "Nominal Defendant" in this action.

3.      And yet, SB Diamond was not consulted as to the Proposed Essex Settlement, was not involved in the negotiations of that settlement, and does not consent to the Debtor's attempt to convert and use SB Diamond's property to strike a settlement between the Debtor and Essex and use the proceeds thereof to pay Debtor's creditors exclusively.

4.      The fundamental problem with the Debtor's requested relief, stems from the Debtor's fundamental mischaracterization of the provenance of the three SB Precious Stones (defined below).  The facts are the reverse of how the Debtor has presented its interest in the SB Precious Stones: SB Diamond has sole title to the SB Precious stones. The Debtor has merely an economic interest in the SB Precious Stones. The SB Precious Stones are simply not an asset of this estate and it is axiomatic that the Debtor may not sell, use, dispose of, compromise, or do anything with goods that are not property of the Debtor's estate. Although the Debtor held economic interests in these three stones, and (at various points in time) had them in its possession with limited rights as a "consignee," the record is clear that SB Diamond held title to each of the three precious stones at all times and hold that title today.

5.    As Judge Gerber held in another bankruptcy-related diamond consignment case, the "true consignment" between SB Diamond and the Debtor that took place here "is essentially an agency with a bailment." *In re Fine Diamonds, LLC*, 501 B.R. 159, 178 (Bankr. S.D.N.Y. 2013).[2] As a bailee/consignee, Debtor has no right to deal with or to dispose of the property that SB Diamond consigned to Debtor.

6.    To the extent Debtor receives any value from anyone (including Essex) attributable to the consigned property, its obligation (and it has no discretion in this respect) is to immediately turn it over to the consignor, SB Diamond. Because the Proposed Essex Settlement does not propose to do that, SB Diamond objects to the proposed settlement.

---

[2]    In *Fine Diamonds*, the Debtor consigned diamonds to a non-debtor and the Court found that the non-debtor never obtained any ownership because title at all times remained with the consignor. 501 B.R. at 178-180. Although the roles are reversed, the legal principles applicable to diamond consignment are fully applicable here. Moreover, Debtor cannot rely on *Fine Diamonds* to claim that the SB Precious Stones became property of the Debtor's estate by virtue of the Debtor's purported downstream consignment to Essex because, as described below, the Debtor had no title rights to consign to Essex in the first place. Debtor's rights were already limited by the original consignment from SB Diamond. The consignment memoranda with respect to those original consignments expressly state that the Debtor could not dispose of SB Diamond's consigned stones in any way without SB Diamond's consent. SB Diamond never gave any consent for a downstream consignment to Essex and the Debtor has never alleged that any such consent was given.

## FACTUAL AND LEGAL
## GROUNDS FOR OBJECTION

### SB Had Title To The Kashmir Sapphire (JR0182) At All Times
### And The Debtor Never Had A Right To Dispose Of It
### Without SB Diamond's Express Consent

7.    The first of the SB Precious Stones (also known as Item JR0182), is a 23.38 carat sapphire with two accompanying diamond "baguettes" (.89 and .83 carats, respectively) set in a ring (the "**Kashmir Sapphire Ring**"). (Debtor's Adv. Proc. Complaint, ECF No. 20, at ¶ 25.)[3]

8.    The economic interests associated with the Kashmir Sapphire Ring were shared (on an equal 1/3 basis) between three partners: SB Diamond, the Debtor, and Radwan Diamond and Jewellery Trading ("**Radwan**"). (*Id.* at ¶ 28.)

9.    However, as evidenced by consignment memoranda that the Debtor itself attached to its complaint in the Adversary Proceeding, *title to and control over the Kashmir Sapphire Ring resided in SB Diamond at all times.*

10.    Specifically, as the Debtor concedes in its Adversary Proceeding, "by [consignment] memo dated February 26, 2019, . . . SB [Diamond] *consigned* the Kashmir Sapphire [Ring] to the [Debtor]. (*Id.* at ¶ 29 (emphasis added).) A true and correct copy of that consignment memo (which was also annexed as Exhibit E to the Adversary Proceeding Complaint) is annexed hereto as **Exhibit A**.

---

[3]    For ease of reference, the Debtor's Adversary Proceeding Complaint in the action against Essex will be referred to hereinafter as the "Complaint." (ECF No. 20.)

11.    The February 26, 2019 consignment memorandum reflects that the Kashmir Sapphire Ring had a value of $7,000,000.00 as of the date of consignment. By countersigning the memorandum, the Debtor acknowledged that value.

12.    The February 26, 2019 consignment memo clearly and unambiguously sets forth the limitations under which the Debtor received the Kashmir Sapphire Ring as SB Diamond's consignee:

> The merchandise described below is delivered to the undersigned. . . on memorandum, at your risk from all hazards, regardless of the cause of the loss or damage, only for examination and inspection by prospective purchasers, upon the express condition that *all such merchandise shall remain the property of S.B. DIAMONDS CORP. ("S.B.")* and shall be returned on demand, *in full*, in its original form. Until the merchandise is returned and actually received by S.B., *you shall remain fully responsible* (both – personally and in your representative capacity) for the merchandise, and in the event of damage or loss, whether caused by you or by another, whether or not under your control, you will *indemnify S.B. immediately by payment of the stated value* which represents the extent of the actual loss (and is not intended to constitute a price for the sale for the merchandize), plus legal fees of twenty percent (20%) of the memorandum value, plus costs, disbursement and interest (at the maximum legal rates), if the matter is forwarded to an attorney. . . . You acquire *no right or authority to sell, pledge, hypothecate or otherwise dispose of the merchandise, **or any part thereof**, by memorandum or otherwise*, . . . A sale of all *or any portion* of the merchandise shall occur only if an when S.B. agrees and you shall have received from S.B. a separate invoice.

(Exhibit A (emphasis and bolding added).)

13.    Thus, the consignment memo makes clear that SB Diamond retained title to the Kashmir Sapphire Ring at all times.

14.    This is fully consistent with New York law. *In re Fine Diamonds, LLC*, 501 B.R. at 180 (Gerber, J.) (finding that consignment of diamonds "on memo"

constitutes a "true consignment" and that "title did not pass to the [consignee] during these consignment transactions"). As Judge Gerber found, "Under caselaw applying New York law, a debtor that consigns goods to another retains title to those goods . . . ." 501 B.R. at 176. Judge Gerber further noted that "the failure to file a financing statement does not" undermine or preclude the finding of a consignment. *Id.* at 179.

15.    Judge Gerber's determinations in Fine Diamonds comports with New York law generally. *See, e.g., House of Diamonds v. Borgioni, LLC*, 737 F. Supp.2d 162, 171-72 (S.D.N.Y. 2010) (granting summary judgment on claim for conversion where plaintiff alleged it sent Defendant diamonds on consignment and defendant failed to return them upon request and noting "According to the consignment memoranda, *the diamonds were the sole property of House of Diamonds [the consignee]*, and Zrelak did not have a right to sell them without approval.") (emphasis added); *Gem Source Intern., Ltd. V. Gem Works N.S. L.L.C.*, 258 A.d.2d 737, 374 (1st Dep't 1999) ("Defendant's resale of the diamonds was inconsistent with the *consignor's "ownership" of the goods*."); *Wood v. Proudman*, 122 A.D. 826, 828 (1st Dep't 1907) ("The consignment memorandum clearly apprised the defendant of the fact that his firm had no authority to sell the diamonds until they reported to the plaintiffs the selections made, and obtained the approval of the plaintiffs. *The title to the diamonds remained in the plaintiffs, and never passed to the defendant's firm*.") (emphasis added). *See also*, *In re Whitehall Jewelers Holdings, Inc.* 2008 WL 2951974, 2008 Bankr. LEXIS 2120 (Bankr. Del. July 28, 2008) (Debtors request for permission to sell consigned jewelry in connection with a Section 363 sale of all of its assets, was

denied pending the commencement of adversary proceedings to "determine the validity, priority, or extent of [an] interest in property"). No such determination is required here. The Precious Stones are subject to a "True Consignment," as was the situation in the case before Judge Gerber. Title in a True Consignment always resides in the consignor.

16.    The consignment memorandum similarly makes clear that the Debtor did not have any right to dispose of the Kashmir Sapphire Ring, ***or even any part of it***, in any way and that, upon demand, the Debtor was obligated to return the Kashmir Sapphire Ring ***in full*** (not some *portion* of it) in its original form.

17.    If the Debtor did not believe in the accuracy and truth of the information set forth in the February 26, 2019 consignment memorandum (including, without limitation, the express statement that title to the Kashmir Sapphire remained "the property of SB" Diamond), then the Debtor should not have countersigned the consignment memorandum. The Debtor certainly cannot disclaim that information now, long after having done so.

18.    In violation of the consignment memo,[4] and without SB Diamond's consent or authorization, the Debtor purported to further consign the Kashmir Sapphire Ring to Essex by memorandum dated May 17, 2019. (Complaint ¶ 72.)

---

[4]    Contrary to the allegation in the Debtor's Adversary Proceeding, (Complaint ¶ 30), SB Diamond's consignment of the Kashmir Sapphire to the Debtor did **not** confer any authority on the Debtor to "consign it to others" without SB Diamond's consent. No such authority is stated anywhere in the consignment memo. (See Exhibit A.)

### SB Diamond Had Title To The Diamond (JR0280) At All Times
### And The Debtor Never Had A Right To Dispose Of It
### Without SB Diamond's Consent

19.    The Second of the SB Precious stones (Item JR0280) is a 10.02 carat diamond ("**Diamond**"). (Complaint ¶ 34.)

20.    The economic interests associated with the Diamond were shared (on an equal 1/2 basis) between SB Diamond and the Debtor. (*Id.* at ¶ 35.)

21.    However, as with the Kashmir Sapphire, *title to and control over the Diamond resided in SB Diamond at all times*. As the Debtor concedes in its Adversary Proceeding, SB diamond consigned the Diamond to the Debtor by consignment memo dated December 4, 2018. (*Id.* at ¶ 36.) A true and correct copy of that consignment memo (which was also annexed as Exhibit J to the Adversary Proceeding Complaint) is annexed hereto as **Exhibit B**.

22.    The December 4, 2018 consignment memorandum reflects that the Diamond had a value of $1,202,400.00 as of the date of consignment. By countersigning that memorandum, the Debtor acknowledged that value.

23.    The December 4, 2018 consignment memo contains the identical language as that quoted above from the February 26, 2019 consignment memorandum. (Exhibit B.)

24.    Thus, the consignment memo makes clear that SB Diamond retained title to the Diamond at all times. It similarly makes clear that the Debtor did not have any right to dispose of the Diamond, ***or even any part of it***, in any way and

that, upon demand, the Debtor was obligated to return the Diamond ***in full*** (not some *portion* of it) in its original form.

25.    If the Debtor did not believe in the accuracy and truth of the information set forth in the December 4, 2018 consignment memorandum (including, without limitation, the express statement that title to the Diamond remained "the property of SB" Diamond, then the Debtor should not have countersigned the consignment memorandum. The Debtor certainly cannot disclaim that information now. Long after having done so.

26.    In violation of the consignment memo, and without SB Diamond's consent or authorization, the Debtor purported to further consign the Diamond to Essex by memorandum dated May 9, 2019. (Complaint ¶ 67.)

### SB Diamond Had Title To The Ruby (JR0306) At All Times And The Debtor Never Had A Right To Dispose Of It Without SB Diamond's Consent

27.    The third of the SB Precious Stones (Item JR03060) is a 7.02 crat ruby set in a platinum ring with "Micro Pave" diamonds ("**Ruby**" and, together with the Kashmir Sapphire and the Diamond, the "**SB Precious Stones**"). (Complaint ¶ 44.)

28.    SB Diamond owns 100% of the Ruby. The Debtor's sole economic interest in the Ruby is a "profit participation" entitling it to 50% (together with SB Diamond) of any *profits* attributable to a sale of the Ruby. (*Id.* at ¶¶ 44-45.)[5]

---

[5]    Given that the Ruby's value exceeds $3.5 million, and given that the total consideration paid by Essex under the Proposed Essex Settlement (for all precious stones including but not limited to the Ruby) is merely $350,000, none of the settlement consideration could possibly implicate the Debtor's 50% "profit participation."

29.    However, as with the Kashmir Sapphire, consignment memoranda demonstrate that *title to and control over the Ruby resided in SB Diamond*. Specifically, as the Debtor concedes in its Adversary Proceeding, SB Diamond consigned the Ruby to the Debtor by consignment memo dated December 4, 2018. (*Id.* at ¶ 46.) A true and correct copy of that consignment memo (which was also annexed as Exhibit P to the Adversary Proceeding Complaint) is annexed hereto as **Exhibit B**.

30.    The December 4, 2018 consignment memorandum reflects that the Ruby had a value of $3,510,000.00 as of the date of consignment. By countersigning that memorandum, the Debtor acknowledged that value.

31.    Thus, in the aggregate, the SB Precious Stones have value — acknowledged by the debtor in consignment memoranda — totaling $11,712,400.00

32.    The December 4, 2018 consignment memorandum contains the identical language as that quoted above from the February 26, 2019 consignment memorandum. (Exhibit B.)

33.    Thus, the consignment memorandum makes clear that SB Diamond retained title to the Ruby at all times. It similarly makes clear that the Debtor did not have any right to dispose of the Ruby, ***or even any part of it***, in any way and that, upon demand, the Debtor was obligated to return the Ruby ***in full*** (not some *portion* of it) in its original form.

34.    If the Debtor did not believe in the accuracy and truth of the information set forth in the December 4, 2018 consignment memorandum (including, without

limitation, the express statement that title to the Ruby remained "the property of SB" Diamond, then the Debtor should not have countersigned the consignment memorandum. The Debtor certainly cannot disclaim that information now, long after having done so.

35.    In violation of the consignment memo, and without SB Diamond's consent or authorization, the Debtor purported to further consign the Ruby to Essex by memorandum dated March 28, 2019. (Complaint at ¶ 64.)

### The Debtor Does Not Have The Right To Use Any Of The SB Precious Stones To Fund A Settlement From Essex, Nor To Retain The Settlement Proceeds Paid By Essex For The SB Precious Stones

36.    Notwithstanding the deferential standards set forth in Bankruptcy Rule 9019, the Proposed Essex Settlement cannot and should not be approved because it is (at least in part) funded by, and premised upon, the Debtor's "disposition" (via settlement) of property that simply does not belong to the Debtor and that it has no right to dispose of. The Debtor never had title to any of the SB Precious Stones nor any right to dispose of them (by settlement or otherwise) in a transaction with Essex to the exclusion of SB Diamond.

37.    Any value that Essex might be prepared to pay for the SB Precious Stones (which notably must be far more than the paltry amount that the Debtor is seemingly prepared to accept from Essex in the proposed settlement in order to be acceptable to SB Diamond)[6] *must be paid to SB Diamond*, not to the Debtor. SB

---

[6]    SB has reviewed the objection filed by Ultimate Diamond Co. (ECF No. 111 et. seq.) in which Ultimate (among other things) opposes the Proposed Essex Settlement on the ground that the consideration proposed to be paid by the settling Defendants (approximately $350,000) is patently insufficient. SB Diamond joins in, and incorporates by reference herein, those

Diamond consigned the three SB Precious Stones to the Debtor and, in so doing, title to the three SB Precious Stones never passed to the Debtor. It resided at all times in SB Diamond. New York law is crystal clear on this.

38.    The fact that—in violation of the terms of the consignment from SB Diamond—the Debtor purported to "dispose" of the SB Precious Stones by purportedly further consigning them to Essex does not change the outcome nor give rise to property rights that the Debtor never had to begin with. At most, that simply reflects the Debtor's conversion and theft of the SB Precious Stones and conveyance of the stolen property to a third party. There is no scenario in which such conduct entitles the Debtor—or its unsecured creditors—to cut out SB Diamond and enter into a transaction with the third party transferee to obtain value (the exclusion of the original owner) for the stolen property. Yet that is precisely what the Proposed Essex Settlement contemplates.

39.    Neither the Debtor nor this Court has the power to force SB Diamond, a non-debtor, to consent to SB Diamond's property being used to fund recoveries to the Debtor's unsecured creditors. Nothing in Rule 9019, the Bankruptcy Code, applicable law or common fairness authorizes such a result.

---

arguments. For the sake of brevity and to avoid unnecessary repetition, SB Diamond will not repeat those arguments herein.

**Consideration Or Approval Of The Proposed Essex Settlement
Will Impair The Parties Ability To Resolve Their Disputes Consensually
As Directed By The Court By Prematurely Making Determinations
As To Disputed Issues In The Debtor's Favor**

40.     SB Diamond is mindful of the Court's command to work expeditiously
and in good faith with the Trustee in an effort to reach a fair and equitable resolution
of the issues between itself and the Trustee.

41.     SB Diamond's counsel has already engaged with the Trustee's counsel
in that regard and remains ready, willing, and able to continue doing so in good faith.
The discussions are ongoing and SB Diamond's counsel has offered suggestions, by
way of an alternative to the Debtor's Proposed Essex Settlement, that would allow
the parties to effectively jointly pursue Essex to hold it fully accountable for the full
value of the SB Precious Stones to the mutual benefit of both SB Diamond and the
Debtor (and its stakeholders). However, once the Debtor's claims against Essex are
compromised at a steep discount, the ability and opportunity to pursue those
alternatives will be forever lost.

42.     The Trustee's pursuit of the Proposed Essex Settlement impairs, if not
destroys, the possibility that the parties can reach a fair and equitable resolution for
an additional reason as well.

43.     The issue of what rights (if any) the Debtor has with respect to the three
SB Precious Stones—whether in a settlement or in any successful prosecution of the
Adversary Proceeding—is at the heart of the dispute that the Court has directed the
parties to try to resolve in good faith. The Debtor and Trustee contend that the SB
Stones are property of the Debtor's estate and claim the right to recover those gems

(or some value attributable to them) from the Defendants and use that value to fund distributions to the Debtor's creditors.  The Debtor further contends that SB Diamond is merely an unsecured creditor holding a prepetition breach of contract claim, and that any recovery from the Debtor on account of the SB Precious Stones must be processed through the Debtor's bankruptcy and repaid in "bankruptcy dollars."

44.    The Trustee's position is simply wrong, not grounded in the law, and rejected and contradicted by the cases previously cited. For the reasons stated above, the Trustee does not have authority or rights with respect to property consigned to it by SB Diamond. It is simply incorrect that SB Diamond's recovery on account of its own property duly consigned to the Debtor "flows through the estate" as an unsecured claim. To the contrary, the SB Precious Stones are not and never can be property of the Debtor's estate as Judge Gerber's opinion in *Fine Diamonds* and numerous other decisions make clear.

45.    As title holder and consignor, control over any sale or disposition of the SB Precious Stones rightfully belongs to SB Diamond. It is for SB diamond, not the Debtor or its Trustee, to decide whether to "settle" with Essex, or anyone else, with respect to the SB Precious Stones and, if so, for how much.  When and if SB Diamond ever obtains a recovery on account of the SB Precious Stones from Essex (by settlement, judgment or otherwise), SB Diamond will (of course) be required to remit to the Debtor's estate the pro rata portion of such proceeds, less the pro rata costs associated with collection, attributable to the Debtor's economic interest in those gems.  But the Debtor, as consignee, cannot force SB as consignor to accept a steeply

discounted settlement that the consignee desires to implement over the objection of the consignor. The consignment memoranda do not give the Debtor or its Trustee any such rights or powers.

46.     If the Court were to approve the Settlement, the dispute between the parties as to who "controls" the SB Precious Stones' destination, and who receives the proceeds from whatever disposition of those stones may eventuate, will have been "called in favor" of the Debtor forever and for all time. There will be nothing left for the parties to "discuss" or "resolve." SB Diamond's rights with respect to the SB Precious Stones that all parties admit and concede were consigned by SB Diamond to the Debtor will nevertheless have forever been extinguished in a manner prejudicial to SB Diamonds.

47.     The Trustee's counsel has claimed that SB Diamond cannot object to the Proposed Essex Settlement because, according to the Trustee, Defendants are paying for, and the estate is receiving, settlement proceeds "only for the Debtor's percentage interest" in the SB Precious Stones.  This argument is meritless for the simple reason – previously stated – that the consignment memoranda simply do not give the Debtor the right to dispose of the portion of the Debtor's economic interest in the SB Precious Stones.

48.     Furthermore, the Trustee (as mere consignee) does not have the right to strike a partial settlement with a third party to whom it never should have provided SB Diamond's consigned property in the first place and, thereby, force the consignor to try to figure out what rights it has against the downstream recipient, and what

effect the Debtor's partial settlement has on those rights, while the party that SB Diamond actually has privity with and who actually converted SB Diamond's property (the Debtor) washes its hands of all further responsibility.

49.     For all of the foregoing reasons, SB Diamond respectfully submits that the Debtor does not have the authority to enter into any settlement, on any terms, with Essex related to the SB Precious Stones and, for that reason, approval for the Proposed Essex Settlement must be withheld no matter how lenient the standards may be under Bankruptcy Rule 9019.

## Reservation Of Rights

50.     Solely to the extent the Court decides (notwithstanding SB Diamond's objection) to approve the Proposed Essex Settlement, and without in any way waiving SB Diamond's arguments that the Motion should be denied, SB Diamond respectfully argues that at, at the very least, any order approving and authorizing the Proposed Essex Settlement must include the following language to fully protect SB Diamond's rights, as consignee, with respect to the SB Precious Stones in future litigation with the Defendants:

- Itemize, for each SB Precious Stone, the amount of the settlement consideration that is allocable to each SB Precious Stone so that SB Diamond's rights and ability to obtain recovery for the remaining full value of each SB Precious Stone is preserved and quantified;

- Each of the settling parties (including Essex and Mr. Paul individually) must acknowledge that, with respect to the SB Precious

Stones, the settlement pertains solely to the Debtor's alleged economic interests in the SB Precious Stone and is without prejudice to all remaining (non-Debtor) economic interests in each SB Precious Stone;

- The Debtor's economic rights in the SB Precious Stones (*i.e.*, 1/3 economic interest in the Kashmir Diamond, 50% economic interest in the Diamond, and 50% profit participation interest in the Ruby) are extinguished by operation of the Proposed Essex Settlement, the consideration provided by Essex to the Debtor and accepted by the debtor for such interests in the Proposed Essex Settlement is full and complete satisfaction of any and all rights that Debtor has in such SB Precious Stones, and the Debtor waives any and all further claims as against SB Diamond or anyone else with respect to each of the SB Precious Stones in the event SB Diamond succeeds in recovering additional value from any other party attributable to any of the SB Precious Stones; and

- Essex and Paul each acknowledge and agree that the Court's approval of the Proposed Essex Settlement with the Debtor does not constitute, and will not be cited or used by either Essex or Paul as a claimed basis for a release, waiver, setoff, liability reduction or any other kind of bar of any and all rights or claims that SB Diamond has against Essex or Paul to recover the full value of the SB Precious Stones.

## **CONCLUSION**

51.     For all of the foregoing reasons, SB Diamond respectfully submits that the Debtor lacks the authority to enter into the Proposed Essex Settlement insofar as it involves the SB Precious Stones and the Court should therefore deny the Motion, withhold approval of the Proposed Essex Settlement, and grant such other and further relief as the Court deems just and proper.[7]

Dated: New York, New York
        April 27, 2021

MORRISON COHEN LLP


By:    */s/ Terence K. McLaughlin*
       Joseph T. Moldovan
       Terence K. McLaughlin
       Christopher Milito
       909 Third Avenue
       New York, New York 10022
       (212) 735-8600
       jmoldovan@morrisoncohen.com
       tmclaughlin@morrisoncohen.com
       cmilito@morrisoncohen.com

       *Attorneys for S.B. Diamond Corp.*

---

[7]    For the avoidance of doubt, SB Diamond has no objection to the Proposed Essex Settlement to the extent it involves precious stones other than the three SB Precious Stones. If the SB Precious Stones were to be expressly carved out of the Proposed Essex Settlement altogether, SB Diamond would have no remaining objection to the Proposed Essex Settlement.